Glenn Katon
Farhana Khera
**MUSLIM ADVOCATES**
315 Montgomery Street, 8th Floor
San Francisco, CA 94104

Ravinder S. Bhalla
**LAW OFFICES OF BHALLA & CHO, LLC**
333 Washington Street, Suite 203
Jersey City, New Jersey 07302

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| SYED FARHAJ HASSAN; THE COUNCIL OF IMAMS IN NEW JERSEY; MUSLIM STUDENTS ASSOCIATION OF THE U.S. AND CANADA, INC.; ALL BODY SHOP INSIDE & OUTSIDE; UNITY BEEF SAUSAGE COMPANY; MUSLIM FOUNDATION INC.; MOIZ MOHAMMED; and JANE DOE,<br><br>          Plaintiffs,<br><br>     v.<br><br>THE CITY OF NEW YORK,<br><br>          Defendant. | *Document Electronically Filed*<br><br>**Civil Action No. _____**<br><br>**Jury Trial Demanded** |

## <u>COMPLAINT</u>

**PRELIMINARY STATEMENT**

1.      This is a civil rights action based upon the United States Constitution and 42 U.S.C. § 1983, to remedy the illegal targeting of New Jersey Muslims for surveillance based solely upon their religion by the New York City Police Department ("NYPD" or "Department"). Plaintiffs seek an injunction prohibiting the NYPD from targeting them for unconstitutional surveillance, expungement of all records made pursuant to past unlawful spying, a declaratory judgment, and nominal damages.

2.      In early 2002, the NYPD began a secret spying program ("Program") to infiltrate and monitor Muslim life in and around New York City.  The Department has focused, in particular, upon New Jersey Muslims, conducting surveillance of at least twenty mosques, fourteen restaurants, eleven retail stores, two grade schools and two Muslim Student Associations, in addition to untold numbers of individuals who own, operate, and visit those establishments.  The Department has also created over twenty precinct-level maps of the City of Newark, noting the location of mosques and Muslim businesses and the ethnic composition of the Muslim community.

3.      As part of the Program, the NYPD takes photographs and videos and collects license plate numbers at mosques.  It also utilizes undercover officers and informants to infiltrate and surveil Muslim communities, including mosques, Muslim Student Associations, and

Muslim-owned businesses. Upon information and belief, the NYPD Program has not undertaken similar surveillance with respect to non-Muslim communities.

4. The NYPD has created a series of reports documenting in detail the information obtained from its surveillance of New Jersey Muslim communities through its surveillance Program, including a report focusing on the Muslim community in Newark ("Newark report"). Plaintiffs include mosques, Muslim Student Associations, and Muslim-owned businesses that were identified in these reports, as well as associations whose members were identified in these reports. Plaintiffs also include individual members of New Jersey mosques and Muslim Student Associations that were identified in the NYPD reports as subjects of the surveillance Program.

5. The NYPD Program is founded upon a false and constitutionally impermissible premise: that Muslim religious identity is a legitimate criterion for selection of law-enforcement surveillance targets, or that it is a permissible proxy for criminality, and that the Muslim community can therefore be subject to pervasive surveillance not visited upon any other religious group or the public at large.

6. Through the Program, the NYPD impermissibly discriminates on the basis of religion and singles out Plaintiffs' religion for disfavor and unequal treatment by police. By targeting Muslim organizations and individuals in New Jersey for investigation solely because they are Muslims or believed to be Muslim, the Program casts an unwarranted shadow of suspicion and stigma on Plaintiffs and, indeed, all New Jersey Muslims. Each Plaintiff has

suffered from the stigmatization that results from being singled out for surveillance on the basis of their religious beliefs.

7.       Plaintiffs bring this lawsuit in order to affirm the principle that individuals may not be singled out for intrusive investigation and pervasive surveillance simply because they profess a certain faith.

## JURISDICTION AND VENUE

8.       The Court possesses jurisdiction to hear this matter pursuant to 28 U.S.C. § 1331 because it alleges violation of the United States Constitution and 42 U.S.C. § 1983, and therefore raises questions of federal law.  Jurisdiction is also based upon 28 U.S.C. § 1343 because relief is sought for the deprivation of Plaintiffs' constitutional rights under color of State law.

9.       Venue is proper in the District of New Jersey under 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to the claims herein occurred in this District.

## PARTIES

### Plaintiffs

10.       **Syed Farhaj Hassan** is a New Jersey resident and a Soldier in a Civil Affairs Brigade who has served in the United States Army Reserves since September 2001.  He is thirty-five years old and a U.S. Citizen.  Hassan has served in Iraq (fourteen months of active duty and deployment to Iraq), during which time he worked in military intelligence, and has received numerous honors for his service, including the Army Service Ribbon, Global War on Terrorism

Expeditionary Ribbon, National Defense Ribbon, Iraq Campaign Medal, Good Conduct Medal, three Army Commendation Medals, Army Achievement Medal, and Combat Action Badge.  His address is 2403 Candlelight Court, Helmetta, NJ 08828.

11.     Hassan is an observant Shi'a Muslim who attends mosque regularly.  He has attended the Astaana-e-Zehra mosque most Fridays for the last two years and has been a congregant for 16 years.  He also worships and attends events at the Masjid-e-Ali mosque approximately ten times per year, the Mehfile Shahe Khorasan mosque approximately four times per year, and the Imam-e-Zamana Foundation of North America mosque approximately twice per year.  Each of these mosques is located in New Jersey and was identified in the NYPD reports as a subject of the NYPD surveillance Program.

12.     Hassan has been unfairly targeted and stigmatized by the NYPD's surveillance of his mosques as part of a program targeting Muslim organizations.  He has decreased his mosque attendance significantly since learning that the mosques he attends have been under surveillance by the NYPD because he has a reasonable and well-founded fear that that his security clearance would be jeopardized by being closely affiliated with mosques under surveillance by law enforcement.  Any blemish in his background check jeopardizes his security clearance and thus his career.  Hassan is also concerned that his fellow soldiers, including his superiors, will have diminished trust in him and treat him differently – thereby harming his career prospects – if they learn he is a regular congregant at mosques under NYPD surveillance.  He believes, reasonably, that if he decreases his attendance, he is less likely to be seen and/or recorded at the mosques.

13.     **The Council of Imams in New Jersey** ("Council" or "CINJ") is a non-profit corporation organized under the law of New Jersey and based in the Newark area.  Its address is 62-70 Howard Street, Irvington, NJ 07111.   Among other things, the Council is formed to conduct Shuraa Baynahum (Mutual Consultation) for the purpose of establishing a whole and balanced society and facilitating the current and future circumstances that shape the continuous improvement of the Muslim Community.  The Council is a membership organization comprising a dozen New Jersey mosques, at least two of which, Masjid al-Haqq and Masjid Ali K. Muslim, were surveilled as part of the NYPD's Program in New Jersey.  Photographs and descriptions of both of these mosques are included in the Department's Newark report.

14.     Masjid al-Haqq and Masjid Ali K. Muslim have been a part of the Newark community for thirty and over forty years, respectively.   Leaders and congregants in both mosques have been unfairly targeted and stigmatized by the NYPD's surveillance of their mosques as part of a program targeting Muslim organizations.  Both mosques have also seen a decline in attendance and contributions as a result of the Department's surveillance, which has directly harmed their ability to fulfill their religious missions.

15.     **Muslim Students Association of the U.S. & Canada, Inc.** ("MSA National") is a non-profit corporation organized under the law of Indiana, based at 6555 South 750 East, Plainfield, IN 46168.  MSA National serves Muslim students during their college and university careers by facilitating their efforts to establish, maintain and develop local MSA chapters.  It strives to facilitate networking, educating and empowering the students of today to be citizens of

tomorrow's community.  To achieve its objectives, MSA National develops tools and resources to facilitate information sharing and to unite students across North America.

16.     Two of MSA National's members, the Muslim Student Associations for the Rutgers University campuses at Newark and New Brunswick, were subject to surveillance in New Jersey through the NYPD Program.  These MSAs were singled out for surveillance by the NYPD simply because their membership is made up of Muslim students.  Student organizations affiliated with other religious denominations were not subject to similar surveillance. Surveillance of the MSAs casts an unwarranted cloud of suspicion upon these MSAs and their membership, unjustly stigmatizing them, and diminishing their ability to fulfill their spiritual and practical missions.  As affinity student groups, MSAs subject to surveillance of their activities and discussions are diminished in their ability to establish viable student organizations that students will feel secure joining and participating in, and that will embark upon integral partnerships with campus administrators and other organizations and fulfill the spiritual needs of their members in a confidential manner.

17.     **All Body Shop Inside & Outside** is a New Jersey corporation that owns and operates a retail store and cafe in downtown Newark (20 Branford Place, Newark, NJ 07102). The store was founded in 1998.  Its owners, Gary Abdul Karim Abdullah and Hamidah Z. Abdullah, are Muslims who have lived and worked in the Newark community for their entire lives.  All Body Shop Inside & Outside was identified in an NYPD report as "Hamidah's Body Shop" and was subject to surveillance as part of the NYPD Program.

7

18.     The owners of All Body Shop Inside & Outside have been unfairly targeted and stigmatized by the NYPD's surveillance of their business as part of a program targeting Muslim organizations.  The NYPD's Program has also harmed their business by scaring away customers.  A photograph and description of their store is included in the NYPD's Newark report, which has been widely publicized.  Since people learned that All Body Shop Inside & Outside was under NYPD surveillance, the number of customers visiting the store has decreased and some customers have told the owners by telephone that they did not feel comfortable visiting the location because of the threat of NYPD surveillance.

19.     **Unity Beef Sausage Company** ("Unity") is a New Jersey corporation that owns and operates Unity Brand Halal Products, Inc., a halal meat store in downtown Newark (94 Orange Street, Newark, New Jersey 07102).  It has a store for retail and wholesale and a building for manufacturing.  Founded in 1968, Unity is owned by Akbar Salaam, who is Muslim.  Unity was surveilled as part of the NYPD Program in New Jersey, and a photograph and description of the Unity store appears in the NYPD's Newark report, which has been widely publicized.

20.     Unity's owner, his employees, and his customers have been unfairly targeted and stigmatized by the surveillance of Unity as part of a program targeting Muslim organizations.  The NYPD surveillance has also hurt business at the Unity halal meat store.  Many regular customers have not been coming to the store since the NYPD's Newark report was made public.  For example, the store typically experiences a rush of business after Friday prayer services, when many Muslims do food shopping and run errands.  That rush slowed considerably immediately

after the Newark report became public.  Some customers have called to ask the owner about the NYPD's surveillance and told him they are no longer comfortable visiting the store.  The store's owner now fears conducting his legitimate business; he is concerned that anyone who comes in or looks at him from across the street might be an NYPD spy.

21.    **Muslim Foundation Inc.** ("MFI") is a New Jersey non-profit corporation that owns and operates the Masjid-e-Ali mosque, located at 47 Cedar Grove Lane, Somerset, NJ, 08873.  MFI's congregation comprises approximately 250 families.  The Masjid-e-Ali mosque was surveilled as part of the NYPD's Program in New Jersey, and was identified in an NYPD report as a subject of surveillance.

22.    Leaders and congregants in MFI have been unfairly targeted and stigmatized by the NYPD's surveillance of their mosque as part of a program targeting Shi'a Muslim organizations.  The NYPD's surveillance of the mosque, and its inclusion in NYPD reports casts an unwarranted cloud of suspicion upon the mosque and its membership.  MFI has also changed its religious services and programming as a direct result of the NYPD surveillance.  Prior to learning that it had been surveilled by the NYPD, the mosque hosted a variety of visiting Islamic scholars and religious authorities to provide guidance to the congregation on how to conduct their daily lives in accordance with religious laws.  These discussions are integral to MFI's religious mission, which includes promoting the lives of its congregants in accordance with divine laws, fellowship, and religious discourse.  After learning that it had been targeted for surveillance, MFI decided not to invite otherwise amenable religious authorities who might

nevertheless be perceived to be controversial because of their previous spiritual or religious training in Iran, views on or history of vocalizing religious edicts aligned with certain prominent centers of learning in Shi'a Islam, or their opinions on the proper role of the Islamic faith and scholarship in the daily lives of adherent Muslims; MFI's leaders feared that the views of such religious authorities and guides would be attributed to the mosque's membership.  As a result, MFI's ability to fulfill its religious mission has been harmed.

23.    **Moiz Mohammed** is a New Jersey resident (22 Woodbridge Street, New Brunswick, NJ 08901) currently enrolled as a full-time student at Rutgers New Brunswick, where he is pursuing a degree in Molecular Biology and Biochemistry.   He is a sophomore and has been active in the Muslim Students Association (MSA) since his freshman year.   The Rutgers New Brunswick MSA was surveilled as part of the NYPD's Program in New Jersey, and was identified in an NYPD report as a subject of surveillance.

24.    Mohammed has been unfairly targeted, and stigmatized by the NYPD's surveillance of his MSA as part of a program targeting Muslim organizations.  The NYPD's surveillance of his MSA unfairly targets him and other Muslim students.   Members of other religious groups are not subjected to such surveillance and monitoring.  The stigma now attached to being a Muslim member of the MSA leads Mohammed to avoid discussing his faith or his MSA participation in public and to avoid praying in places where non-Muslims might see him doing so.  The NYPD's unwarranted surveillance has contributed to a stigma upon Mohammed

that students of other faiths do not suffer because their religious student groups have not been targeted.

25.   **Jane Doe** is a New Jersey resident currently enrolled as a full-time student at Rutgers New Brunswick in her junior year and is active in the Muslim Students Association. She will be moving the Court for leave to proceed under pseudonym after counsel for Plaintiffs confers with counsel for Defendant.

26.   Doe suffers the same stigma as Mohammed as a result of the NYPD's surveillance of the activities of Muslims on campus.  She experiences this stigma in a variety of ways.  For instance, she no longer discusses religious topics at MSA meetings, such as the differences between Sunni and Shi'a Islam, because of a reasonable fear that such discussions would be misunderstood and taken out of context by those suspicious of her religion.  She also has a reasonable fear that her discussions with other students and other participation in MSA activities may be observed by NYPD and taken out of context, resulting in unwarranted scrutiny premised solely on her Muslim faith and participation in religious discourse.

<u>Defendant</u>

27.   **The City of New York** is a municipal corporation duly incorporated and existing pursuant to the laws of the State of New York and having its principal offices at City Hall, New York, NY 10007.  The City of New York has established and maintains the NYPD as a constituent department or agency.  The NYPD acts as the City of New York's agent in the area of law enforcement.  The NYPD's operations include the activities described herein.

**STATEMENT OF FACTS**

The NYPD Program Intentionally Targets Muslims for Surveillance on the Basis of Religion

28.     In January 2002, the NYPD created a secret spying program to analyze and surveil the Muslim community in New York City and nearby regions, including Muslim religious institutions, schools, businesses, associations, and congregations.   The Department created the Program following the September 11, 2001, attacks based on the mistaken and unconstitutional premise that Muslim religious identity is a legitimate criterion for selection of law-enforcement surveillance targets, or that it is a permissible proxy for criminality, and that Muslims can therefore be subject to pervasive surveillance not visited upon any other religious group or the public at large, simply because of their religion. This Program reflects a policy, custom, usage and/or practice of the NYPD to target the Muslim community for surveillance solely on the basis of religion.

29.     As part of this Program, the NYPD specifically and purposefully targets mosques, Muslim-owned businesses, Muslim Student Associations, and Muslim schools for surveillance based only upon the religious beliefs of their owners or members.   The NYPD Program intentionally targets only the Muslim faith and does not undertake similar surveillance with respect to any other religious group.

30.     The Department has focused, in particular, upon New Jersey Muslims as part of its Program. The Department has conducted surveillance of at least twenty mosques, fourteen restaurants, eleven retail stores, two grade schools and two Muslim Student Associations in New

Jersey, in addition to an untold number of individuals who own, operate, and visit those establishments.  The Department has also created over twenty precinct-level maps of the City of Newark, noting the location of mosques and Muslim businesses and the ethnic composition of the Muslim community.  As part of the Program, it has also created a series of reports documenting in detail the information obtained from its surveillance of New Jersey Muslim communities.

31.    The Program uses a variety of methods to spy on Muslims, such as taking video and photographs at mosques, Muslim-owned businesses, and schools, sending undercover officers to those locations to engage in pretextual conversation to elicit information from proprietors and patrons, planting informants in mosques, and monitoring websites, listserves, and chat rooms.  The Department does not conduct similar surveillance of houses of worship, businesses, and schools associated with other religions.

32.    In addition to targeting Muslims by focusing on mosques, Muslim-owned businesses, and other Muslim-associated organizations as subjects of surveillance, the Program also intentionally targets Muslims by using ethnicity as a proxy for faith.

33.    As part of the Program, the Department has designated twenty-eight countries and "American Black Muslim" as "ancestries of interest."   The twenty-eight countries are: Afghanistan, Albania, Algeria, Bahrain, Bangladesh, Chechnya, Egypt, Guyana, India, Indonesia, Iran, Iraq, Jordan, Lebanon, Libya, Morocco, Pakistan, Palestine, Saudi Arabia, Somalia, Sudan, Syria, Tunisia, Turkey, U.A.E., Uzbekistan, Yemen, and Yugoslavia.  Those

twenty-eight countries constitute about 80% of the world's Muslim population.  All but five of the countries on the list are more than three-fourths Muslim.  Of these five, all but two countries are majority Muslim and one of the remaining two countries is India, which alone is home to 11% of the world's Muslims.

34.     However, the Department does not surveil all people and establishments with "ancestries of interest," but expressly chooses to exclude people and establishments with such "ancestries" if they are not Muslim.  Thus, for example, the NYPD does not surveil Egyptians if they are Coptic Christians, Syrians if they are Jewish, or Albanians if they are Catholic or Orthodox Christian.

35.     The NYPD's report analyzing Newark observes: "There appears to be a sizable and growing non-immigrant, African-American Muslim population."   No analysis of non-Muslim African-Americans appears in the Newark report.

36.     The NYPD's surveillance is not limited to those Muslims with "ancestries of interest."  In its surveillance of Newark, the Department has observed that the largest immigrant communities in that city are from Portugal and Brazil, countries not found on its list of twenty-eight "ancestries."  Nevertheless, the Department's Newark report examines these communities for the presence of Muslims: "No Muslim component within these [Portuguese and Brazilian] communities was identified, with the exception of one identified location being owned and operated by a Brazilian Muslim of Palestinian descent."   No non-Muslim individuals or

establishments from Newark's Portuguese or Brazilian immigrant communities are identified in the NYPD's Newark report.  The surveillance and analysis are concerned only with Muslims.

NYPD's Surveillance Activities Against Muslims

37.     The NYPD Program utilizes numerous forms of surveillance in its monitoring of Muslim communities, including its surveillance of Muslim communities in New Jersey.  The NYPD Program does not undertake similar surveillance of non-Muslim communities.

38.     As part of the Program, NYPD officers snap pictures, take video, and collect license plate numbers of congregants as they arrive at mosques to pray, making records of those in attendance.  They also mount surveillance cameras on light poles and aim them at mosques.  Officers can control the cameras with their computers and use the footage to help identify worshippers.   The NYPD has not conducted similar surveillance at non-Muslim houses of worship.

39.     The Department also utilizes informants and undercover officers, who report, among other things, which businesses are owned or frequented by Muslims, which stores sell halal meat, the subject of conversations heard at mosques, and where religious schools are located.  For example:

> a.   The NYPD uses undercover officers called "rakers" to monitor daily life in neighborhoods believed to be heavily Muslim.  Rakers surveil places like bookstores, bars, cafes, and nightclubs.  They do so not based upon evidence of wrongdoing, but

because the Department believes it should monitor Muslim communities more than other communities.

b.  The NYPD also has informants called "mosque crawlers" who monitor sermons and conversations in mosques and report back to the NYPD.  Mosque crawlers are used at particular mosques as part of a broader plan for blanket surveillance of Muslim communities.  The Department has sought to have an informant inside every mosque within a 250-mile radius of New York City and has, in fact, prepared an analytical report on every mosque within 100 miles, including Plaintiff MFI and at least two of the members of CINJ.  Upon information and belief, the NYPD's mosque crawlers have monitored thousands of prayer services in mosques, collecting detailed information about worshippers simply because they are Muslim, without evidence they engaged in any wrongdoing.

c.  Rakers and mosque crawlers have monitored discussions in mosques about the controversy surrounding the publication of a Danish artist's cartoons of the Prophet Muhammad, the results of which were included in a February 2006 report.  That report documents twenty-three conversations at twenty mosques.  None of the information collected showed any indication of criminal activity.  The NYPD prepared a similar report after an accidental plane crash in Manhattan in October 2006.  Upon information and belief, the Department prepares many such reports targeting Muslims, none of which even allegedly involve any wrongdoing.

16

d.   Using mosque crawlers, rakers, and other officers and agents, the NYPD has documented painstaking details of Muslim life, including in New Jersey.   For example, Department surveillance reports note the fact that flyers are posted in shops advertising for Quran tutoring; a picture of a mosque hangs in a grocery store; a restaurant serves "religious Muslims;" customers visit a Dunkin' Donuts after Friday prayer; a restaurant is located near a particular mosque; employees or customers of establishments are observed wearing "traditional clothing;" Muslim prayer mats are hanging on the wall at an Indian restaurant; and a store posts a sign that it will be closed on Friday in observance of Friday prayer.

40.   The NYPD Program has not utilized informants and undercover agents to undertake similar surveillance of non-Muslim communities.

41.   The NYPD also closely monitors the activities of Muslim Student Associations at colleges and universities in New York, New Jersey, Connecticut, and Pennsylvania.  It places informants or undercover officers in many MSAs, without any indication whatsoever of criminal activity or any connection whatsoever to wrongdoing.

42.   NYPD officers monitor the web sites of Muslim student organizations, troll chat rooms, and talk to students online.  Undercover NYPD officers sometimes pose as students to attend MSA events.  One officer went on a rafting trip with an MSA and recorded how often students prayed and that they discussed religious topics.

43.     On a weekly basis, the Department also prepares an MSA Report on schools, including reports on Rutgers New Brunswick and Rutgers Newark.  Its reports include the names of professors, scholars, and students without any indication that they engaged in wrongdoing.

44.     The Department does not conduct similar blanket surveillance of the activities of Christian, Jewish, or other religious student groups.

45.     To facilitate its surveillance of entire Muslim communities, the NYPD also creates maps indicating the location of mosques, restaurants, retail establishments, and schools owned by or serving Muslims, as well as ethnic populations from heavily Muslim countries.  The Department has over twenty such maps of Newark, New Jersey.

46.     The NYPD has not compiled similar maps of non-Muslim communities.

47.     The NYPD also inspects records of name changes and compiles databases of new Muslim converts who take Arabic names, as well as Muslims who take names that are perceived to be "Western."  The Department does not compile similar information for other kinds of name changes.

48.     The NYPD's surveillance of the Muslim community in New Jersey, including its surveillance of Plaintiffs, is extensive and sustained.  For example, undercover NYPD officers participating in the Program operated a base of operations in an off-campus apartment near Rutgers New Brunswick.   On information and belief, the NYPD Program in New Jersey, including its surveillance of Plaintiffs, is ongoing.

<u>The NYPD Program Harms the Plaintiffs and the Muslim Community as a Whole</u>

49.     The NYPD's blanket surveillance of Muslims casts guilt on all people of that faith by suggesting that Muslims pose a special threat to public safety.  As targets of the NYPD's discriminatory Program, the Plaintiffs and other New Jersey Muslims have, as a result, been gravely stigmatized and will continue to suffer, significant stigma.

50.     The Department's Newark report analyzes more than forty "Locations of Concern," which include mosques, restaurants, retail establishments, and a school for grades one through four recognized by the New Jersey Department of Education.  The report defines "Location of Concern" as, among other things, a "location that individuals may find co-conspirators for illegal actions" and a "location that has demonstrated a significant pattern of illegal activities."  But these establishments, which include Plaintiffs Unity halal meat store, All Body Shop Inside & Outside, and two of the mosques represented by the Council of Imams in New Jersey, were surveilled and documented in the report only because they are Muslim-owned or -affiliated, not because there has been any demonstrated pattern of illegal activities or for any other legitimate reason.  Nonetheless, the Department's use of such a description for mosques, businesses, and schools casts a dark shadow of suspicion on congregations, customers, lenders, children and parents – indeed, the community as a whole – gravely stigmatizing and otherwise having a significant deleterious impact upon them.

51.     The NYPD causes similar damage in its report on the threat to New York City of a potential U.S. - Iran conflict.  Among the "key findings" and "recommended actions," included

19

in the report are to "[e]xpand and focus intelligence collections at Shi'a mosques."  While the report observes that "the majority of Iranian nationals residing in the US are either Zoroastrian, Jewish, or Christian," the report only targets Muslim institutions, without any justification. Moreover, the report's focus on Shi'a Muslim mosques sweeps up vast numbers of individuals with no connection to Iran or to any threat arising from a potential conflict between the United States and Iran.  Indeed, the report observes that the Shi'a Muslim community includes many individuals of Iraqi, Lebanese and Pakistani descent.  Yet the report targets the Shi'a Muslim community as an undifferentiated whole.  The report therefore unmistakably targets Muslim institutions simply because they are Muslim and unconstitutionally deploys religious affiliation as a criterion for selection of law-enforcement surveillance targets, or as a proxy for criminality.

52.     The U.S – Iran report describes organizations believed to pose serious threats to New York City, such as Hezbollah and Hamas, supporters of those organizations and their locations, followed by a list of "Other Shi'a Locations in the vicinity of NYC."  This list of twelve Shi'a Muslim locations includes six in New Jersey, including Plaintiff MFI and its Masjid-e-Ali mosque, as well as three additional mosques attended by Plaintiff Hassan (Astaana-e-Zehra, Mehfile Shahe Khorasan, and Imam-e-Zamana Foundation of North America).  The clear implication of the report is that Shi'a mosques pose a threat to public safety unlike other establishments and places of worship.  But under the NYPD's Program the only reason that these mosques, including Plaintiffs, were included in the report is that they are affiliated with Shi'a Islam, not because of any wrongdoing or any other legitimate reason.

53.     The harm the NYPD inflicts on Plaintiffs and Muslim communities results not just from the surveillance, and from the stigma of being targets of discrimination, but from the public statements New York City officials make in support of the surveillance.  These statements have acknowledged the existence of the NYPD program, describing it as focused on "threats" and as an attempt to document the "likely whereabouts of terrorists."

54.     Because the NYPD Program did not limit itself to threats or terrorists but rather targeted the Muslim community as a whole, such statements suggest that all Muslim establishments are "threats" or likely to harbor terrorists, thereby engendering suspicion and distrust of Muslims and Muslim establishments, including Plaintiffs, affecting people's livelihoods, and damaging the fabric of Muslim communities and the broader society within which Muslims live.

55.     New York City officials have made clear that they believe the NYPD's targeting of Muslims for surveillance on the basis of their religion is appropriate and will continue. Discussing the surveillance, Mayor Bloomberg has stated publicly, "We're doing the right thing. We will continue to do the right thing."  Commissioner Kelly has said, "We're going to continue to do what we have to do to protect the city."  Under our Constitution, however, what the NYPD may not do is to continue to target Muslims for investigation and pervasive surveillance simply because they are Muslims.

## CLAIMS FOR RELIEF

<u>FIRST CAUSE OF ACTION</u>
VIOLATIONS OF THE FOURTEENTH AMENDMENT TO THE U.S. CONSTITUTION

56.     Plaintiffs repeat and reallege the foregoing paragraphs as if the same were fully set forth at length herein.

57.     The Defendant's Program impermissibly and intentionally discriminates against Plaintiffs because of their religion.  As a direct and proximate result of the acts of the Defendant and its agents, the Plaintiffs have therefore been deprived of their rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

<u>SECOND CAUSE OF ACTION</u>
VIOLATIONS OF THE FIRST AMENDMENT TO THE U.S. CONSTITUTION

58.     Plaintiffs repeat and reallege the foregoing paragraphs as if the same were fully set forth at length herein.

59.     The Defendant's Program is neither neutral with respect to religion, nor of general applicability.  The Program instead singles out Plaintiffs' religion for disfavor and intentionally denigrates Islam.  As a direct and proximate result of the acts of the Defendant and its agents, the Plaintiffs have therefore been deprived of their rights under the Free Exercise Clause and the Establishment Clause of the First Amendment to the United States Constitution and 42 U.S.C. § 1983.

THIRD CAUSE OF ACTION
EXPUNGEMENT ACTION AT COMMON LAW

60.     Plaintiffs repeat and reallege the foregoing paragraphs as if the same were fully set forth at length herein.

61.     Government entities may not maintain records where the harm to the Plaintiffs caused by the existence of records outweighs the utility of their continued maintenance, especially where the information contained in the records was compiled by unlawful methods.

62.     Defendants' have compiled records identifying mosques represented by Plaintiffs CINJ and MFI, the Rutgers Newark and Rutgers New Brunswick MSA chapters, represented by Plaintiff MSA National, Plaintiff Unity Beef Sausage Company, and Plaintiff All Body Shop Inside & Outside as targets of surveillance and investigation.  Upon information and belief, the NYPD also maintains records identifying Plaintiffs Hassan, Mohammed and Doe as targets of surveillance or investigation.   These records are likely to command attention from law enforcement officials, other agencies of government, and the public at large, to the detriment of the Plaintiffs.

63.     Maintenance of these records, which are the fruits of the Defendant's unconstitutional actions and which falsely identify the Plaintiffs as linked to the threat of terrorism, creates harms that significantly outweigh their utility, if any.

**PRAYER FOR RELIEF**

WHEREFORE the Plaintiffs respectfully request that the Court:

(a) Declare that the Defendant's actions violate the Plaintiffs' rights under the First and Fourteenth Amendments of the United States Constitution;

(b) Enjoin further violations of the Plaintiffs' constitutional rights, including but not limited to an injunction that requires the Defendant to refrain from targeting Plaintiffs for surveillance on the basis of religion;

(c) Order the expungement of all records of Plaintiffs made pursuant to past unlawful spying;

(d) Award Nominal Damages for the harms suffered by Plaintiffs;

(e) Award attorney's fees and costs associated with this action; and

(f) Award any further relief as is just and proper and any other relief as allowed by law.

Respectfully submitted,

Glenn M. Katon
(motion to appear *pro hac vice* forthcoming)
Farhana Khera
(motion to appear *pro hac vice* forthcoming)
MUSLIM ADVOCATES
315 Montgomery Street, 8th Floor
San Francisco, CA 94104
(415) 692-1484 (tel)
(415) 765-1774 (fax)
glenn@muslimadvocates.org

/s/ Ravinder S. Bhalla
Ravinder S. Bhalla
LAW OFFICES OF BHALLA & CHO, LLC
333 Washington Street, Suite 203
Jersey City, New Jersey 07302
(201) 610-9010
(201) 610-9030
rbhalla@rsblawfirm.com

*Attorneys for Plaintiffs*

Dated: June 6, 2012