

May 30, 2013

Hon. William J. Martini
Unites States District Judge
Martin Luther King, Jr. Federal Building & U.S. Courthouse
50 Walnut Street
Newark, NJ 07101

   Re: *Hassan, et al. v. City of New York*
     <u>Docket No. 2:12-cv-03401 (D.N.J.)</u>

Dear Judge Martini:

   Last week, the United States District Court for the District of Arizona issued an important decision that synthesizes well the Supreme Court precedent on the Equal Protection Clause that is particularly relevant to the Motion to Dismiss (Doc. 15) pending before Your Honor in the above-captioned case.  In *Melendres v. Arpaio*, 2013 U.S. Dist. LEXIS 73869 (D. Ariz. May 24, 2013) (copy provided, for the convenience of the Court), the plaintiffs asserted that the Maricopa County Sheriff's Office (MCSO) engaged in police practices that discriminated against Latinos, in violation of the Equal Protection Clause of the Fourteenth Amendment, in addition to other claims.  *Id*. at *8.  The court held that the MCSO violated the Equal Protection Clause and its analysis of that constitutional provision should apply with equal force to the instant case.

   The holding of the *Melendres* court controverts the lynchpin of the defendant City of New York's motion to dismiss for failure to state a claim, which is that Plaintiffs have not alleged sufficiently that "the NYPD's purpose was driven solely based upon their religion" rather than "the more likely explanation . . . that the NYPD's purpose was part of its overall efforts to deter or detect another terrorist attack."  Mem. of Law in Support of Mot. to Dismiss at 7.  The City's argument fails for two important reasons explained in *Melendres*.

   First, the requirement that plaintiffs allege and ultimately prove discriminatory intent only "arises when law enforcement operations that are race-neutral nevertheless produce racially disparate results."  *Melendres*, 2013 U.S. Dist. LEXIS, at *242 (citing *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272 (1979)).  But, when law enforcement's policies and practices "expressly permit[] officers to make racial classifications[1]" and "reveal an institutionalized consideration of race," the policy and practice *is the discrimination* and a separate "showing of discriminatory intent is not necessary."  *See id*. at *238 (citing *Wayte v. U.S.*, 470 U.S. 598, 609 n.10 (1985)).  Thus, when a government policy is based in part on reports that refer to explicit racial characteristics, the policy is "presumed to be racially discriminatory."  *See id*. at *239.  That is the case here, of course, where numerous NYPD reports refer to Plaintiffs' religion.  As a

---

[1] The *Melendres* case involved racial classification whereas the case at bar involves religious classification.  The strict scrutiny that is applied, however, is the same, Br. in Op. to Mot. to Dismiss, at 7 n.2, and the City does not contend otherwise.

666 broadway, 7 fl, new york, ny 10012
t 212 614 6464 f 212 614 6499 www.CCRjustice.org

Honorable William J. Martini
May 30, 13
Page 2

result, the many allegations in Plaintiffs' complaint reflecting NYPD policies and practices expressly targeting Muslims constitute an institutionalized consideration of religion that does not require a separate showing of discriminatory intent.  *See* Br. in Op. to Mot. to Dismiss, at 2-7.

Second, the holding of the *Melendres* court undermines the City's argument that its spying program would be constitutional, as a matter of law, if "done for the purpose of the City's antiterrorism efforts, not for the purpose of discriminating against Muslims based solely on religion."  *See* Def.'s Reply Br., at 6.  The court assumed for the sake of argument that the MCSO's policies and practices were race neutral and held that:

> Although such discrimination must be intentional in a disparate impact case, it need not be based on ill-will.  That is, although the MCSO permits its officers to make overt racial classifications in making law enforcement decisions, it does not necessarily follow that such policies and practices are based on overt antipathy towards Hispanics.  The policies, at least originally, may have been based on a desire to produce the most efficient immigration enforcement.  *Yet, to the extent the MCSO intended and does discriminate based on race, through its policies, the lack of racial antipathy as a motivation makes no difference in the constitutional analysis*.  The Supreme Court has noted that their "cases clearly reject the argument that motives affect the strict scrutiny analysis."  See *Parents Involved in Community Schools v. Seattle School Dist. No. 1*, 551 U.S. 701, 741 (2007) (collecting cases).

*Melendres*, 2013 U.S. Dist. LEXIS at *243-44 (emphasis added and footnote omitted).  Accordingly, even if this Court were to accept at this preliminary stage (*Melendres* was decided after a bench trial) the City's suggestion that its program was "for the purpose" of antiterrorism, Plaintiffs have nonetheless alleged sufficient facts to support their claim that the City wrongfully used religion as basis for law enforcement decisions.  *See id*. at *253 ("MCSO has a constitutional responsibility to refrain from wrongfully using race in law enforcement decisions.").

Based upon the foregoing, and Plaintiffs' Brief in Opposition to Motion to Dismiss, Defendant's motion should be denied in its entirety.  Thank you for your kind consideration of this brief submission.

Respectfully submitted,

Baher Azmy

Enclosure: *Melendres* opinion

cc (via email): Peter Farrell
                Ravinder Bhalla
                Glenn Katon

13555H



**Manuel de Jesus Ortega Melendres, on behalf of himself and all others similarly situated; et al., Plaintiffs, v. Joseph M. Arpaio, in his individual and official capacity as Sheriff of Maricopa County, AZ; et al., Defendants.**

**No. PHX-CV-07-02513-GMS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF ARIZONA**

*2013 U.S. Dist. LEXIS 73869*

**May 24, 2013, Decided**
**May 24, 2013, Filed**

**COUNSEL:** [*1] For Manuel de Jesus Ortega Melendres, on behalf of himself and all others similarly situated, Plaintiff: James Duff Lyall, Kelly Joyce Flood, LEAD ATTORNEYS, Daniel Joseph Pochoda, ACLU - Phoenix, AZ, Phoenix, AZ; Nancy Anne Ramirez, LEAD ATTORNEY, MALDEF - Los Angeles, CA, Los Angeles, CA; Andre Segura, ACLU - New York, NY, New York, NY; Andrew Carl Byrnes, Stanley Young, Covington & Burling LLP, Redwood Shores, CA; Anne Lai, Attorney at Law, New Haven, CT; Cecillia D Wang, ACLU - San Francisco, CA, San Francisco, CA; David Hults, Covington & Burling LLP, San Francisco, CA, San Francisco, CA; Lesli Rawles Gallagher, Covington & Burling LLP, San Diego, CA; Tammy Albarran, Covington & Burling LLP, San Francisco, CA.

For Jessica Quitugua Rodriguez, on behalf of themselves and all others similarly situated, Plaintiff: James Duff Lyall, Kelly Joyce Flood, LEAD ATTORNEYS, Daniel Joseph Pochoda, ACLU - Phoenix, AZ, Phoenix, AZ; Andre Segura, ACLU - New York, NY, New York, NY; Andrew Carl Byrnes, Stanley Young, Covington & Burling LLP, Redwood Shores, CA; Anne Lai, Attorney at Law, New Haven, CT; Cecillia D Wang, ACLU - San Francisco, CA, San Francisco, CA; David Hults, Covington & Burling [*2] LLP - San Francisco, CA, San Francisco, CA; Lesli Rawles Gallagher, Covington & Burling LLP, San Diego, CA; Tammy Albarran, Covington & Burling LLP, San Francisco, CA; Nancy Anne Ramirez, MALDEF - Los Angeles, CA, Los Angeles, CA.

For David Rodriguez, on behalf of themselves and all others similarly situated, Velia Meraz, on behalf of themselves and all others similarly situated, Manuel Nieto, Jr., on behalf of themselves and all others similarly situated, Somos America, Plaintiffs: James Duff Lyall, Kelly Joyce Flood, LEAD ATTORNEYS, Daniel Joseph Pochoda, ACLU - Phoenix, AZ, Phoenix, AZ; Andre Segura, ACLU - New York, NY, New York, NY; Andrew Carl Byrnes, Stanley Young, Covington & Burling LLP, Redwood Shores, CA; Anne Lai, Attorney at Law, New Haven, CT; Cecillia D Wang, ACLU - San Francisco, CA, San Francisco, CA; David Hults, Covington & Burling LLP - San Francisco, CA, San Francisco, CA; Lesli Rawles Gallagher, Covington & Burling LLP, San Diego, CA; Nancy Anne Ramirez, MALDEF - Los Angeles, CA, Los Angeles, CA; Tammy Albarran, Covington & Burling LLP, San Francisco, CA.

For Maricopa, County of, Defendant: Charitie L Hartsig, John Michael Fry, Michael D Moberly, Thomas George Stack, [*3] Ryley Carlock & Applewhite PA, Phoenix, AZ; David A Selden, Cavanagh Law Firm PA, Phoenix, AZ; Julie A Pace, The Cavanagh Law Firm PA, Phoenix, AZ.

For Joseph M Arpaio, in his individual and official capacity as Sheriff of Maricopa County, AZ, Defendant: Ann Thompson Uglietta, LEAD ATTORNEY, Thomas P Liddy, Maricopa County Attorneys Office - Civil Services Division, Phoenix, AZ; James Lawrence Williams, LEAD ATTORNEY, Schmitt Schneck Smyth & Herrod PC, Phoenix, AZ; Alec R Hillbo, Leigh Eric Dowell, Ogletree Deakins Nash Smoak & Stewart PC, Phoenix, AZ; Kerry Scott Martin, Ogletree Deakins Nash Smoak & Stewart PC - Tucson, AZ, Tucson, AZ; Timothy

James Casey, Schmitt Schneck Smyth Casey & Even PC, Phoenix, AZ.

For Maricopa County Sheriff's Office, Defendant: Ann Thompson Uglietta, LEAD ATTORNEY, Maricopa County Attorneys Office - Civil Services Division, Phoenix, AZ; James Lawrence Williams, LEAD ATTORNEY, Schmitt Schneck Smyth & Herrod PC, Phoenix, AZ; Alec R Hillbo, Leigh Eric Dowell, Ogletree Deakins Nash Smoak & Stewart PC, Phoenix, AZ; Julie A Pace, The Cavanagh Law Firm PA, Phoenix, AZ; Kerry Scott Martin, Ogletree Deakins Nash Smoak & Stewart PC - Tucson, AZ, Tucson, AZ; Timothy [*4] James Casey, Schmitt Schneck Smyth Casey & Even PC, Phoenix, AZ.

For United States of America, Movant: Edward G Caspar, LEAD ATTORNEY, US Dept of Justice - Civil Rights, Washington, DC.

For United States of America, Amicus: Edward G Caspar, LEAD ATTORNEY, US Dept of Justice - Civil Rights, Washington, DC; Elizabeth A Strange, US Attorneys Office, Tucson, AZ.

**JUDGES:** G. Murray Snow, United States District Judge.

**OPINION BY:** G. Murray Snow

**OPINION**

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

At issue in this lawsuit are: 1) the current policies and practices of the Maricopa County Sheriff's Office ("MCSO") by which it investigates and/or detains persons whom it cannot charge with a state crime but whom it believes to be in the country without authorization, and 2) the operations the MCSO claims a right to use in enforcing immigration-related state criminal and civil laws, such as the Arizona Human Smuggling Statute, Ariz. Rev. Stat. ("A.R.S.") *§ 13-2319* (Supp. 2010), and the Arizona Employer Sanctions Law, *A.R.S. § 23-211 et seq.* (Supp. 2010). According to the position of the MCSO at trial, it claims the right to use the same type of saturation patrols to enforce state laws that it used during the time that it had authority [*5] delegated from the federal government to enforce civil violations of federal immigration law.

During the time relevant to this lawsuit, the Immigration and Customs Enforcement Office of the Department of Homeland Security ("ICE") delegated authority to enforce federal immigration law to a maximum of 160

MCSO deputies pursuant to *Section 287(g) of the Immigration and Nationality Act, 8 U.S.C. § 1357(g) ("the 287(g) program")*. In the *287(g)* training that ICE provided, and in other policies and procedures promulgated by the MCSO, MCSO deputies were instructed that they could consider race or "Mexican ancestry" [1] as one factor among others in making law enforcement decisions during immigration enforcement operations without violating the legal requirements pertaining to racial bias in policing. Pursuant to its 287(g) authority, the MCSO used various types of saturation patrols described below in conducting immigration enforcement. During those patrols, especially the large-scale saturation patrols, the MCSO attempted to leverage its 287(g) authority by staffing such operations with deputies that both were and were not 287(g) certified.

> 1   Historically, there is no separate racial designation [*6] for persons of Hispanic or Latino ancestry. Nevertheless, to the extent that such persons are separately classified for purposes of distinctions in their treatment by the government, courts have applied the strict scrutiny analysis that is reserved for racial distinctions. *Johnson v. California, 543 U.S. 499, 502, 125 S. Ct. 1141, 160 L. Ed. 2d 949 (2005); Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 205, 227, 115 S. Ct. 2097, 132 L. Ed. 2d 158 (1995); U.S. v. Ochoa-Ochoa, 114 Fed. App'x 295, 296 (9th Cir. 2004).*

ICE has since revoked the MCSO's 287(g) authority. In response, the MCSO trained all of its officers on immigration law, instructed them that they had the authority to enforce it, and promulgated a new "LEAR" policy. The MCSO continues to follow its LEAR policy, which requires MCSO deputies to detain persons believed to be in the country without authorization but whom they cannot arrest on state charges. Such persons are either delivered directly to ICE by the MCSO or detained until the MCSO receives a response from ICE as to how to deal with them. Until December 2011, the MCSO operated under the erroneous assumption that being an unauthorized alien in this country established a criminal violation of federal immigration law which the MCSO [*7] was entitled to enforce without 287(g) authorization. However, in the absence of additional facts, being within the country without authorization is not, in and of itself, a federal criminal offense. The LEAR policy, however, remains in force.

Pursuant to this policy and the MCSO's enforcement of state law that incorporates immigration elements, the MCSO continues to investigate the identity and immigration status of persons it encounters in certain situations. In undertaking such investigations, MCSO deputies continue to apply the indicators of unlawful presence (in-

2013 U.S. Dist. LEXIS 73869, *

cluding use of race as one amongst other factors) they received in the *287(g)* training from ICE. Further, in enforcing immigration-related state laws, the MCSO either continues to use, or asserts the right to continue to use, the same type of saturation patrols that it used when it had full 287(g) authority. Those saturation patrols all involved using traffic stops as a pretext to detect those occupants of automobiles who may be in this country without authorization. The MCSO asserts that ICE's termination of its 287(g) authority does not affect its ability to conduct such operations because a person's immigration status [*8] is relevant to determining whether the Arizona state crime of human smuggling--or possibly the violation of other state laws related to immigration--are occurring.

Plaintiffs challenge these policies and practices. The Court certified a Plaintiff class of "[a]ll Latino persons who, since January 2007, have been or will be in the future stopped, detained, questioned or searched by MCSO agents while driving or sitting in a vehicle on a public roadway or parking area in Maricopa County Arizona." *Ortega-Melendres v. Arpaio, 836 F. Supp. 2d 959, 992 (D. Ariz. 2011)* (internal quotation marks omitted). The issues in this lawsuit are: (1) whether, and to what extent, the *Fourth Amendment* permits the MCSO to question, investigate, and/or detain Latino occupants of motor vehicles it suspects of being in the country without authorization when it has no basis to bring state charges against such persons; (2) whether the MCSO uses race as a factor, and, if so, to what extent it is permissible under the *Fourth Amendment* to use race as a factor in forming either reasonable suspicion or probable cause to detain a person for being present without authorization; (3) whether the MCSO uses race as a factor, [*9] and if so, to what extent it is permissible under the *equal protection clause of the Fourteenth Amendment* to use race as a factor in making law enforcement decisions that affect Latino occupants of motor vehicles in Maricopa County; (4) whether the MCSO prolongs traffic stops to investigate the status of vehicle occupants beyond the time permitted by the *Fourth Amendment*; and (5) whether being in this country without authorization provides sufficient reasonable suspicion or probable cause under the *Fourth Amendment* that a person is violating or conspiring to violate Arizona law related to immigration status.

As is set forth below, in light of ICE's cancellation of the MCSO's 287(g) authority, the MCSO has no authority to detain people based only on reasonable suspicion, or probable cause, without more, that such persons are in this country without authorization. The MCSO lost authority to enforce the civil administrative aspects of federal immigration law upon revocation of its 287(g) authority. And, in the absence of additional facts that would provide reasonable suspicion that a person com-

mitted a federal criminal offense either in entering or staying in this country, it is not a [*10] violation of federal criminal law to be in this country without authorization in and of itself. Thus, the MCSO's LEAR policy that requires a deputy (1) to detain persons she or he believes only to be in the country without authorization, (2) to contact MCSO supervisors, and then (3) to await contact with ICE pending a determination how to proceed, results in an unreasonable seizure under the *Fourth Amendment to the Constitution*.

Further, in determining whom it will detain and/or investigate, both with respect to its LEAR policy, and in its enforcement of immigration-related state law, the MCSO continues to take into account a suspect's Latino identity as one factor in evaluating those persons whom it encounters. In Maricopa County, as the MCSO acknowledged and stipulated prior to trial, Latino ancestry is not a factor on which it can rely in arriving at reasonable suspicion or forming probable cause that a person is in the United States without authorization. Thus, to the extent it uses race as a factor in arriving at reasonable suspicion or forming probable cause to stop or investigate persons of Latino ancestry for being in the country without authorization, it violates the *Fourth Amendment*. [*11] In addition, it violates the Plaintiff class's right to equal protection under the *Fourteenth Amendment to the Constitution* and *Title VI* of the Civil Rights Act of 1964.

Moreover, at least some MCSO officers, as a matter of practice, investigate the identities of all occupants of a vehicle when a stop is made, even without individualized reasonable suspicion. Further, MCSO policy and practice allow its officers to consider the race of a vehicle's occupants in determining whether they have reasonable suspicion to investigate the occupants for violations of state laws related to immigration, or to enforce the LEAR policy. In some instances these policies result in prolonging the traffic stop beyond the time necessary to resolve the issue that initially justified the stop. When the deputies have no adequate reasonable suspicion that the individual occupants of a vehicle are engaging in criminal conduct to justify prolonging the stop to investigate the existence of such a crime, the extension of the stop violates the *Fourth Amendment's* prohibition against unreasonable seizures.

Finally, the knowledge that a person is in the country without authorization does not, without more, provide sufficient [*12] reasonable suspicion that a person has violated Arizona criminal laws relating to immigration, such as the Arizona Human Smuggling Act, to justify a *Terry* stop for purposes of investigative detention. To the extent the MCSO is authorized to investigate violations of the Arizona Employer Sanctions law, that law does not provide criminal sanctions against either employers or employees. A statute that provides only civil sanctions

is not a sufficient basis on which the MCSO can arrest or conduct *Terry* stops of either employers or employees.

For the reasons set forth above, Plaintiffs are entitled to injunctive relief to protect them from usurpation of rights guaranteed under the United States Constitution. Therefore, in the absence of further facts that would give rise to reasonable suspicion or probable cause that a violation of either federal criminal law or applicable state law is occurring, the MCSO is enjoined from (1) enforcing its LEAR policy, (2) using Hispanic ancestry or race as any factor in making law enforcement decisions pertaining to whether a person is authorized to be in the country, and (3) unconstitutionally lengthening stops. The evidence introduced at trial establishes [*13] that, in the past, the MCSO has aggressively protected its right to engage in immigration and immigration--related enforcement operations even when it had no accurate legal basis for doing so. Such policies have apparently resulted in the violation of this court's own preliminary injunction entered in this action in December 2011. The Court will therefore, upon further consideration and after consultation with the parties, order additional steps that may be necessary to effectuate the merited relief.

**FINDINGS OF FACT**

**I. General Background**

**A. Maricopa County**

According to the trial evidence, approximately 31.8% of the residents of Maricopa County are Hispanic or Latino. [2] (Tr. at 157:21--158:4.) [3] As even the testimony of Defendant's expert demonstrated, the considerable majority of those residents are legal residents of Maricopa County and of the United States. [4] (*Id.* at 1301:14.) Due to the large number of authorized residents of Maricopa County who are Latino, the fact that someone is Latino in Maricopa County does not present a likelihood that such a person is here without authorization.

2    *Cf.* United States Census, State & County QuickFacts, Maricopa County, Arizona, http://quickfacts.census.gov/qfd/states/04/04013. html [*14] (last visited May 21, 2013) (reporting 30.0% of the population as of Hispanic or Latino origin). The Defendant's expert placed the Hispanic population at 30.2% for the relevant period. Ex. 402 at 3. Throughout this litigation, both parties have used the term "Hispanic" and "Latino" interchangeably. A recent study by the Pew Hispanic Center found that "a new nationwide survey of Hispanic adults finds that these terms ["Hispanic" and "Latino"] still haven't been fully embraced by Hispanics themselves." Paul Taylor et al., Pew Hispanic Center, *When Labels Don't Fit: Hispanics and their Views of Identity* 2 (2012). The Court will principally use the term Hispanic because most of the testimony and evidence presented at the trial on this matter used the term Hispanic rather than Latino. Still, where the evidence principally uses the term "Latino," the Court will likewise use "Latino." Both words are used interchangeably in this Order.

3    "Tr." refers to the continually paginated trial transcript.

4    At trial, Defendants' expert Dr. Steven Camarota noted that his estimate as to the percentage of the Arizona population not legally present within the United States had been cited by the United States [*15] Supreme Court in *Arizona v. United States, ___ U.S. ___ , 132 S. Ct. 2492, 2500, 183 L. Ed. 2d 351 (2012)*. In that study Dr. Camarota concluded that 8.9% of the population of the state of Arizona was made up of unauthorized immigrants. *See* Camarota & Vaughan, Center for immigration Studies, *Immigration and Crime: Assessing a Conflicted Situation* 16 (2009). During his trial testimony, Dr. Camarota testified that he assumed that his state-wide estimate would also apply to Maricopa County. His trial testimony was consistent with the figure cited in *Arizona* as he noted that he assumed that approximately one in three Hispanic residents of Maricopa County was here without authorization. (Tr. at 1301:9--11.) In *Arizona*, however, the Supreme Court also cited a study of the Pew Hispanic Center that determined that 6% of the state's population was unauthorized. *132 S. Ct. at 2500*. Nevertheless, if Dr. Camarota's testimony is applied, and one assumes that virtually all of the unauthorized residents in the state are of Latino ancestry, about 73% of the Latino residents of Maricopa County are legal residents of the United States. If the Pew Hispanic Center's estimates are applied, and the same assumptions are [*16] made, about 81% of the Latino residents of Maricopa County are legal residents. In either case, a great majority of the Latino residents of Maricopa County are authorized to be in the United States.

Nevertheless, it is also true that the overwhelming majority of the unauthorized aliens in Maricopa County are Hispanic. As Defendant's expert report notes, the Pew Hispanic Center estimates that 94% of illegal immigrants in Arizona are from Mexico alone. [5] (Ex. 402 at 14.)

5    "Ex." denotes the number of the exhibit admitted at trial.

As trial testimony further demonstrated, MCSO officers believe that unauthorized aliens are Mexicans, Hispanics, or Latinos. (Tr. at 359:11--14, 991:23--992:4.) As Defendants acknowledged at the summary judgment stage and in their post-trial briefing, many MCSO officers--as well as Sheriff Arpaio--testified at their depositions that most of the unauthorized immigrants they have observed in Maricopa County are originally from Mexico or Central or South America. [6] (Doc. 453 at 150, 151 ∂∂ 28--30, 36.)

> 6   "Doc." denotes the number at which the document can be found on the Court's docket.

**B. The MCSO**

The MCSO is a law enforcement agency operating within the confines of Maricopa  [*17] County. (Doc. 530 at 4 ∂ 1.) It employs over 800 deputies. (Id. ∂ 17.) Sheriff Joseph Arpaio serves as the head of the MCSO and has final authority over all of the agency's decisions. (Id. ∂ 18.) He sets the overall direction and policy for the MCSO. The MCSO is composed of multiple bureaus, including the detention bureau, the patrol bureau, and the patrol resources bureau. (Id. ∂ 19.)

The Sheriff of Maricopa County is elected, thus the Sheriff has to be responsive to his constituents if he desires to remain in office. In the words of the MCSO's Chief of Enforcement Brian Sands, Sheriff Arpaio is a political person, who receives significant popular support for his policies. (Tr. at 808:14--809:12.) A chief element of Sheriff Arpaio's popular support is his prioritization of immigration enforcement. (Id.) The MCSO receives federal funding and federal financial assistance. (Doc. 530 at 4 ∂∂ 173--74.)

**C. Prioritization of Immigration Enforcement and the ICE Memorandum**

In 2006, the MCSO created a specialized unit--the Human Smuggling Unit ("HSU")--to enforce a 2005 human smuggling law, A.R.S. β 13-2319 (2007). (Doc. 530 at 4 ∂∂ 27--28.) The HSU is a division within the patrol resources bureau  [*18] and makes up a part of the larger Illegal Immigration Interdiction Unit (the "Triple I" or "III"). (Id. ∂∂ 27--29.) The HSU unit consisted of just two deputies when it was created in April of 2006. (Id. ∂ 44.)

In 2006, the Sheriff decided to make immigration enforcement a priority for the MCSO. In early 2007, the MCSO and ICE entered into a Memorandum of Agreement ("MOA") pursuant to which MCSO could enforce federal immigration law under certain circumstances. (Id. ∂ 40.) After the MOA was signed, the HSU grew. By September of 2007 it consisted of two sergeants, 12 dep-

uties, and four detention officers, all under the leadership of a lieutenant. (Id. ∂ 44.) In September 2007, Lieutenant Sousa assumed command of the HSU. (Tr. at 988:13--14.) He remained in charge of the unit and later the Division including the unit, until April 1, 2012. (Tr. at 988:12--23.) He reported to Chief David Trombi, who is the commander of the Patrol Resources Bureau. (Doc. 530 at 1, ∂ 33.) Chief Trombi reported to Chief of Enforcement Brian Sands. (Id. ∂ 31.) For most of the period relevant to this lawsuit, Chief Sands reported to Deputy Chief David Hendershott, who reported directly to Sheriff Arpaio. (Id. ∂∂  [*19] 21, 23.)

Sergeant Madrid was one of the two supervising sergeants from the founding of HSU until he was transferred in February 2011. (Id. at 1131:19--25.) Sergeant Palmer was the other HSU supervising sergeant. He joined the HSU in April of 2008, apparently succeeding Sergeant Ryan Baranyos. He remained as a supervising sergeant until May of 2012. (Id. at 661:20--21.) According to the testimony of Sgts. Madrid and Palmer, each of them supervised their own squad of deputies and also cross-supervised the other's squad. (Id. at 663:23--25.)

The MOA permitted up to 160 qualified MCSO officers to enforce administrative aspects of federal immigration law under the 287(g) program. [7] (Ex. 290.) It required MCSO deputies that were to be certified for field operations to complete a five-week training program. (Id.) Witnesses who took the training program testified that the topic of race in making decisions related to immigration enforcement covered an hour or two of the five-week course. (Tr. at 948:8--20, 1387:23--1388:7.)

> 7   The 160 maximum persons included both deputies trained for field enforcement and the MCSO personnel who worked "solely in a correctional facility or ICE detention facility." (Ex. [*20] 290.)

All or virtually all of the deputies assigned to the HSU became 287(g)-trained and certified. A number of other MCSO deputies did as well. The MCSO generically designated all non-HSU officers who were certified under 287(g) as members of the Community Action Team or "CAT." According to an MCSO policy memo "CAT refers to all 287(g) trained deputies who are not assigned to HSU." (Ex. 90 at MCSO 001887--88.) Members of the HSU, CAT and MCSO detention officers who were 287(g) certified constituted the Triple I Strike Team. (Id.)

Nevertheless, according to ICE Special Agent Alonzo Pena, under the MOA, 287(g) certified officers could not use their federal enforcement authority to stop persons or vehicles based only on a suspicion that the driver or a passenger was not legally present in the Unit-

ed States. (Tr. at 1811:15--16, 1854:8--11, 1856:15--23.) Rather, the 287(g) power was appropriately used as adjunct authority when Sheriff's deputies made an otherwise legitimate stop to enforce provisions of state law. (*Id.*) Special Agent Pena further testified that he "would definitely be concerned if traffic stops were being used as pretext" to investigate immigration violations. (*Id.* at 1859:17--22.)

Still, [*21] nothing in the text of the MOA prohibits the MCSO from making pre-textual traffic stops in order to investigate the immigration status of the driver of a vehicle. The MCSO Triple I Strike Team Protocols, however, did specify that before investigating a person's immigration status, a 287(g)-trained deputy "must have probable cause or reasonable suspicion" to stop a person for violation of "state criminal law and civil statutes." (Ex. 92 at MCSO 001888.) As the testimony at trial also established, MCSO deputies are generally able, in a short amount of time, to establish a basis to stop any vehicle that they wish for some form of Arizona traffic violation. (Tr. at 1541:8--11 (Armendariz: "You could not go down the street without seeing a moving violation."), 1579:20--23 ("Armendariz: [I]t's not very difficult to find a traffic violation when you're looking for one."); *see also* Doc. 530 at ∂ 86 ("Deputy Rangel testified that it is possible to develop probable cause to stop just about any vehicle after following it for two minutes.").)

The necessity of having a state law basis for the stop prior to engaging in immigration enforcement did not appear in MCSO news releases. At the February 2007 [*22] press conference announcing the partnership between MCSO and ICE, Sheriff Arpaio described the MCSO's enforcement authority in the presence of ICE officials as unconstrained by the requirement that MCSO first have a basis to pursue state law violations. He stated: "Actually, . . . , ours is an operation, whether it's the state law or the federal, to go after illegals, not the crime first, that they happen to be illegals. My program, my philosophy is a pure program. You go after illegals. I'm not afraid to say that. And you go after them and you lock them up." (Tr. at 332:19--25; Ex. 410d.)

Upon completion of the first 287(g) training course for deputies in March 2007, Sheriff Arpaio described the duties of CAT certified patrol deputies in a news release as "arresting suspects even solely for the crime of being an illegal alien, if they are discovered during the normal course of the deputies' duties." (Ex. 184.) In July 2007, in describing the MCSO as "quickly becoming a full-fledged anti-illegal immigration agency" he also announced that MCSO had created a dedicated hotline for citizens to "use to report illegal aliens" to the MCSO. (Ex. 328.) In this same news release, the Sheriff further [*23] announced a policy that when his deputies stopped any vehicle for suspicion of human smuggling, the im-

migration status of all of the occupants of the vehicle would be investigated. (*Id.*)

**D. MCSO's Immigration Enforcement Operations**

In approximately July of 2007, at the same time it implemented its illegal immigrant hotline, the MCSO also announced that the HSU would begin conducting "saturation patrols," in which MCSO officers would conduct traffic enforcement operations with the purpose of detecting unauthorized aliens during the course of normal traffic stops. (Tr. at 1136:7--9.) There were several different types of traffic saturation patrols, including day labor operations, small-scale saturation patrols, and large-scale saturation patrols. HSU deputies sometimes recruited other deputies and MCSO posse members to assist in day labor and small-scale saturation patrols. Other deputies were always a part of large-scale saturation patrols. There is no evidence that all deputies participating in such patrols from other units were 287(g) certified. All of these saturation patrols were supervised by the HSU command structure, and HSU deputies conducted, or at least participated in, all of [*24] the saturation patrols at issue in this lawsuit.

**1. Day Labor Operations**

In a typical day labor operation, undercover HSU officers would station themselves at locations where Latino day laborers assembled and identify vehicles that would pick up such day laborers. Once a vehicle was identified, the undercover officers notified patrol units that were waiting in the area. (*Id.* at 242:7--23; Exs. 123, 126, 129, 131.) The patrol units located the vehicle, followed it, and "establish[ed] probable cause for a traffic stop." (*Id.*) Once the MCSO deputy had stopped the vehicle, HSU deputies would proceed to the scene to investigate the immigration status of any passengers. (Tr. at 242:24--244:6.) The patrol officer would either issue a traffic citation or give the driver a warning, while the HSU deputies would investigate the immigration status of the passengers and detain them if there was a basis to do so.

Day labor operations took place on: (1) September 27, 2007, at the Church of the Good Shepherd of the Hills in Cave Creek, (2) October 4, 2007, in Queen Creek, (3) October 15, 2007, in the area of 32nd Street and Thomas ("Pruitt's Furniture Store") in Phoenix, and (4) October 22, 2007, in Fountain [*25] Hills. (Exs. 123, 126, 129, 131.)

According to the arrest reports of the four day labor operations, all of the 35 arrests were for federal civil immigration violations, and the arrestees were turned over to ICE for processing. (*Id.*) None of the 35 persons were arrested for violating state laws or municipal ordinances. (*Id.*) Further, they were all passengers in the ve-

hicle, not drivers. (*Id.*) Thus, their identity and immigration status were investigated during the course of a stop based on the driver's violation of traffic laws, even when that stop resulted in the driver only receiving a warning. The MCSO made 14 total traffic stops, 11 of which resulted in the 35 arrests. (*Id.*) Thus, only three of the 14 stops did not result in immigration arrests, all of those coming from the Fountain Hills operation. (*Id.*)

None of the arrest reports of these operations contains any description of anything done by the passengers once the vehicle was stopped that would create reasonable suspicion that the passengers were in the country without authorization. The stops were made purely on the observation of the undercover officers that the vehicles had picked up Hispanic day laborers from sites where  [*26] Latino day laborers were known to gather. It was the nature of the operation that once the stop had been made, the HSU officers proceeded to the scene to conduct an investigation of the Latino day laborer passengers.

The two news releases that covered the day labor operations communicated that the operations were designed to enforce immigration laws, ("Starting at 4:00 am this morning, September 27, 2007, Sheriff's deputies began cracking down on illegal immigration in Cave Creek"), and were directed at day laborers whom the MCSO perceived as coming from Mexico (quoting Sheriff Arpaio to the effect that "[a]s far as I am concerned the only sanctuary for illegal aliens is in Mexico"). (Exs. 307--08.) They further encouraged citizens to report day labor locations to the MCSO as part of its illegal immigration enforcement operations. (*Id.*)

**2. Small-Scale Saturation Patrols**

There was testimony and evidence introduced at trial concerning 25 patrols that were described as saturation patrols but were neither explicitly identified as day labor operations nor as one of the 13 large-scale saturation patrols whose arrest reports were admitted at trial. During 15 of the 25 small-scale saturation patrols,  [*27] all of the persons arrested were unauthorized aliens. [8] During six of the patrols, the great majority of all persons arrested were unauthorized aliens. [9] During four of these patrols, the MCSO made very few total arrests and of that number only a few of the arrests or no arrests were of unauthorized aliens. [10]

[8]  The 2007 patrols in which all persons arrested were unauthorized aliens occurred on October 30 (ten of ten arrests), November 7 (eight of eight arrests), November 15 (nine of nine arrests), November 21 (12 of 12 arrests), November 29 (nine of nine arrests), December 1 (eight of eight arrests), December 5 (13 of 13 arrests), December

14 (26 of 26 arrests), and December 22 (two of two arrests). (Exs. 80, 81, 114, 120.) The 2008 patrols in which all persons arrested were unauthorized aliens occurred on January 4 (six of six arrests), January 5 (four of four arrests), January 31 (two separate patrols) (six of six arrests), February 4 (three of three arrests), and September 4 (11 of 11 arrests). (Exs. 112, 114.)

[9]  The 2007 patrols in which the great majority of all persons arrested were unauthorized aliens occurred on December 8 (16 of 17 arrests), and December 10 (five of eight arrests).  [*28] (Ex. 114.) The 2008 patrols in which the great majority of all persons arrested were unauthorized aliens occurred on February 29, (eight of 11 arrests), May 6--7 (14 of 18 arrests), July 8 (18 of 19 arrests), and August 19 (12 of 16 arrests). (Exs. 108, 117, 119.)

[10]  The 2008 patrols in which no arrests were made of unauthorized aliens occurred on February 25 (zero of two arrests) and on October 10 (zero of one arrest). (Exs. 114, 125.) The 2009 patrols in which a majority of the arrests made were of other than unauthorized aliens occurred on January 23 (one of five arrests) and May 29 (three of 11 arrests). (Exs. 175, 286.)

The small-scale saturation patrols seem to be divisible into two different types of operations. As with day labor operations, many of these small-scale saturation patrols, particularly those conducted before May 2008, [11] show an extremely high correlation between the total number of traffic stops executed in an operation and the number of those stops that resulted in one or more immigration arrests. These small-scale patrols with high arrest ratios seem to have been either day labor operations or had targeting elements very similar to day labor operations in that the  [*29] patrols targeted vehicles that picked up Latino day laborers.

[11]  One exception is the December 2007 traffic operation at Aguila, Wickenburg, and Wittmann. (Ex. 76.)

The second type of small-scale patrol (post-May 2008) appears to principally rely on traffic patrols which, while using traffic stops as a pretext for enforcing immigration laws, did not uniquely target vehicles who picked up day laborers. These patrols thus had a higher number of stops during the operation. Both types of small-scale patrols were conducted at locations either where the MCSO had previously conducted day labor operations or day laborers were known to congregate. (Exs. 76, 80, 81, 108, 112, 114, 117, 119, 120, 125, 175, 286.)

Participating deputies kept track of certain figures during their patrols. Although there was some variation

in the categories of information kept by the deputies, the deputies were always required to keep track at least of the number of persons arrested for federal immigration violations and the number of unauthorized aliens who were arrested on state charges. (*See, e.g.*, Exs. 97, 102, 111.) After the patrol, supervising officers would collect the individual stat sheets and summarize the [*30] activity during the patrol by statistical category. [12] (Tr. at 1009:11--23.) After the patrol statistics were tallied, Lt. Sousa, Sgts. Madrid or Palmer, or another MCSO officer would send out an e-mail briefing describing the total officer activity during the patrol. (*Id.* at 1010:7--12, 1133:13--14, 690:23--691:3.) Sgt. Madrid would brief Sheriff Arpaio personally on how many unauthorized aliens had been arrested during the patrol. (*Id.* at 1133:13--15.) He would relay the number of people arrested for not being legally present in the country up his chain of command, because he was asked for this information by his supervisors. (*Id.* at 1153:16--25.) Sgt. Palmer would do likewise. (*Id.* at 690:23--691:3.)

> 12   Although most of the deputies' actual statistics sheets have been destroyed, a few remain and are in the record, although there was some variance between the categories of information requested for various patrols. (Doc. 235-3, Exs. 9--11.) Many if not all of the summary sheets remain and are in the record.

During both types of small-scale patrols, the MCSO issued news releases that emphasized that their purpose was immigration enforcement.

**a. Small-Scale Patrols with High Arrest Ratios**

After [*31] the day labor operation at Pruitt's Furniture Store, the Pruitt's area remained a focal point for activists. In response to the protests and the continuing presence of day laborers, the MCSO conducted 11 small-scale traffic saturation patrols in that area in the months between November 2007 and February 2008. [13] Its first two large-scale saturation patrols were also centered on the same area. [14]

> 13   October 30, November 7, November 21, December 1, December 8, December 10, and December 22, 2007, and January 5, January 31, February 4, and February 25, 2008. The exhibit for the January 5 patrol reports two separate small-scale saturation patrols occurring on the same day--one at Pruitt's and one in Avondale. The operation at Pruitt's had one stop that resulted in two immigration arrests with a citation issued to the driver.
>
> 14   At the Court's request, the parties filed a stipulation concerning exhibits that contained ar-

rest information associated with particular MCSO operations. That stipulation omitted three follow-up operations that occurred at Pruitt's on December 22, 2007, (Ex. 114 at MCSO 014904), January 5, 2008, (Ex. 114 MCSO 014693), and February 25, 2008 (Ex. 114, MCSO 014533). Although, [*32] as will be detailed below, none of these reports resulted in significant arrests either on immigration or state criminal charges, they apparently were saturation patrols, even if small ones, and the Court thus considers them.

As a whole, the individual reports of the small-scale operations around Pruitt's show an extremely high correlation between total stops and stops that resulted in immigration arrests. Only about half of the Pruitt's arrest reports kept track of the exact number of stops made during an operation. Others made general estimates of the total number of stops, stated the number of immigration arrests resulting from the total stops, or stated the number of citations issued to other vehicles from which no arrest was made. This information is probative of the correlation that existed between total stops and stops that resulted in immigration arrests during these operations.

Reports of the October 30 and November 7 operations were written by Sgt. Baranyos, who preceded Sgt. Palmer at HSU. These reports, while not specifying the total number of stops, [15] nevertheless show that all recorded stops resulted in one or more immigration arrests. [16] (Ex. 114.)

> 15   To the extent that [*33] the reports authored by Sgt. Baranyos state that "numerous" stops were made during an operation, the Court notes that he may have had a generous understanding of the word "numerous." Note for example his report of the October 30 operation in which he stated that "numerous" traffic violations occurred that resulted in four traffic stops. (Ex. 114 at MCSO 014678.) Further, in his November 15 report of a saturation patrol in Mesa, Sgt. Baranyos noted that "numerous traffic stops were conducted in the area with the following results," and then sets forth three traffic stops that resulted in the issuance of three citations and six immigration arrests. (Ex. 120.) His use of the term numerous thus suggests that for Sgt. Baranyos four stops were "numerous" stops.
>
> 16   In the October 30 report, Sgt. Baranyos stated that HSU "conducted four traffic stops for numerous traffic violations" and that the four stops resulted in the arrest of ten illegal immigrants. All ten were arrested for violating federal immigration law and turned over to ICE for administrative processing. While the report does not

establish that each traffic stop resulted in the arrest of at least one illegal immigrant, it does establish [*34] a high number of arrests of illegal aliens for a relatively low number of traffic stops. The drivers of all four vehicles were issued civil citations, and there is no other record of arrests or citations issued during the operation. (Ex. 114 at MCSO 014678.) Similarly, in the November 7 operation, Sgt. Baranyos stated that "Detectives conducted numerous traffic stops in the area "with the following results." He then set forth four stops which resulted in the eight immigration arrests. Sgt. Baranyos noted no other traffic citations issued or arrests occurring during the operation. All eight persons arrested were passengers in their respective vehicles. (*Id.* at MCSO 014672--73.)

The next four of the small-scale operations at Pruitt's (taking place between November 21 and December 10) specified both the total number of traffic stops made during each operation and the number of traffic stops that resulted in the arrest of unauthorized aliens. 24 stops were made, and 21 resulted in immigration arrests. [17] (*Id.*)

> [17]   The MCSO made four traffic stops during its November 21 operation. (*Id.* at MCSO 014893.) All four of them resulted in the arrest of persons who were in the country illegally. (*Id.*) [*35] In the December 1, 2007 operation, the MCSO made five stops each of which resulted in at least one federal immigration arrest. (*Id.* at MCSO 014665--67.) In its December 8 operation, nine out of ten total traffic stops resulted in the arrest of at least one unauthorized resident. (*Id.* at MCSO 014663--64.) In its December 10 operation three out of five stops resulted in the arrest of five unauthorized persons. (*Id.* at MCSO 014659.)

After the first six operations, the number of stops and immigration arrests at Pruitt's declined. [18] (*Id.*)

> [18]   In the December 22 summary report, Sgt. Madrid noted that one stop resulted in both immigration arrests made during the operation where "several stops were made" resulting in six other traffic citations being written to U.S. citizens. (*Id.* at MCSO 014909.) In its January 5, 2008 operation two out of four total traffic stops resulted in arrests of unauthorized aliens. (*Id.* at MCSO 014693.) In his reports for January 31, February 4, and February 25, Sgt. Madrid noted, apparently as a matter of form, that "several traffic stops were made." On January 31, one of the-

se 'several stops" resulted in the arrest of two unauthorized aliens, on February 4, two of these [*36] "several stops" resulted in the arrests of three unauthorized aliens. "[A] few other stops" were made "that resulted only in traffic citation." (*Id.* at MCSO 014519, 014525.) In the final Pruitt's operation, on February 25, 2008, none of the several stops resulted in the arrest of an unauthorized alien--some stops resulted in traffic citations, one driver was arrested for driving on a suspended license, and another was arrested for possessing drug paraphernalia. (*Id.* at MCSO 014533.)

These reports suggest that as the Pruitt's location became known for constant immigration patrols, both small and large scale, the success rate of such operations declined. But prior to that time, the MCSO made an extraordinary number of immigration arrests per vehicle pulled over. The MCSO kept the public apprised of its efforts to combat illegal immigration at Pruitt's. (Ex. 309 ("Illegal immigration activists have protested at Pruitt's every Saturday in the last six weeks since Sheriff Arpaio's deputies began patrolling the vicinity of the furniture store near 36th Street and Thomas Road. Already, 44 illegal aliens have been arrested by Sheriff's deputies, including eight illegals arrested this past Saturday [*37] during the weekly protest.").)

Several of the remaining small-scale saturation patrols that occurred in the same time frame, but did not occur at Pruitt's, such as the small-scale patrols at Mesa, [19] Cave Creek and Bell Roads, [20] 35th Avenue and Lower Buckeye Road, [21] and in Avondale, [22] similarly involved operations that demonstrated a remarkably high correlation between the number of stops made by deputies in an operation and the number of stops that result in an immigration arrest.

> [19]   Three successive Mesa patrols occurred in the same general neighborhood on November 15, November 29 and December 5, 2007. (Exs. 120, 80, 81.) For the November 15 operation, Sgt. Baranyos's report details that "numerous" traffic stops and one observed drug transaction resulted in four stops during which MCSO made nine immigration arrests. (Ex. 120.) Reports for the November 29 and December 5 Mesa small-scale saturation patrols were written by Sgt. Madrid. (Exs. 80, 81.) As he did with the last Pruitt's reports, Sgt. Madrid noted in each report that "several traffic stops were made." (*Id.*) During the November 29 operation, nine immigration arrests occurred in the five stops detailed in the report-- thus five [*38] of "several" traffic stops--that were all processed by ICE. (Ex. 80.) During the

December 5 Mesa operation, 13 immigration arrests occurred in seven of "several" traffic stops, and all arrestees were processed by ICE. (Ex. 81.)
20   The operation at 24th Street and Bell Road took place on January 4, 2008. (Ex. 114 at MCSO 014512.) During this patrol, the MCSO arrested six unauthorized aliens in three traffic stops during an operation in which five total traffic citations were issued. (*Id.*) A total of two civil traffic citations were written to United States Citizens that did not result in immigration arrests during the operation. (*Id.*)
21   On January 31, 2008, the MCSO conducted a saturation patrol "in the area of the Durango complex" at 35th and Lower Buckeye roads. (*Id.* at MCSO 014519.) Three stops at or close to that intersection each resulted in the immigration arrests of a total of four persons, all of whom were unauthorized but most, if not all, of whom were arrested on unspecified state charges. (*Id.*) There were "a few other stops" made during this operation that "resulted only in traffic citation." (*Id.*) Note that this report was filed as a joint report for saturation operations that [*39] occurred both at the Durango complex and at Pruitt's on the same day. The Pruitt's operation resulted in one stop that resulted in two arrests of unauthorized persons. The Durango operation resulted in three stops that resulted in four arrests of unauthorized persons. Both operations resulted in the arrest of six persons, who were not authorized to be in the country, but five out of the six were arrested on state charges, one was turned over to ICE. (Ex. 114 at MCSO 014519.)
22   On February 29, 2008, the MCSO conducted a saturation patrol in District 2 in Avondale and made seven total traffic stops. Four of those stops resulted in eight arrests of unauthorized aliens. (Ex. 119.)

Based on the high arrest to stop ratios in the 17 small-scale saturation patrols discussed above, if the MCSO was not conducting day labor operations, it was conducting operations very similar to them with comparable targeting elements. [23] As with the day labor operations, these high-ratio small-scale saturation patrols all involve only "several" stops at most. Yet the MCSO deputies participating in these operations made immigration arrests on a considerable majority of their recorded traffic stops. Many of the [*40] stops resulted in the arrest of multiple illegal aliens for each stop. All or a considerable number of these small-scale patrols may in fact have been day labor operations. But even if not, the high stop to arrest ratio leads the Court to conclude that the targeting factors used by the MCSO in these opera-

tions to determine whether to stop the vehicles included the race and work status of the vehicle's occupants.

23   13 of the 25 small-scale operations reflect a high ratio of total stops to stops that resulted in immigration arrests. Four more Pruitt's operations were the final small-scale operations conducted at Pruitt's after it would have become apparent that MCSO was conducting repeated enforcement out of that location.

**b. Small-Scale Operations Without High Arrest Ratios**

The remaining eight operations [24] continued, for the most part, to be located in areas where, based at least on their past operations, the MCSO knew Latino day laborers assembled. While many arrests were made, they arose out of a smaller percentage of total stops.

24   The December 14, 2007 operation in Aguila; the May 6--7, 2008 operation in Fountain Hills; the Cave Creek operations on July 8, August 19, and September 4, [*41] 2008; the two operations at 7th Street and Thunderbird operations occurring on October 10, 2008 and January 23, 2009; and the May 29, 2009 operation in Avondale.

For example, the December 14, 2007 Aguila operation produced 29 arrests, 26 of which were for immigration violations with all the immigration arrests processed administratively through ICE. (Ex. 76.) [25] Those arrests, however, came from only five of the 35--40 stops. (*Id.*) Still, the nature of the arrests demonstrates that the operation, no matter how it was carried out, was designed to engage in immigration enforcement. Therefore, the persons who were stopped, contacted or cited, were all contacted with the premier goal of enforcing immigration laws.

25   The MCSO conducted this saturation patrol with the primary focus on the town of Aguila and a secondary focus on the City of Wickenburg and the Town of Wittmann. As the earlier October 4, 2007 MCSO news release demonstrates, an earlier saturation patrol had occurred in the Wickenburg area at which approximately 25 unauthorized aliens were arrested. (Ex. 308).

On May 6--7, 2008, the MCSO returned to Fountain Hills, where it had previously conducted a day labor operation, and conducted [*42] a two-day saturation patrol there. During the first day of this operation, MCSO made seven traffic stops with four of those seven stops resulting in immigration arrests, thus reflecting a high ratio of stops to immigration-related arrests. (Ex. 108.) Seven of the eight unauthorized persons arrested were processed

through ICE while one was arrested on state charges for an outstanding felony warrant and an ICE detainer was attached. (*Id.*) During the operation's second day, Sgt. Palmer estimated that MCSO made approximately 20 stops. (*Id.*) Only seven of those stops resulted in arrests. (*Id.*) Four of those seven stops resulted in the immigration arrest of seven unlawful residents who were processed through ICE. (*Id.*) While eight of the total of approximately 27 stops that occurred during the two-day operation may still be an impressive ratio of stops to immigration arrests, it is not as high as the ratios for the other small-scale saturation patrols previously discussed.

That trend continued during the subsequent Cave Creek, [26] 7th Street and Thunderbird, [27] and Avondale [28] operations. The MCSO had previously conducted day labor operations in Cave Creek, and Avondale was the site of a prior [*43] small-scale patrol and two large-scale patrols. Of note is that during the September 4, 2008 operation in Cave Creek, ten of the 11 persons arrested provided their names, all of which were Hispanic. [29] (Ex. 112.) The single person arrested who did not provide his name was nevertheless arrested on immigration charges, as were the ten others. (*Id.*) All were administratively processed through ICE. (*Id.*)

> 26   In the first Cave Creek patrol, on July 8, 2008, the MCSO made 59 stops and arrested 19 people. 18 of the 19 persons arrested were unauthorized aliens. (Ex. 117.) During the August 19 saturation patrol, the MCSO made 47 stops that resulted in 16 arrests, 12 of whom were unauthorized aliens. (Ex. 109.) During the September 4 saturation patrol, the MCSO arrested 11 persons on 33 stops with all of the persons arrested being unauthorized aliens. (Ex. 114.)
>
> 27   The 7th Street and Thunderbird operations took place on October 10, 2008, and January 23, 2009. The October 10 saturation patrol was made in response to vandalism complaints, and only one arrest was made for a liquor violation warrant. (Ex. 125.) During the January 23 saturation patrol, five arrests were made, only one of which was of [*44] an unauthorized alien booked on state charges. (Ex. 286.)
>
> 28   The May 29, 2009 Avondale patrol was apparently not planned in advance, but was conducted "[d]ue to the vendor detail being rescheduled." (Ex. 175.) On that date, the MCSO made 11 arrests, three of whom were unauthorized aliens and all of whom were arrested on state charges ranging from driving on a suspended license to open container. (*Id.*) A vendor detail was apparently an operation in which MCSO targeted "unpermitted food vendors, which are generally peddlers using shopping carts or modified bicy-

cles selling food." (Ex. 100.) One of the goals of the operation was to enforce the County Health Code, but such operations were also targeted at unauthorized aliens as the same instructions about contacting a suspect about his immigration status that were eventually given in large-scale saturation patrols were also given to deputies participating in such operations. (*Id.*) Because food vendors are not by definition members of the Plaintiff class as certified in this action, the Court does not further consider such operations.

> 29   At trial, the parties introduced a list of Hispanic surnames from the 1980 U.S. census. (Ex. 320.) If a [*45] surname or part of a hyphenated surname appeared on the census list of Hispanic surnames, the Court concluded that the name was a Hispanic name. If the name did not appear on the list, the Court did not count it as a Hispanic surname even if it was a close alternate spelling or the name otherwise appeared to be Hispanic. At trial, the MCSO noted that Hispanic surnames are not a flawless indicator of Hispanic identity. Several deputies noted, for example, that Sgt. Madrid's wife is not Hispanic although she now has a Hispanic surname. The Court accepts that Hispanic names are not a perfect indicator of Hispanic identity. A Hispanic surname is nevertheless probative of Hispanic identity.

Despite the lower stop to immigration arrest ratios, the MCSO specifically identified some of these operations in news releases as an integral part of Sheriff Arpaio's "illegal immigration stance." (Ex. 316; *see also* Exs. 315 (May 8, 2008 news release describing arrests of "illegal aliens" in Fountain Hills), 186 (July 8, 2008 news release describing Sheriff's Illegal Immigration Interdiction Unit responding to complaints from Cave Creek citizens and announcing that "in a matter of five hours, deputies [*46] conducted 81 interviews, in the process of making 59 traffic violation stops. During those traffic stops, 19 people were arrested and taken into custody, including the 18 illegal aliens"), 332 (news release dated September 4, 2008 stating, "Early this morning Sheriff Arpaio's Illegal Immigration Interdiction unit (Triple I) saturated the towns of Cave Creek and Carefree. In four short hours, eleven illegal aliens were arrested; . . . In the last two weeks deputies have arrested twenty three illegal aliens in Cave Creek.").)

### 3. Large-Scale Saturation Patrols

The first 13 large-scale saturation patrols that the MCSO conducted were the principal focus of trial testimony. The large scale saturation patrols were preceded by, and to some extent conducted simultaneously with, the smaller-scale saturation patrols. The large-scale satu-

ration patrols began in January 2008. They continued until well after the period that arrest reports for such operations were provided in evidence. Like the last eight small-scale saturation patrols discussed above, large-scale saturation patrols mostly consisted of enforcing traffic and other laws. Participating deputies made stops for minor infractions of the  [*47] traffic code that departed from MCSO's normal traffic enforcement priorities. Again, once a vehicle was stopped, the deputies would determine whether to investigate the identities of the occupants of the vehicle.

Unlike the small-scale saturation patrols, the large-scale operations involved many more patrol deputies and covered larger areas. Lt. Sousa, who supervised the HSU as of September 2007, oversaw most of the large-scale saturation patrols either as Operations Commander or Deputy Operations Commander. The two HSU supervising sergeants--for most such patrols, Sgts. Madrid and Palmer, and before Sgt. Palmer, Sgt. Baranyos--were typically "Operations Supervisors" for such patrols. Deputies participating in the large scale patrols were frequently assigned from multiple divisions of the MCSO, whether or not the deputies were 287(g) certified. (Tr. at 697:19--23, 1135:20--24.) Both HSU and non HSU deputies who participated in such patrols investigated the identity of a vehicle's passengers. [30] If non-287(g) certified officers encountered persons they believed to be in the United States without authorization, they were supposed to detain the person and place a radio call for a 287(g) certified  [*48] deputy to respond and handle the matter.

> 30   Deputies Kikes and Beeks, who testified at trial, were not 287(g) certified at the time that they participated in all or most of the saturation patrols, but they nevertheless made immigration arrests in each such patrol. Deputy Kikes participated in at least three saturation patrols, Deputy Beeks participated in at least four. They both were noted as the arresting officer in making 287(g) arrests during operations in which they were not authorized to make such arrests. (Ex. 82 at MCSO 001851; Tr. at 1477:3--10.)

Deputies assigned to participate in large-scale saturation patrols were expected to sign-in at a briefing that would take place at the command post prior to the patrol and read all or parts of the operation plans at that time. (Id. at 995:6--11.) Lt. Sousa did not distribute many copies of such operation plans because he did not want them to become available to the general public. (Id. at 1059:2--12.) Deputies were also frequently given an oral briefing at the command post by Lt. Sousa, or other members of the MCSO command structure at the time of sign-in. Not all participating deputies attended the briefings, signed in

to the operation,   [*49] or read all of the operations plans. [31]

> 31   The arrest records demonstrate that not infrequently an officer made an arrest who did not sign in. For example, Deputy Kikes conducted an arrest during the saturation patrol on March 27, 2008, but never signed the roster. (Tr. at 616:3--15; Ex. 82.) And while virtually every HSU officer would participate in the saturation patrols, (id. at 683:18--21), members of the HSU would typically not attend the briefings conducted prior to the saturation patrols (Id. at 1501:18--25).

After conducting each large-scale saturation patrol, MCSO created records documenting arrests made on those patrols. (Exs. 77, 79, 82, 87, 90, 97, 102, 111, 168, 170, 174, 176, 179--82.) There are not complete arrest records for all such patrols, but the arrest reports generally contain the names of the persons arrested, the charges on which they were arrested, the initial reason for stopping the vehicle in which the arrested person(s) were occupants, and whether the person was an unauthorized alien.

The first two large-scale patrols are exceptions. The report for the January 18--19, 2008 large-scale saturation patrol at Pruitt's contains no names of arrestees, arresting officers,  [*50] or the probable cause that justified the initial stop. (Ex. 77.) Consequently, that report is not included in many of the calculations that appear later in this Order. The report for the second large-scale saturation patrol at Pruitt's (March 21--22, 2008) contains a list of arrestees that includes their names, but it does not identify arresting officers or the probable cause supporting the initial stop. [32] (Ex. 79.)

> 32   Although the arrest sheets give the name of 43 people arrested, the tally sheet suggests that 44 people were arrested. (Ex. 79.)

The reports from the 11 large-scale patrols that took place between March 27, 2008, and November 18, 2009, generally include the name of an arresting officer, the alleged probable cause supporting the stop, the name of the person arrested, the charge for which the person was arrested, and whether the person was processed under 287(g) for not being legally present in the country. [33] (Exs. 82, 87, 90, 97, 102, 111, 168, 170, 174 178.)

> 33   The report for the saturation patrol on September 5, 2009, does not record the alleged probable cause supporting the stop. (Ex. 170). The reports for the October 16--17, 2009, and November 16--18, 2009, saturation patrols  [*51] again include the name of an arresting officer, the alleged probable cause for the stop, and the charge

for which a person was arrested. (Exs. 174, 178.) Because the MCSO's 287(g) field authority had been revoked by this time, they do not indicate the use of 287(g) authority, although they do indicate that some detainees were turned over to ICE. (*Id.*)

Most of the MCSO administrators and deputies who testified acknowledged that immigration enforcement was at least a primary purpose--if not the primary purpose--of such operations. Insofar as any MCSO officers testified that there was no particular purpose associated with the large scale saturation patrols at issue other than general law enforcement, their testimony is outweighed by substantial, if not overwhelming, evidence to the contrary. [34]

> 34    For example, Sgt. Madrid readily acknowledged that the principal purpose of such patrols was immigration enforcement. (Tr. at 1136:11--20.) Sheriff Arpaio testified that in addition to using the patrols to enforce federal immigration laws, he used the saturation patrols to enforce the state human smuggling and employer sanctions laws. (*Id.* at 786:14--18, 787:5--6.) Chief Sands testified, although somewhat reluctantly, [*52] that immigration enforcement was one of the purposes of the saturation patrols. (*Id.* at 786:14--18, 787:5--6.) Sgt. Palmer, while not acknowledging that immigration enforcement was a purpose of such patrols, did acknowledge that he expected to arrest a large number of people who were not lawfully present in the country on 287(g) authority during such patrols. (*Id.* at 688:9--11.) Lt. Sousa and Deputy Rangel denied that immigration enforcement was a purpose of such patrols and testified that the saturation patrols were "based on citizens' complaints referenc[ing] criminal activity or criminal nuisance." (*Id.* at 993:24--994:1, 943:15--16.)

As with the day labor operations and small-scale saturation patrols, participating deputies were required to keep track of the number of unauthorized aliens they arrested during the large-scale patrols and report these figures to their supervising sergeants. The supervising sergeants compiled and summarized these figures to emphasize the number of unauthorized aliens arrested and sent the reports to the MCSO command structure, including the public relations department.

The MCSO public relations department issued news releases discussing the largescale saturation [*53] patrols that either emphasized that their purpose was immigration enforcement, or prominently featured the number of unauthorized aliens arrested during such operations. (Exs. 310 (dated January 18, 2008, announces Central Phoenix operation in which "Illegal Immigration Arrests [are] Anticipated"), 311 ("The Thomas Road crime suppression operation around Pruitt's Furniture Store occurred over a two month time period and resulted in 134 people arrested, 94 of whom were determined to be in the United States illegally."), 312 (dated March 28, 2008, announces ongoing Bell Road Operation and announces 21 arrests, 12 of whom are illegal immigrants five of whom were arrested on state charges), 313 (dated April 3, 2008, announcing crime suppression operation in Guadalupe because "tensions are escalating between illegal aliens and town residents," and further referring to Bell Road/ Cave Creek and 32nd Street and Thomas operations at which 79 of 165 arrests were determined to be illegal aliens), 314 (dated April 4, 2008, announcing 26 arrests of which five were of suspected illegal aliens), 316 (dated June 26, 2008, describing Mesa "illegal immigration" operation, and recent similar operations [*54] in Phoenix, Guadalupe and Fountain Hills), 330 (dated July 15, 2008, describing Mesa crime suppression/illegal immigration operation), 331 (dated August 13, 2008, describing West Valley operation designed to capture human smugglers and their co-conspirators), 333 (dated January 9, 2009, announcing Buckeye operation to capture human smugglers and their co-conspirators, and "in the course of their law enforcement duties, where illegal immigrants are found, they will be arrested and booked into jail"), 334 (dated April 23, 2009, announcing Avondale operations targeting "criminal violations including drugs, illegal immigration and human smuggling"), 349 (dated October 16, 2009, announcing operation in Northwest Valley targeting "all aspects of illegal immigration laws such as employer sanctions, human smuggling, and crime suppression), 350 (dated October 19, 2009, announcing 66 arrests, 30 of whom were suspected of being in the country illegally).)

### a. Operations Plans

The operations plans for the first three large-scale saturation patrols (two at Pruitt's, and the third at Cave Creek and Bell Roads) were very rudimentary. Those plans did not include any language regarding officers' use of [*55] race, or their discretion (or lack thereof) in making stops and arrests. (Exs. 75, 79, 82.) They included the following instructions: 1) "All criminal violations encountered will be dealt with appropriately," and 2) "Contacts will only be made with valid PC". (*Id.*; *see also* Tr. at 996:14--17.)

The operations plan for the MCSO's fourth large-scale saturation patrol on April 3--4, 2008, at Guadalupe contained more detail. It gave brief instruction on the primary (criminal and traffic enforcement) and secondary (public relations contacts with citizens in the community) objectives of the patrol. (Ex. 86.) It provided

separate paragraphs on **"Conducting traffic stops on saturation patrol,"** and **"Conducting interviews reference a contact or violator's citizenship."** (*Id.* (emphasis in original).) The revised instructions also included a sentence that required MCSO officers to book anyone that they observed committing a criminal offense. (*Id.*)

**1) Instructions on Conducting Stops**

A paragraph in the instructions specified that "[a]ll sworn personnel will conduct all traffic stops in accordance with MCSO Policy and Procedures, as well as training received at the basic academy level. **Note:** At no time [*56] will MCSO personnel stop a vehicle based on the race of the subjects in the vehicle (racial profiling is prohibited)." (Ex. 86.) That general instruction remained in operation plans for many of the operations thereafter, (Exs. 90, 97, 102, 111, 169, 174), and was further incorporated into the Triple I team protocols, (Ex. 90 at MCSO 001888.)

**2) Instructions on Investigating Citizenship**

The next paragraph in the operations plans contained specific instructions both to officers who were 287(g) certified, and those who were not, about "**[c]onducting interviews reference a contact or violator's citizenship**" during a large scale saturation patrol. (Ex 86 (emphasis in original).) Certified 287(g) officers were instructed that they could conduct interviews regarding a person's citizenship status only "when indicators existed per the U.S. Immigration and Nationality Act, Title *8 U.S.C. β 1324, 287(g)* and training received during the 287g training course." (Exs. 86, 90, 97, 102, 111, 169.) The plans did not include the indicators set forth in *β 1324*, but provided as an example that "[t]he violator does not have a valid identification and does not speak English." [35] (Ex. 86.)

> 35   In fact, while in appropriate [*57] circumstances an inability to speak English and an inability to provide a drivers' license may be indicators of unauthorized presence, neither is an indicator listed under *β 1324. Section 1324* is the federal criminal smuggling statute, which provides criminal penalties to anyone who "knowing that a person is an alien, brings to or attempts to bring to the United States in any manner whatsoever such person at a place other than a designated port of entry." *8 U.S.C. β 1324(a)(1)(A)(i) (2006).* To determine whether the person being smuggled in such circumstances is an alien, the statute provides that any of the three following indicators shall be evidence "that an alien involved in the alleged violation had not received prior official authorization to come to, enter, or reside in the

United States": a) records of proceedings in which it was determined that a person was not lawfully present, b) official State Department documents showing that the person was not granted authorization to enter the country, or c) testimony by a federal immigration officer with personal knowledge that a person is not legally present in the country. *Id. β 1324(b)(3)(A--C).* The statute is silent on civil immigration [*58] violations or factors like not speaking English or not carrying identification.

"287g" refers to the section of the act, codified at *8 U.S.C. β 1357(g)*, that authorizes ICE to certify local law enforcement authorities to enforce federal immigration law. That section itself, however, provides no indicators as to unauthorized presence. Nonetheless, as will be further discussed below, the plan's reference to "training received [by MCSO officers] during the 287g training course" explicitly authorized MCSO deputies to consider race as one factor among others in forming reasonable suspicion in an immigration enforcement context that a person is in the country without authorization.

The instructions also noted that a non-287(g) certified officer could detain persons she or he believed were violating immigration law pending the arrival of a 287(g) officer, but "at no time" could such a "deputy call for a 287(g) certified deputy based on race." (Exs. 86, 97.) However, this instruction was modified for subsequent saturation patrols to indicate that "at no time will a deputy call for a 287g certified deputy based *just* [or *only*] on race." (Exs. 90 at MCSO 001898, (Mesa saturation patrol in June [*59] 26--27, 2008) (emphasis added), 102 (Sun City saturation patrol in August 2008) ("at no time will a deputy call for a 287g certified deputy based just on race"), 111 (January 2009 in Southwest Valley), 169 (September 2009 in Southwest Valley) ("at no time will a deputy call for a 287g certified deputy based only on race").) These instructions were also incorporated into the III strike team protocols. (Ex. 90 at MCSO 001888.) This modification made the MCSO's policy on how race could be considered consistent with the instructions given to 287(g) certified officers about conducting interviews.

When presented with an operation plan which stated that officers could not call for a 287(g) certified deputy "based just on race," Sgt. Palmer confirmed that this meant that officers could call a 287(g) certified officer based on race in combination with other factors. (Tr. at 783:3.)

**3) Instruction to Book All Criminal Offenders**

The operation plan also contained limited instruction concerning those individuals deputies were required to

arrest during saturation patrols. This instruction specified in bold print that "**All criminal offenders will get booked**." (Ex. 87.) These instructions, then, while [*60] not indicating how deputies should handle civil violations, presumably removed the discretion to issue criminal citations or give only warnings for minor criminal conduct. According to the instruction, if the deputy witnessed or became aware of criminal conduct during the operation, she or he must arrest and book the criminal offender. A similar instruction appeared in the operation plans for many of the large-scale saturation patrols thereafter. (Exs. 86, 90, 97, 102, 111, 169, 174.)

### b. Large-Scale Saturation Patrol Results

By the Court's count, of the 727 arrests recorded during large scale saturation patrols, 347--nearly half--were of persons who were not in the country legally. (Exs. 77, 79, 82, 87, 90, 97, 102, 111, 168, 170, 174, 176, 179--82.) The MCSO itself arrived at an even higher figure. (Ex. 359 (March 18, 2010 news release stating that, "[a]ccording to the Sheriff, the 13 previous two-day crime-suppression operations netted a total of 728 arrests. Some legal U.S. residents were arrested but of the 728 total arrests, 530 or 72% were later determined to be illegal aliens.").)

During the large scale saturation patrols for which arrest records were placed in evidence and last names [*61] were available, 496 out of 700 total arrests or 71% of all persons arrested, had Hispanic surnames. (Exs. 79, 82, 87, 90, 97, 102, 111, 168, 170, 174, 176, 179--82.) 341 of those arrests involved immigration-related offenses. (*Id.*) Of the 583 people who were arrested during saturation patrols that took place while the MCSO had 287(g) authority, and where records of the last names were kept, 414, or 71%, appeared to have Hispanic surnames. (Exs. 79, 82, 87, 90, 97, 102, 111, 168, 170.) That percentage remained consistent after ICE revoked the MCSO's 287(g) authority--even then, 82 of the 117 arrests (70%) involved a person with a Hispanic surname. (Exs. 174, 176, 179-- 82.)

### c. ICE's Revocation of the MCSO's 287(g) Authority

Prior to the actual revocation of 287(g) authority (announced in early October and effective on October 16, 2009) MCSO began noting in its news releases that "a move is underway to suspend [Sheriff Arpaio's] 287 G agreement." (Ex. 353.) ICE began refusing to accept some of the persons that were arrested during MCSO saturation patrols. (Exs. 128, 342.) And in saturation patrols the MCSO began for what appears to be the first time to arrest some unauthorized aliens on the [*62] charge of conspiring to violate the Arizona human smuggling law instead of making an arrest on federal immigration charges. (Ex. 168.)

Moreover, sometime before July 15, 2009, Chief Sands asked Sgt. Palmer to conduct legal research into whether the MCSO had authority to enforce immigration law absent the authorization of the Department of Homeland Security. (Tr. at 702:19--24.) Sgt. Palmer conducted an internet search, and copied his findings into an e-mail to Chief Sands on July 15, 2009. (*Id.* at 703:11.) The e-mail stated that "State and local law enforcement officials have the general power to investigate and arrest violators of federal immigration statutes without INS knowledge or approval, as long as they are authorized to do so by state law." (Ex. 269.) It continued, "[t]he 1996 immigration control legislation passed by Congress was intended to encourage states and local agencies to participate in the process of enforcing federal immigration laws." (*Id.*) The e-mail provided as a citation for this proposition "*8 U.S.C. β 1324(a)(1)(A)(iv), (B)(iii).*" [36]

> 36  Sgt. Palmer also wrote an email to Lt. Sousa which claimed that "all violations of the INA are federal criminal violations." (Tr. [*63] at 708:16--19.) During his 2010 deposition, Sgt. Palmer testified that the MCSO had inherent authority to enforce immigration laws, based on training he had received from Kris Kobach. (*Id.* at 698:23--699:7.)

That section of the United States Code did not then and does not now exist. Nevertheless, it apparently provided the impetus for Sheriff Arpaio's public statements that the MCSO maintained the authority to make immigration arrests despite ICE's suspension of 287(g) authority. In his interview with Glenn Beck a few days after the effective date of the ICE revocation, Sheriff Arpaio stated that MCSO officers retained the authority to enforce federal immigration law because it had been granted by "that law in 1996, part of the comprehensive law that was passed, it's in there." (Tr. at 364:24--363:5.)

In such interviews the Sheriff stated that the revocation of 287(g) authority did not end the MCSO's attempts to enforce federal immigration law. At the time of the revocation the MCSO had approximately 100 field deputies who were 287(g) certified. (Exs. 356, 359, 360.) Shortly after the revocation of his 287(g) authority, Sheriff Arpaio decided to have all of his deputies trained on illegal [*64] immigration law. According to the MCSO, that training enabled all MCSO deputies to make immigration arrests. An MCSO news release dated March 18, 2010 notes:

> Arpaio recently ordered that all 900 sworn deputies be properly trained to enforce illegal immigration laws, a move made necessary after the recent decision by Department of Homeland Security to

take away the federal authority of 100 deputies, all of whom had been formally trained by ICE (Immigration and Customs Enforcement) to enforce federal immigration laws.

'They took away the ability of 100 federally trained deputies to enforce immigration laws, and so I replaced them with 900 sworn deputies, all of whom are now in a position to enforce illegal immigration laws in Maricopa County," Arpaio said.

(Ex. 359; *see also* Exs. 356, 358 (MCSO news release dated March 1, 2010 stating that "[t]hese arrests are a result of Sheriff Joe Arpaio's recent promise to ensure that all 900 of his sworn deputies receive training on the enforcement of illegal immigration laws."), 360, 362.)

This training erroneously instructed MCSO deputies that a person within the country without authorization was necessarily committing a federal crime, and they thus [*65] maintained the authority to detain them for criminal violations. (Tr. 699:3--700:17.) Sgt. Palmer continued to provide such instruction and training until December 2011, when this Court entered its injunctive order preventing the MCSO from detaining persons on the belief, without more, that those persons were in this country without legal authorization. *Ortega-Melendres, 836 F. Supp. 2d at 994.*

At the same time, Sheriff Arpaio gave interviews to the national and local press in which he asserted that if a person is in the country without authorization that person has necessarily committed a criminal offense. "They did commit a crime. They are here illegally." (Tr. at 362:17--21.)

After the revocation of his 287(g) authority the Sheriff continued to run numerous saturation patrols that focused on arresting unauthorized immigrants. (Exs. 350 ("[D]eputies turned over a total of 19 of the 30 suspected illegal aliens who were not charged for any state violations to Immigration and Custom Enforcement officials without incident."), 358, 359 (in the 13 previous operations 530 of 728 arrests were of illegal aliens), 361, 362 (in the 14 previous operations, 436 of 839 arrests were of illegal aliens, [*66] 78 of 111 arrests in most recent operation were of illegal aliens), 363 (63 of 93 arrests of illegal aliens), 367.) In such operations he continued to arrest and turn over to ICE the unauthorized aliens that his deputies arrested during these patrols. (Ex. 360 (MCSO news release noting that 47 of 64 people arrested in a post-revocation saturation patrol were illegal aliens. 27 of those 47 were arrested on state charges with the remainder being turned over to ICE").) At trial, Sheriff Arpaio testified that he has continued to enforce "the immigration laws, human smuggling, employer sanction" as he did previously. (Tr. at 473:23--474:2.)

In sum, according to the Sheriff, the loss of 287(g) authority did not affect how the MCSO conducted its immigration related operations, including the saturation patrols. (*Id.* at 469:23--470:5). The Sheriff still maintains the right and intention to conduct such operations today. (Tr. at 330:9--14, 469:20--470:2; 473:5--474:7; 474:20--24.) Sheriff Arpaio testified that the last saturation patrol the MCSO conducted prior to trial occurred during October 2011 and was conducted in southwest Phoenix. (*Id.* at 474:8--13.) Nevertheless, the Sheriff testified that the [*67] MCSO continues to engage in immigration enforcement even though not using saturation patrols to do so. (*Id.* at 474:14--24.) He noted during his testimony that in the two weeks prior to trial, the MCSO arrested approximately 40 unauthorized aliens, and those that it couldn't charge with a state violation it successfully turned over to ICE. (*Id.* at 502:25--503:6.)

Once the MCSO lost its 287(g) authority, it revised its operation plans for saturation patrols. *See* Section I.D.3.a, *supra.* While the MCSO continued to assert the authority to arrest and detain persons it believed to be in the country without authorization but could not arrest on state charges, it had no practical authority to process them absent the participation of ICE. [37] Neither the MCSO, nor any state authority, had any prerogative to initiate removal proceedings, authorize voluntary departure or, in appropriate cases, bring criminal immigration charges against such persons. *See, e.g., Arizona v. United States, U.S. , , 132 S. Ct. 2492, 2506--07, 183 L. Ed. 2d 351 (2012)*; *Reno v. Am.-Arab Anti-Discrimination Comm., 525 U.S. 471, 483--484, 119 S. Ct. 936, 142 L. Ed. 2d 940 (1999)* (federal government retains exclusive discretion on these matters); *Martinez-Medina v. Holder, 673 F.3d 1029, 1036 (9th Cir. 2011).*

37   In [*68] a press interview, Sheriff Arpaio apparently stated, however, that if ICE refused to take them he would "load them on a bus and drive them to the border."(Ex. 348.) But aside from this comment in a newspaper article admitted into evidence, there is no evidence that the MCSO actually did, or is doing so.

Accordingly, the MCSO revised its operation plans for the large scale saturation patrols. Lt. Sousa directed either Sgt. Palmer or Sgt. Madrid to draft what became known as the LEAR Protocol. (Tr. at 1056:14--23.) The LEAR protocol states that "IF a Deputy Sheriff believes with reasonable suspicion he has one or more illegal aliens detained AND there are no state charges on which to book the subject(s) into jail THEN the Deputy will fol-

low the LEAR Procedures outlined below." (Ex. 174.) An officer is to call a field supervisor to location when he "has indicators as outlined above leading him to believe (Reasonable Suspicion) a violator or other subject he is in lawful contact with is in fact an illegal alien in the United States." (Id.) Thus the LEAR protocol authorized the deputy to detain the individual prior to further processing from ICE.

Thereafter, the protocol requires the MCSO [*69] field supervisor to obtain and "provide a brief summary of the contact, including how the contact was made and what indicators exist that lead to the belief the person is an illegal alien." [38] (Id.) The operational plans continue to specify that "ICE LEAR will want to talk with the suspected illegal alien via cell phone in order to confirm illegal alien status in the United States. ICE LEAR will determine if their unit will respond to take custody of the illegal alien." (Id.) The policy further specifies that "[a]ny person detained solely for illegal alien status in the U.S. whom LEAR refuses to respond for AND for which there is no other probable cause to detail WILL be immediately released from custody." (Id.)

> 38   The LEAR procedures require the field supervisor to ensure that a detailed written record of the encounter is made that includes "all information concerning the contact with any illegal aliens as well as any LEAR contact." (Ex. 174.) It specifies that "information that will be recorded includes . . . the full and complete name of the illegal alien(s), the alien's DOB, full descriptors, an address in AZ if obtainable, the Deputy's name and serial number making the original [*70] contact, a phone number to reach the Deputy" and "the person the supervisor spoke to at LEAR." (Id.)

MCSO drafted, placed in effect, and trained all of its deputies on this policy. (Tr. at 1055:14--1056:13, 1069:17--1070:18, 1076:11--18.) This policy remains in force at the MCSO. In determining who may be present without authorization for purposes of application of the LEAR Policy, Lt. Sousa noted that MCSO officers "still had the [287(g)] training," so they could "definitely" still use the indicators from that training in carrying out the LEAR policy. (Id. at 1007:6--11.)

## II. SPECIFIC FINDINGS

Based on the facts presented at trial, the Court draws the following factual conclusions:

**1. The purpose of the saturation patrols discussed above was to enforce immigration laws.**

Many MCSO administrators and deputies who testified acknowledged that immigration enforcement was at least a primary purpose, if not the primary purpose, of saturation patrols. During all types of saturation patrols discussed above, all participating deputies were required to keep track of the number of unauthorized aliens they arrested and report these figures to their supervising sergeants. The supervising sergeants compiled [*71] and summarized these figures to emphasize the number of unauthorized aliens arrested and the reports were sent to the MCSO command structure, including the public relations department.

The MCSO public relations department issued news releases discussing the saturation patrols. These news releases either emphasized that the patrols' purpose was immigration enforcement, or prominently featured the number of unauthorized aliens arrested during such operations. Most of the time, the reports ignored any other arrests that took place.

The large-scale operation plans contained instructions on initiating investigations into the citizenship status of persons contacted during the operation.

The arrest records also support this conclusion. Every person arrested during the day labor operations was arrested on immigration charges. The vast majority of persons arrested during small-scale saturation patrols were unauthorized aliens. Finally, a significant number of persons arrested during the large-scale saturation patrols were unauthorized aliens.

**2. [*72] ICE trained HSU officers that it was acceptable to consider race as one factor among others in making law enforcement decisions in an immigration context.**

The testimony of MCSO officers and deputies makes clear that ICE training allowed for the consideration of race as a factor in making immigration law enforcement decisions. At trial, Sgt. Palmer testified that ICE training permitted the use of race as one factor among many in stopping a vehicle, (Tr. at 715:3--19), and that ICE trained him that "Mexican Ancestry" could be one among other factors that would provide him reasonable suspicion that a person is not lawfully present in the United States (id. at 715:9--12). Sgt. Madrid testified that he was trained by ICE that a subject's race was one relevant factor among others that officers could use to develop reasonable suspicion that a subject was unlawfully present in the United States. (Id. at 1164:4-12.)

Lt. Sousa testified at his deposition that since he was not 287(g) certified and his sergeants were, when it came to what ICE taught in 287(g) training regarding the use of race, "I would have to rely on my sergeants," and that "when we start getting into all the specifics, that's when

[*73] I lean on my sergeants." (Doc. 431-1, Ex. 90 at 56:15--19.) Nevertheless, Lt. Sousa testified at trial that it was his understanding that ICE officers taught MCSO deputies in their 287(g) training that while race could not be used even as one factor when making an initial stop, it could be used as one of a number of indicators to extend a stop and investigate a person's alienage. (Tr. at 1016:3--7.)

Similarly, the ICE 287(g) training manual expressly allows for consideration of race. The 287(g) training manual for January 2008 that was admitted in the record cites to *United States v. Brignoni-Ponce, 422 U.S. 873, 95 S. Ct. 2574, 45 L. Ed. 2d 607 (1975)*, for the proposition that "apparent Mexican ancestry was a relevant factor" that could be used in forming a reasonable suspicion that a person is in the country without authorization "but standing alone was insufficient to stop the individuals." (Ex. 68 at 7.) In referring to *Brignoni-Ponce*, the ICE materials go on to observe that "[t]his is an administrative case but it also applies in criminal proceedings" and further notes that "[a]n example of this in action in the criminal context is that a LEA Officer cannot stop a vehicle for an investigation into smuggling just [*74] because the occupants appear Mexican." (*Id.*)

Alonzo Pena, ICE's Special Agent in Charge of Arizona at the time that ICE began its 287(g) certification training of MCSO officers, testified that it was his understanding that officers with 287(g) authority can form a reasonable suspicion that a person is unlawfully present when "several factors in combination" are present, with race being one of those factors. (Tr. at 1831:17--832:19.) Agent Pena does not believe that race is sufficient in and of itself to give rise to such suspicion, but he does believe that race can be a factor in forming such a suspicion. (*Id.*)

**3. In an immigration enforcement context, the MCSO did not believe that it constituted racial profiling to consider race as one factor among others in making law enforcement decisions. Its written operational plans and policy descriptions confirmed that in the context of immigration enforcement, the MCSO could consider race as one factor among others.**

The MCSO has no general written policy concerning racial profiling. (*Id.* at 465:18--24.) In his trial testimony the Sheriff acknowledged that he had earlier testified that the MCSO does not need a training program to prevent racial [*75] profiling because he did not believe the MCSO engages in racial profiling. (*Id.* at 466:16--19.) He further testified that he believes that the MCSO is "the most trained law enforcement agency in the country with the five weeks of training from the government, [presumably the 287(g) training for those deputies who

received it], academy training, in-house training." (*Id.* at 465:21--24.)

The large-scale saturation patrol operation plans written after April 2008 refer deputies to the MCSO Academy training they received about racial profiling. MCSO witnesses who testified concerning the Academy training stated that they received brief and generalized instruction regarding racial profiling, but could remember nothing else about it.[39] There was no testimony that such training defined racial profiling or provided any instruction to officers on how to proceed in the circumstances present in Maricopa County when the MCSO decided to enforce immigration laws.

> 39   Deputy Rangel testified that he was trained not to "racially profile" as part of a course on criminal law, and received no further academy or in-service training from the MCSO on racial bias. (Tr. at 899:4--10.) Deputy Armendariz believed the [*76] MCSO training was part of a basic ethics class, and described it as follows: "I believe it was short and sweet, and we don't racial profile." (*Id.* at 1549:17--20.) He remembers being told not to racially profile, but has never received a definition of what "racial profiling" meant. (*Id.* at 1151:18--21.) Deputy DiPietro does not recall how the term "racial profiling" was defined during his training prohibiting racial profiling. (*Id.* at 320:3--5.) When asked if he was trained at the MCSO academy regarding the prohibition on racial profiling, Sgt. Palmer stated that he "believe[s] there was" such training. (*Id.* at 753:3--6.) Sgt. Madrid states that he is "sure there was" training at the academy level prohibiting racial profiling, but that "I don't specifically remember it now." (*Id.* at 1214:17--19.)

In addition to the Academy training, Sgt. Madrid testified that Lt. Sousa would also "yell" at the briefings prior to the large-scale saturation patrols that "we don't racially profile . . . several times to make sure everybody was clear." (*Id.* at 1191:5--7.) Again, no definition of "racial profiling" was provided during those instructions, and no examples of what would constitute "racial profiling" [*77] were offered. (*Id.* at 1215:5--12.) Further, as Lt. Sousa himself testified, when he issued such oral instruction he also told those assembled that he knew that they were not racially profiling, but that he was giving the briefing "to remind you of what people are saying out there and being proactive." (*Id.* at 1024:18--21, 1025:6--8.) According to his testimony a primary reason he issued the instruction was not because he deemed it necessary, but so he could demonstrate to the public that his officers were receiving such instruction and testify dur-

ing this lawsuit that he had in fact issued such instructions. (*Id.* at 1025:12--17.)

The MCSO introduced in evidence an electronic bulletin board posting on the MCSO's electronic "Briefing Board" for October 21, 2008, where the MCSO published its Illegal Immigration Enforcement Protocols. That posting repeated the instruction that also appeared in the large-scale saturation patrol operations plans after April 2008. "At no time will sworn personnel stop a vehicle based on the race of any subject in a vehicle. ***Racial profiling is _underlined_ and will not be tolerated.***" (Ex. 92 at 3 (emphasis in original).) All those who testified in this lawsuit agreed [*78] that it constituted impermissible "racial profiling" for a law enforcement officer to stop a person for a law enforcement purpose based *uniquely or primarily* on a person's race. [40] Nevertheless, a number of MCSO witnesses also testified it was appropriate to consider race as one factor among others in making law enforcement decisions in an immigration enforcement context.

> 40   Sheriff Arpaio testified when presented with a hypothetical example of a law enforcement officer stopping a person solely because of his race, that "that would be racial profiling." (*Id.* at 468:21--469:5.) MCSO's police practices expert, former Dallas Police Chief Bennie Click defined "racial profiling" as "the unlawful, discriminatory practice of treating race, ethnicity or skin color as a *primary* indication of criminal conduct." (Ex. 1070 at 43 (emphasis added).) Agent Pena defined "racial profiling" as "picking an individual for law enforcement action based solely on his race and no other particular criteria," and understood that ICE 287(g) certification process included training that racial profiling was prohibited under this definition. (Tr. at 1818:24--1819:3.) Agent Jason Kidd of ICE defined "racial profiling" [*79] as "the use of race as a determining factor for a law enforcement activity." (*Id.* at 1388:15--16.) Lt. Sousa went so far as to testify that it would constitute "racial profiling" to make a law enforcement contact based on race, even as one among other factors. (*Id.* at 1015:7--11.) Deputy Kikes testified that when instructed not to engage in racial profiling, that meant that "[y]ou don't just pick on the--the Chinese, the Americans, the whites, the blacks, the browns, the greens. Anybody and everybody who had a violation was to be stopped; was to be cited; was to be pulled over." (*Id.* at 612:10--13.) Deputy Armendariz, an HSU deputy, testified that ICE training provided a list of indicators with which to do investigations. He does not recall if race was one of the indicators. (*Id.* at 1486:19--1487:13.) Deputy

Ratcliffe stated that during his 287(g) training, he was taught that there was "no place" for the use of race in making law enforcement decisions. (Tr. at 1355:8--10.)

As the operations plans themselves and other public pronouncements of the MCSO make plain, while officers were prohibited from using race as the only basis to undertake a law enforcement investigation, they were allowed [*80] as a matter of policy and instruction to consider race as one factor among others in making law enforcement decisions in the context of immigration enforcement. For example, while prohibiting racial profiling generally, the operations plans simultaneously instruct MCSO officers that they may consider the race of persons they encountered as one factor among others in making law enforcement decisions. First, according to the operations plans, a 287(g) certified officer should initiate investigations into a person's citizenship status "when indicators existed per . . . the training received during the 287g training course." (Exs. 86, 90, 92, 97, 102, 111, 169.) The testimony at trial was uniform that during their 287(g) training course MCSO officers were taught that they could use race as one indicator among others in forming reasonable suspicion that a person was in the country without authorization.

Second, the operations plans instructed MCSO officers who were not 287(g) certified that they should not summon a 287(g) certified officer to the scene to investigate a person's immigration status based only on that person's race. (Ex. 90 at MCSO 001898; Exs. 102, 111, 169.) In discussing [*81] this instruction at trial, both Sgts. Palmer and Madrid testified that, under such instruction, MCSO officers could consider the race of the subject as one factor among others in making such a determination; they just could not consider the subject's race as the only factor. (Tr. at 782:8--11, 783:3, 1162:14--23, 1170:5--15.) This testimony reasonably acknowledged the obvious: that while MCSO policy prohibits using race as the only or sole factor, it still permits an officer to use race as a factor in making a law enforcement decision.

The MCSO's frequently-issued news releases reflect this understanding. In one, the MCSO described its policy pertaining to decisions about whom to pull over during these operations. (Ex. 342.) Like the operation plans, the policy described in the news release prohibits racial profiling without defining the term, while at the same time permitting the use of race as a factor in an officer's decision to pull over a vehicle. (*Id.*) In the news release the Sheriff is quoted as saying, "All stops will be made in full accordance with Sheriff's Office policy and procedures and at no time will any vehicle be stopped *solely* because of the race of the occupants inside [*82] that vehicle. Racial profiling is strictly prohibited, Arpaio

says." (*Id.* (emphasis added).)) In interpreting similar language in the operations plans that governed when a non-certified deputy should summon a certified deputy to initiate an immigration investigation, Sgts. Palmer and Madrid noted that in prohibiting such a deputy from acting solely based on the race of the subject, the policy permitted the deputy to consider race as one factor among others in deciding to act. (Tr. at 782:8--11, 783:3, 1162:14--23, 1170:5--15.) This same understanding would apply to the MCSO policy that prohibits using race as the sole factor in deciding to pull over a vehicle during a saturation patrol. (Ex. 342.)

Further, as is discussed below, both Sgts. Palmer and Madrid testified that so long as there was a legitimate basis for an officer to pull over a vehicle for a traffic infraction, there was by definition no racial profiling involved in the stop. For example, Sgt. Palmer testified that if, in reviewing arrest reports, he saw that a deputy had reported that he had reasonable suspicion to justify a stop that meant the deputy did not engage in "racial profiling." (Tr. at 724:22--725:1.) Sgt. Madrid [*83] testified that if he determined that an officer had probable cause to make a stop, he "wouldn't even suspect" that the officer had engaged in racial profiling. (*Id.* at 1172:20--23.)

Thus, as illustrated by these operation plans and news releases, while the MCSO did prohibit racial profiling, it understood racial profiling to mean making law enforcement decisions based exclusively on racial factors. The MCSO did not understand this term, in an immigration context, to prohibit the use of race as a factor among others in making a law enforcement decision. Thus, MCSO deputies could consider race as one factor in stopping a vehicle or initiating an investigation so long as race was not the sole basis on which deputies made that decision. Accordingly, the Court finds that the MCSO operated pursuant to policies that, while prohibiting "racial profiling," did not require MCSO officers to be race-neutral in deciding how to act with respect to immigration investigations; the policies merely required that race not be the sole reason for their decision.

### 4. The MCSO considered Latino ancestry as one factor among others in choosing the location for saturation patrols.

The MCSO almost always scheduled [*84] its day labor and small-scale saturation patrols where Latino day laborers congregated; the same is true for a considerable number of its large-scale saturation patrols.

The MCSO witnesses uniformly testified that there is nothing about being a day laborer per se that is illegal. But, as both the testimony at trial and a number of MCSO's news releases demonstrate, in selecting loca-

tions for day labor, small-scale and large-scale saturation patrols, the MCSO equated being a day laborer with being an illegal alien. (Exs. 307 (news release describing a crackdown on illegal aliens at a day labor center), 308 (news release entitled "Sheriff Arpaio Goes After Day Laborers"), 309 (news release referring to "illegal immigrant day laborers" and "pro-illegal day laborer supporters" who "continue to protest the Sheriff's MCSO policies at Pruitt's Furniture Store"), 310 (anticipating the arrest of many unauthorized aliens in the Pruitt's location because it remains a popular spot for day laborers), 311 (news release which noted "there are two legal day laborer centers in the Bell Road area which are 'magnets for more illegal aliens'"); *see also* Doc. 453 at 150 ∂ 36 (the MCSO acknowledges that many [*85] MCSO officers thought day laborers were illegal aliens).) It is presumably for this reason that the MCSO news releases invited Maricopa County citizens to report day laborers to the MCSO on its immigration hotline. (Ex. 309 ("The Sheriff recently initiated an Illegal Immigration Hot Line . . . to help citizens report information regarding illegal aliens. Since the tip line was implemented, over 120 calls of 2,100 have been received specifically about day laborers.").)

Theoretically, the MCSO could have selected sites for operations due only to the presence of day laborers absent any racial considerations. A day laborer is neither necessarily Latino nor unauthorized. And there is nothing about being a day laborer that is, in and of itself, illegal. (Tr. at 386:17--22, 1193:8--9, 864:2--4.) But the MCSO did not conduct operations in which it simply checked the identity and immigration status of all day laborers. Nor did it present at trial evidence that would suggest that during the time it had 287(g) authority, it had a reasonable basis on which to form a suspicion that any day laborer, regardless of race, was an unauthorized alien. Rather, pursuant to at least its own policy, the MCSO [*86] had to have a basis under Arizona law to stop and question persons prior to checking their immigration status. When the MCSO's underlying purpose was immigration enforcement and not traffic enforcement it implemented that policy by directing patrol vehicles to follow and strictly enforce all requirements of the traffic code against vehicles that picked up Latino day laborers. Sgt. Madrid, and Deputies Rangel and DiPietro confirmed that the purpose of the day labor and small-scale operations was "to investigate day laborers for their immigration status." (Tr. at 1152: 12--14, 792:1--24, 908:8--11, 1137:6--8.)

The evidence demonstrates that the MCSO specifically equated being a Hispanic or Mexican (as opposed to Caucasian or African-American) day laborer with being an unauthorized alien. (Exs. 308 (MCSO news release asserting that the only sanctuary for illegal alien

day laborers is in Mexico), 310 (MCSO news release asserting that despite the anticipated arrest of many "illegal aliens" the MCSO is not engaged in racial profiling.), 311; *see also* Doc 453 at 150 ∂∂ 28--30 (the MCSO acknowledging that the Sheriff and MCSO deputies believed the overwhelming number of illegal aliens in Maricopa [*87] County are from Mexico and South America).) In his testimony Sheriff Arpaio acknowledged that he would not investigate Caucasians for immigration compliance because it would not have occurred to him that they were in the country without authorization. (Tr. at 441:22--442:3.) For the totality of all of the MCSO operations in which it targeted and arrested day laborers, Chief Sands could not identify a single instance in which the MCSO arrested a day laborer who was not Hispanic on any charge. (Doc. 530 at 1 ∂ 84.) Similarly, there is no evidence that undercover officers directed patrol officers during day labor operations to stop vehicles that had picked up day laborers that were not Latino. Thus, the Court concludes as a matter of fact that MCSO officers, who believed that Latino day laborers were unauthorized, centered day labor operations in locations where specifically Latino day laborers assembled, and where MCSO deputies perceived they had a higher likelihood of encountering persons present in the country in violation of immigration laws. The logistics of such operations, together with other evidence introduced at trial, show that the MCSO used this combination of race and work [*88] status in determining where to locate operations in which it would target vehicles for pretextual enforcement of traffic regulations to investigate immigration status.

However, several MCSO witnesses testified that the locations for these operations were selected in response to complaints about day laborers being involved in other illegal activity, and not principally to enforce immigrations laws against Hispanics. While the Court recognizes that a single law enforcement operation can serve multiple purposes, and that law enforcement officials are entitled to considerable deference in locating and conducting their operations, the Court does not credit such testimony because, among other reasons, there are in the record some direct connections between a citizen complaint regarding Hispanics and Latinos congregating in a certain area and an MCSO enforcement action.

## A. The Cave Creek day labor operation was not in response to public safety issues presented by the gathering of day laborers.

According to the news release issued by the MCSO after the first Cave Creek operation, the genesis for that operation was "tips received on [Sheriff Arpaio's] newly implemented illegal immigration hotline" [*89] about a local church providing assistance to day laborers. (Ex.

307.) According to the news release, the day laborers also caused "public safety issues along Cave Creek Road." (*Id.*) However, on September 19 and 22, 2007, several days previous to the September 27 operation, Latino HSU officers went undercover to the church, signed up for work, and verified the presence of day laborers inside the church parking lot. The undercover reports detailed that the Good Shepherd of the Hills congregation allowed day laborers to "sign-in" and wait "inside their property" to be employed, in turn, by those who wished to hire day laborers. (Ex. 122.) The Church would post a sign outside on the street, noting the availability inside the property of day laborers for hire. (*Id.*) The undercover investigation discovered "no information pertaining to forced labor, human smuggling, or possible 'drop houses.'" [41] (*Id.*) And, of course, the reports contained nothing about the day laborers in the church parking lot causing public safety problems along Cave Creek Road. Nevertheless, on the September 27, the MCSO conducted a day labor operation at the church.

> 41   In an email sent on September 24, 2007, Deputy Sean [*90] Ross informed Lt. Sousa that Deputies Rangel and Gonzalez had gone to the church undercover. (Ex. 122.) At trial, Deputy Rangel denied that he had done so. (Tr. at 908:12--19.)

As the undercover reports indicated, the day laborers gathered inside the parking lot of the church. Thus, the day labor operation at the church was not conducted because the day laborers presented public safety issues on Cave Creek Road. Further, no arrests were made or citations issued during the operation on such a basis. [42] Thus while the Court credits the news release to the extent that it announced the results of an operation launched at a Church that assisted day laborers, it does not credit the statement that the operation was in response to traffic problems along Cave Creek Road.

> 42   There is evidence that day laborers gathered at other locations in Cave Creek that may have caused such problems. For example, when a day labor operation was scheduled for a Cave Creek location several weeks later, deputies discovered that the problem along Cave Creek Road was at least temporarily cured by a Cave Creek anti-loitering ordinance that had recently become effective and the MCSO presence in the area. As a result [*91] they engaged in no day labor operations and the only person on whom they conducted a traffic stop was apparently not eligible for "287g action." (Ex. 121.) Follow-up patrols took place at both the church and along the Carefree Highway in Cave Creek during the following year. (*See, e.g.*, Ex. 186.)

**B. The Queen Creek day labor operation was a response to citizen complaints about the presence of Hispanic day laborers.**

The second day labor operation in Queen Creek on October 4, 2007, was also connected to a specific complaint regarding Hispanic day laborers. Two days before the operation, the Queen Creek Town Manager had forwarded a complaint to Lieutenant D'Amico--who was the MCSO lieutenant in charge of the MCSO district incorporating Queen Creek--that had been originally sent to the Queen Creek Mayor and town council. [43] (Ex. 219.) In the complaint, the author states that a Hispanic man jeered at her on the corner of Ocotillo and Ellsworth. (*Id.*) According to the e-mail "He then ran back to another Hispanic man and exchanged high fives while both laughed." (*Id.*) The e-mail further stated "[t]hen as I turned right another Hispanic man on the same corner, gave me what I would describe as [*92] a very intimidating look. Kids passing this area when on the school bus have seen Hispanic man [sic] take out cell phones and look like they were taking a picture of the kids. These men have whistled or made other noises at very young teenage girls." (*Id.*)

> 43  The Town Manager appears to have forwarded the complaint at the request of Lieutenant D'Amico. (Ex. 219.)

The next day, October 3, Lieutenant D'Amico forwarded the complaint to Lieutenant Sousa, the commander of the HSU. (*Id.*) The day after that, October 4, the HSU conducted a day labor operation at the corner detailed in the complaint--Ocotillo and Ellsworth. (*Id.*)

When he was presented with the exhibit containing the e-mail complaint and its transmission history at trial, Sheriff Arpaio testified that he could not tell whether any of the conduct complained of in the exhibit was criminal, but would have referred the matter for investigation. (Tr. at 390:16--391:5.) He further testified that the e-mail complaint would not have resulted in the Queen Creek operation by the MCSO without some conclusion that a crime had been committed because the MCSO does not just "go grabbing people on street corners unless we have a crime committed." [*93] (*Id.* at 392:14--15.) He further testified that the MCSO would not have had time to mount the Queen Creek operation between the time that it received the complaint and the time that the operation occurred two days later, because it takes three to four weeks to plan such an operation. (*Id.* at 393:6--14.) At any rate, he testified, those who were arrested in the Queen Creek operation were arrested by the MCSO for committing state crimes, (*id.* at 392:16--93:5), and thus their arrest presumably did not demonstrate that MCSO

was conducting operations against Latino day laborers purely on the basis that they were Latino day laborers.

However, as the contemporaneous records and other testimony demonstrate, Sheriff Arpaio's testimony in this respect is incorrect. On the same day as the Queen Creek operation, Lt. Sousa forwarded the e-mail complaint to Paul Chagolla, who ran the MCSO's public relations, with a designation of high importance. The MCSO swiftly issued a news release that day titled "Sheriff Arpaio Goes After Day Laborers." It confirmed that the operation was in response to the citizen's complaint. The news release noted: "[t]oday, Maricopa County Sheriff's Joe Arpaio's Office [sic] [*94] Illegal Immigration Interdiction Unit (Triple I), responding to Queen Creek citizen complaints regarding day laborers harassing school children at a bus stop, arrested 16 more illegal aliens under the federal immigration laws." The news release further noted "[c]itizens complained that day laborers are shouting at the children and photographing them at the bus stop. Sheriff's deputies contacted the 16 illegals during traffic investigations." [44] (Ex. 308.)

> 44  This news release also refers to the Sheriff's previous enforcement efforts in Wickenburg and Cave Creek that resulted in 34 arrests of unauthorized persons. Because the September 27 Cave Creek operation resulted in 9 arrests, the Court infers, pursuant to its Order, (Docs. 261, 493) that a previous day labor operation at Wickenburg resulted in the arrest of 25 unauthorized aliens. The news release further claims that "[s]ince the hot line began operating 96 illegal aliens have been arrested by Sheriff's deputies." (Ex. 308.) The Court thus infers that other operations occurred in which 46 other unauthorized aliens were arrested.

The news release directly refers to the complaint received by Lieutenant Sousa only a day before as the [*95] reason for the operation regarding Hispanic day laborers, and notes that the operation was run by the Illegal Immigration Interdiction Unit. (*Id.*) As the news release also states, the 16 persons were arrested not for state crimes, but for federal immigration violations and turned over to ICE. (*Id.*; Ex. 129.) Thus, the evidence demonstrates that on October 4, 2007, the MCSO conducted a small-scale saturation patrol on the corner of Ellsworth and Ocotillo, based on a complaint transmitted to the MCSO on October 2 that Hispanic day laborers congregated there.

**C. The Pruitt's day labor operations were a response to complaints of day laborers and illegal immigration.**

By October 2007, the MCSO had been aware for two years that the area around Pruitt's Furniture Store was a significant gathering spot for Latino day laborers.

In late November 2005, the Sheriff received a letter from the Minuteman Civil Defense Corps, a group of citizens concerned about illegal immigration who conducted "protest rallies" at day labor sites and pick up points throughout the valley. (Ex. 385.) In their letter to Sheriff Arpaio they identified two significant day laborer centers, one at 36th Street and Thomas ("Pruitt's"), [*96] and the other at Cave Creek and Bell Roads. (Id.) The letter described how the past weekend there had been around 100 day laborers, 30 minuteman protestors, six members of the American Civil Liberties Union ("ACLU"), and members of the media to report on "the day['']s activities" at the Pruitt's site. (Id.) The letter further informed the Sheriff that "[w]e will hold these rallies every Saturday until the end of the year," and complained that neither Phoenix Police nor ICE would respond to the Minutemen's request to investigate day laborers. (Id.)

The letter, which equated day laborers with illegal immigrants, stated that the Minuteman "want to work with an organization that is willing to investigate and deport illegal immigrants when they are spotted in our cities," and further asked "[i]s it unreasonable to ask our police to question day laborers about their immigration status?" (Id.) Sheriff Arpaio suggested an internal meeting about how to respond to this group. (Tr. 329:7--11; Ex. 385.) Although the MCSO's actions at these locations almost two years after the date of the letter is hardly a direct response to the letter, the letter and Sheriff Arpaio's notations on it demonstrate [*97] the MCSO's knowledge of the group, the day labor centers of which it complained, and that these locations were areas of activism and press coverage regarding immigration issues.

The Friday before the Monday, October 15 operation occurred, MCSO Detective Gabriel Almanza had a conversation with a doctor whose office was located in the commercial complex adjacent to Pruitt's and who was also aware of an apparent successful operation previously conducted by the MCSO at the day labor locations at Cave Creek and Bell Road. The detective asked the doctor to send him an e-mail memorializing their conversation. (Ex. 124.) The doctor did so.

After commenting that "what you did out at 25th St. and Bell was wonderful!" [45] the e-mail complained of the high concentration of day laborers who were illegal immigrants and congregated in the commercial complex at 36th Street and Thomas. (Id.) According to her e-mail, the day laborers were all illegal "because they admit it when asked." (Id.) She complained that they harassed her patients, made sexual innuendos, trespassed, loitered, littered, blocked sidewalks, urinated and defecated on the property and "showed their bellies" to everyone. (Id.) The doctor [*98] also complained that the neighborhood had become a focal point in which neighborhood resi-

dents had regular showdowns with Hispanic Rights advocates since the owner of Pruitt's Furniture Store had forced the day laborers off of his property. (Id. ("Reza & Gutierrez staged a large chanting protest at Pruitt's to shut Pruitt's out of business for kicking them off his property," and "Salvador Reza & Alfredo Gutierrez come out here every other week & tell these workers they can do anything they want anytime and are protected. We know this because [O]fficer Ruelas said they told him this & we see Reza out here all the time.").)

> 45   The MCSO was thus apparently involved in similar unreported operations at 25th St. and Bell Roads. The Court therefore infers, pursuant to its order, (Docs. 261, 493), that previous day labor operations occurred at 25th St. and Bell Roads.

The following Monday, October 15, 2007, the HSU conducted a day labor patrol in this location. (Ex. 131.) Although MCSO successfully sought to have the complainant document her complaint in an e-mail, MCSO's resulting operation was not targeted at those persons who committed the acts complained of. Rather, during the day labor operations [*99] at Pruitt's, just as with the previous operations, the MCSO targeted vehicles picking up day laborers and arrested them only on federal immigration charges. (Id.)

A week later, the MCSO also conducted a day labor operation in Fountain Hills based on information provided by local businesses that day laborers were in the area with no other specific complaint being made. (Doc. 123) All persons were arrested on federal violations and turned over to ICE.

Despite the yield from the Pruitt's operation being disappointing to Sgt. Madrid, (see, e.g., Ex. 131 ("It should be noted that this area had far less day laborers in the area than our two previous details completed by HSU.")), the MCSO continued to run its small-scale saturation patrols at and around that location because of the activism and resulting media focus that the location had drawn. (Ex. 309.)

In its December 5, 2007 news release, the MCSO noted that Sheriff "Arpaio is set to increase the presence at Pruitt's of his Illegal Immigration Interdiction Unit (Triple I) this weekend, as pro-illegal immigration demonstrators and illegal immigrant day laborers continue to protest his illegal immigration policies on the driveways of the Pruitt's [*100] Furniture Store." (Ex. 309.) The news release further observed that "[i]llegal immigration activists have protested at Pruitt's every Saturday in the last six weeks since Sheriff Arpaio's deputies began patrolling the vicinity." (Id.) In response, Sheriff Arpaio pledged to keep running such operations until the activists stopped their protests. "This weekend, I will

increase the number [of] deputies to patrol the Pruitt's area, and I promise that my deputies will arrest all violators of the state and federal immigration laws. . . . I will not give up. All the activists must stop their protest before I stop enforcing law in that area.'" (*Id.*; *see also* Ex. 124 (noting the repeated presence of press, and Hispanic activists Alfredo Gutierrez and Salvador Reza).) This scheduling of small-scale patrols in response to the activities of activists may be equally or more indicative of Sheriff Arpaio's desire to generate media attention of his immigration enforcement activity than of the MCSO's use of race in selecting locations for patrols. Nevertheless, the selection of this location because of the presence of Hispanic activists is indicative of the MCSO's focus on illegal immigration in conducting [*101] patrols, and its general association of day laborers with illegal immigration.

**D. The Mesa small-scale patrols were in response to complaints about illegal immigration and "Mexicans."**

Contemporaneous with the small-scale operations scheduled at Pruitt's, the MCSO began conducting similar small-scale patrols in Mesa in response to citizen complaints. In late September 2007, Sheriff Arpaio reviewed transcribed comments from the MCSO's immigration hot line. One of the callers stated: "[w]e have called the non-emergency and illegal hot line numerous times and nobody gets all the Mexicans hanging out at Mesa Dr. between Southern and Broadway. Why isn't anything being done?" (Ex. 375.) The Sheriff highlighted that hot line entry and sent the comment and his annotation to Chief Sands and Deputy Sheriff Hendershott, and placed a copy of the comment in his immigration file. (*Id.*)

Beginning on November 15, 2007, the MCSO conducted three separate saturation patrols in that same neighborhood (Broadway and Stapley), with stops and arrests occurring in the several square miles surrounding that intersection. Almost all persons arrested during these operations were transported to ICE and processed for [*102] violating federal immigration law, although a few were also processed on state charges.

**E. The large-scale patrols were conducted to target Hispanic unauthorized immigrants.**

As with the day labor and small-scale saturation patrols, many of the large-scale saturation patrols were centered either on locations where day laborers gathered, or on locations that had a high concentration of Latino residents. Chief Sands testified at trial that although he would take direction from Sheriff Arpaio if he ever gave it in designating a location for a large-scale saturation patrol, it was generally Chief Sands that selected the lo-

cations. (Tr. at 707:16--18, 809:20--810:3, 814:21--815:1, 824:24--825:6.) He acknowledged that in selecting some of the locations he considered complaints from members of the public and from businesses about day labor activity. (*Id.* at 790:5--791:11, 814:21 25.) However, he testified that that he would not conduct a saturation patrol based solely on a complaint that did not allege violations of law. (*Id.* at 795:18--21.)

When considered in light of the reasons the MCSO contemporaneously gave in the news releases that announced the pending operations, this testimony is not quite [*103] as persuasive. As the news release announcing the first large scale saturation patrol demonstrates, the principal reason the site was chosen was because, even after the departure of the activists, the location remained a gathering spot for day laborers which the MCSO knew to be Hispanic. The news release quoted the Sheriff as saying that

> [t]he protestors who support the illegal immigration movement may have left the area, but the problems that caused Pruitt's Furniture Store to contract with the Sheriff's Office for security still exist. . . . The posse volunteers and deputy sheriffs will not racially profile anyone in this operation . . . . Still, I anticipate that many illegal immigrants will be arrested as this central Phoenix neighborhood remains a popular spot for day laborers. All criminal violations will be subject to arrest which means if we come across illegals, properly trained officers will be there to enforce the state and federal immigration laws.

(Ex. 310.) The next large-scale saturation patrol operation likewise centered on this same location.

When the MCSO initiated its third large-scale saturation patrol at the intersection of Cave Creek and Bell Road, the MCSO news [*104] releases again demonstrate that this site was chosen because of the presence of Latino day laborers. The MCSO stated that the site had two day laborer centers which are "magnets for more illegal aliens" and which create an atmosphere detrimental to business. (Ex. 311 ("Hundreds of the Sheriff's volunteer armed posse member and deputies will migrate today . . . from central Phoenix and the Thomas Road area to 25th Street and Bell Road" to assist with the atmosphere detrimental to business created by "the growing number of day laborers in the area.").) The news release goes on to note that the operation would address at least "two day laborer centers in the Bell Road area which are 'magnets for more illegal aliens.'" [46] (*Id.*) Fur-

ther, this was the location that, together with the Pruitt's location, the Minuteman had identified to the MCSO two years earlier as a frequent day labor location. Finally, the MCSO had previously conducted the January 4, 2008 small-scale saturation patrol at this location (Ex. 114) and at least one earlier operation for which records were not submitted at trial.

> 46   Chief Sands testified that he planned a satu-
> ration patrol on Bell Road and Cave Creek Road
> because  [*105] Sheriff Arpaio requested that he
> conduct a saturation patrol there after receiving a
> written request from ten business owners. (Tr. at
> 797:15--20.) Chief Sands is not aware of any ef-
> fort made by the MCSO to investigate the claims
> made by the small business owners, interview
> them, or check the sources of the letter in any
> way before planning and executing the saturation
> patrol. (Id. at 797:24--798:15.)

The fourth large-scale saturation patrol occurred on April 3--4, 2008, at Guadalupe. (Ex. 87.) The MCSO also considered race as one factor among others in select-ing Guadalupe as the site for a large-scale saturation pa-trol. Although the news release announcing the operation stated that Guadalupe was selected because "tensions are escalating between illegal aliens and town residents," (Ex. 313), there was no testimony or evidence as to how the MCSO came to that conclusion. Chief Sands testified that he does not necessarily consult crime data to select saturation patrol locations, and would not use an increase in crime to determine where to have a saturation patrol. (Tr. at 787:25--788:8.) He testified that any crime analy-sis he did conduct would be attached to the saturation patrol operation  [*106] plans. (Id. at 789:10--13.) The operations plans for the saturation patrol in Guadalupe have no crime analysis attached. [47]

> 47   Chief Sands acknowledged that, although oc-
> casionally he assembled crime statistics for the
> areas in which a large-scale saturation patrol was
> planned, the locations for such operations were
> not typically selected as a result of comparing
> crime rates among different valley locations, (Tr.
> at 789:19--22), or an increase or spike in crime in
> any particular location (id. at 787:16--788:8). The
> nature of crime statistics and analysis attached to
> those plans that have them vary: some provide
> local crime statistics indicating a spike in a par-
> ticular area (Ex. 168 at MCSO 057002--03),
> some provide only statistics on the raw numbers
> of major crimes in a city over the past quarter
> (Exs. 90 at MCSO 001890, 97 at MCSO 001937),
> some provide information on immigration en-
> forcement in an area (Ex. 111 at MCSO 001557--

58), and some, like Guadalupe, include no crime data at all (Ex. 102).

Further, the only document in evidence that even suggests a reason for the operation is an e-mail written by Lt. Siemens to various contacts in the police depart-ments of the adjacent municipalities  [*107] in advance of the patrol that describes the operation as a response to the MCSO District 1 Commander's complaint of in-creased criminal and gang activity in the area. (Ex. 87 at MCSO 001876--7.) No mention of "illegal aliens" is made.

It is also clear that the MCSO did not conduct the saturation patrol at the request of the town. In fact, dur-ing the middle of the operation, the town mayor asked the MCSO to cease the operation and leave. (Ex. 314 (dated April 4, 2008, announcing that the results of the first day of the saturation patrol, and further noting that the Mayor had asked the Sheriff to leave town).) In re-sponse to the Guadalupe Mayor's request to leave, the MCSO issued a news release quoting Sheriff Arpaio as saying that "the Sheriff still has jurisdiction here and I will still enforce the illegal immigration laws in Guada-lupe." (Id.) This appears to be a more frank assessment of the MCSO's purpose for the operation. Because the MCSO's purpose for the operation was to enforce immi-gration law, and it believed that the vast majority of ille-gal immigrants in Maricopa County were Hispanic, the Court concludes the MCSO desired to conduct such an operation in a neighborhood densely  [*108] populated with Hispanic residents. [48]

> 48   According to the 2010 United States Census
> Bureau, 62.2% of the residents of Guadalupe are
> of Hispanic or Latino origin. *State & County*
> *Quickfacts:   Guadalupe   (town),   Arizona*,
> http://quickfacts.census.gov/qfd/states/04/043027
> 0.html. A court may take judicial notice of facts
> that "can be accurately and readily determined
> from sources whose accuracy cannot reasonably
> be questioned." *Fed. R. Evid. 201(b)(2)*. The
> Ninth Circuit has determined that census data
> meets these requirements. *United States v. Es-*
> *quivel, 88 F.3d 722, 727 (9th Cir. 1996)*.

After conducting its small-scale patrols in Guada-lupe, the MCSO conducted the fifth and sixth large scale operations in Mesa, [49] the eighth and ninth large scale saturation patrols in Avondale (MCSO's District II) [50] (Ex. 111), and the eleventh large-scale patrol, in the Du-rango area on the 35th Ave. corridor in September 2009 (Exs. 169--70). [51] Due to its previous day labor and small-scale saturation operations, the MCSO at least knew that Latino day laborers assembled in these areas. Unlike the first three large-scale saturation patrols, how-ever, there is no evidence in the record that these patrols

were covered [*109] by advance news releases that directly stated that the reason for the site selection was the presence of day laborers. To the extent that these large-scale patrols included more officers and covered larger geographic areas than the small-scale patrols that preceded them, the fact that the large-scale operations covered areas in which the MCSO had previously conducted successful smaller-scale operations makes considerations of race in their selection somewhat more attenuated.

49   In addition to the hotline complaint, Ex. 375, that prompted the initial Mesa small-scale saturation patrols in November and December 2007, (Exs. 80, 81, 121), Sheriff Arpaio had received, and referred to Chief Sands for action, additional communications about day labor locations in the City of Mesa that associated such locations with Latinos before holding the large-scale saturation patrols there. (Exs. 223 (May 8, 2008 letter complaining that illegal immigrants "know little to nothing about this country other than the fact that welfare is better here than in Mexico," and noting that "[l]iving in Mesa, I can drive down any of the streets where day laborers (most of whom, I would believe to be here illegally) [*110] gather and wait for work" yet Mesa city police do not inquire about their citizenship), 244 (May 24, 2008 letter complaining of Mesa declining to investigate illegals due to Hispanic head of Mesa police union and MCSO Hispanic deputies, and also complaining of the "30+ illegals that were on all four corners" at Norton's corner and other Mesa and southeast valley locations). In his operations plans, the Sheriff also noted that he was responding to the invitations of East Valley legislators in scheduling his large-scale saturation patrols in Mesa. (Exs. 90 at MCSO 001881, 97 at MCSO 001929.)

50   A second, and apparently impromptu, small-scale saturation patrol again occurred there on May 29, 2009, (Ex. 175), after these two large-scale patrols.

51   The MCSO had earlier conducted a small-scale saturation patrol at 35th Ave. and Lower Buckeye Road with high arrest ratios on January 31, 2008. (Ex. 114 at MCSO 014519.)

Of the additional large-scale patrols that followed, the record is clear that at least three of them—the seventh and twelfth in the far northwest valley and the tenth in the southeast valley—occurred in locations for which the Sheriff had received previous complaints about the presence [*111] of Mexicans or day laborers or both. The MCSO held the first of its two operations in the Sun City area on August 13--14, 2008, and the second slightly more than a year later on October 16--17, 2009. (Exs.

102, 103, 174.) While this general area had not been the location of a reported small-scale saturation patrol, the operation occurred slightly more than a week after Sheriff Arpaio reviewed correspondence from two separate constituents. The first correspondence, dated August 1, 2008, came from a Sun City woman who complained of Spanish being spoken in a McDonald's at Bell Road and Boswell and requested that the Sheriff rid the area of illegal immigrants. (Ex. 237.) The Sheriff annotated the memorandum indicating he would look into it and copied it to Brian Sands on August 5, noting that the letter was "for our operation." (Id.) On August 8, 2008, the Sheriff was sent another e-mail that stated, "I would love to see an immigrant sweep conducted in Surprise, specifically at the intersection of Grand and Greenway. The area contains dozens of day workers attempting to flag down motorists seven days a week." The Sheriff reviewed the e-mail on August 13 and had a copy sent to Brian Sands [*112] and Lita at the PLO on that same date. (Ex. 235.)

The first day of the two-day operation, however, was on the same day the Sheriff annotated the second e-mail and sent it to Chief Sands. Thus, he would not have had time to plan the operation after having read the e-mail. Further, Sheriff Arpaio's notation on August 5 that the complaint was "for our operation," suggests that an operation had already been planned and that the letter served to justify it, rather than serving as the motivation for the site selection. Moreover, in announcing the operation, the MCSO news release stated in part that during the operation it would be "traveling well known smuggling routes" on I-17 in the north county area. (Ex. 331.) The operation did appear to result in the arrest of five separate human smuggling loads with at least three of those loads being stopped on I-17 and thus not in locations that were the subject of the correspondence. (Ex. 102 at MCSO 001974.)

The tenth saturation patrol occurred on July 23--24, 2009, in the Southeast valley. (Exs. 128, 168.) To be sure, the Sheriff had received and referred for action at least one previous letter which complains of day labor locations in the southeast [*113] valley areas that were covered by this patrol. (Ex. 244.) Nevertheless, the letter had been sent a full year earlier. (Id. (dating the letter at May 25, 2008).) Thus, while the MCSO was aware of day labor locations in the southeast valley area covered by the patrol, the July 23--24, 2009 patrol was not a direct response to the May 24, 2008 complaint.

The thirteenth and final large-scale saturation patrol discussed in detail at trial occurred on a countywide basis. (Ex. 176.) Such a generalized location can support no inference that it was selected as a result of the race of the persons who inhabit it.

At trial, Plaintiffs attempted to draw a direct link between citizen complaints received by the MCSO that referred to racial or ethnic characteristics of persons in particular locations and the corresponding scheduling by MCSO of a saturation patrol in those locations. Plaintiffs have established such a direct link between the day labor operations in Cave Creek and Queen Creek in October 2007, and the three small-scale saturation patrols in Mesa in November and December 2007. In those patrols, the MCSO responded directly with saturation patrols to complaints about the gathering of "Hispanic" [*114] and "Mexican" day laborers without sufficient indication that they were otherwise engaged in violations of state or municipal law. To the extent that Plaintiffs attempted to establish such a direct link between citizen complaints about operations in Sun City and or elsewhere, they have not met their burden of proof that the operations were planned in response to the specific citizen complaints about ethnicity. Nevertheless, due to the MCSO's conflation of racial and work status indicators in locating these operations, Plaintiffs have established that as a whole, in the site selection for all of the MCSO's day labor operations, most of their small-scale patrol operations, and many of their large-scale patrol operations, race was a factor, among others, to the extent that the MCSO sought to base such operations around locations at which Latino day laborers were known to assemble.

**5. All saturation patrols relied on pre-textual stops as a basis to investigate the occupants of a vehicle.**

Even when it had 287(g) authority, the MCSO, pursuant to its own policy, did not directly stop persons that it believed to be in the country without authorization.

> 287g trained deputies can't contact someone [*115] just because they think they are here illegally. 287g deputies can only screen people reference their immigration status that they come across during their duties as a Deputy Sheriff and then indicators must exist per the US Immigration and Nationality Act, Title *8 USC, 287g*, before screening can take place (must have probable cause or reasonable suspicion to contact a violator or suspect for state criminal and civil statutes).

(Ex. 92.)

Thus, even when the purpose of an operation was to enforce federal immigration laws, as with the operations at issue in this lawsuit, MCSO deputies first needed a basis in state law to contact and detain the persons they sought to screen. The saturation patrols at issue in this lawsuit all involved traffic stops used as a pretext to detect those occupants of automobiles who may be in this country without authorization. (Tr. at 837:1--17.) Defendants have never asserted that they stopped vehicles during the saturation patrols based solely on a reasonable suspicion that the drivers or passengers were not legally present in the country. Instead, they stopped the vehicles because of traffic violations and then investigated occupants for immigration offenses [*116] once the stops had been made.

**6. During saturation patrols, participating deputies conducted many stops for minor violations of the traffic code, including minor equipment violations. This departs from MCSO's traffic enforcement priorities during regular patrols.**

The MCSO so stipulated prior to trial. (Doc. 530 ∂ 85 at 12.)

**7. Generally, MCSO officers had no difficulty in finding a basis to stop any vehicle they wished for a traffic infraction.**

MCSO witnesses who testified at trial acknowledged that "if you follow any vehicle on the roads of this country for even a short amount of time, you will be able to pull that person over for some kind of violation." (Tr. at 696:17--21, 1541:8--11 ("You could not go down the street without seeing a moving violation."), 1579:20--23; Doc. 530 at ∂ 86 ("Deputy Rangel testified that it is possible to develop probable cause to stop just about any vehicle after following it for two minutes.").) Chief Sands also testified that it is not feasible to require officers to stop every driver whom they observe committing a traffic violation. (Tr. at 830:10--14.)

**8. The MCSO provided no race-neutral criteria for deputies to use in determining whom to pull over for traffic [*117] violations during the three types of saturation patrols.**

One of the MCSO's chief defenses against the arguments of the Plaintiff class was that during saturation patrols it used a zero tolerance policy that required participating MCSO officers to pull over every vehicle that they observed committing any traffic infraction, no matter how slight. The MCSO represented to the Court that this policy ensured that there was no racial bias in the selection of vehicles that MCSO pulled over during saturation patrols. After having reviewed the evidence of the parties and heard the testimony, the Court concludes that no such policy was ever clearly promulgated or understood by MCSO deputies participating in such patrols.

As an initial matter, no written instructions were given for small-scale saturation patrols or day labor operations. (*Id.* at 1155:10--20.) The first several large-scale saturation patrols also occurred before the promulgation of any policy that was subsequently identified as a zero tolerance policy. (*Id.* at 996:15--17.) Even after the large-scale saturation patrol instructions were modified in April 2008, they specified only that all persons committing a criminal violation should [*118] be booked. (*Id.* at 996:21--25.) The operations plans contained no specific instruction to deputies about how to determine, in a race-neutral way, which vehicles to pull over for traffic or equipment infractions. [52]

> [52] The HSU officers and others who participated in small-scale patrols may have been aware of such instructions once they were developed for the large-scale saturation patrols, but even assuming the deputies would have applied such instructions to small-scale patrols, such plans were not written until April of 2008. By then all but the last seven small-scale patrols discussed at trial had occurred. These last patrols, together with the December 2007 operation in Aguila, were the patrols with the lower stop to arrest ratios.

Other than the written instructions explaining that all criminal offenders should be booked, there was no consistent understanding about the substance of any zero tolerance policy. Lt. Sousa, who identified himself as the author of the policy, testified that it pertained only to what a deputy could do after he had already made a stop. He testified: "[I]f we made a lawful traffic stop, and you had a criminal defendant with an arrestable charge, they would [*119] get booked. And whoever we stopped, we would write a citation for the probable cause for the stop." [53] (*Id.* at 996:21--25.) He testified that the policy did not remove officer discretion as to making the decision as to which cars to stop in the first instance. (*Id.* at 998:18--25, 999:4--7.)

> [53] The revised plans contain no instructions concerning citing those who were stopped. Nor do they require patrol deputies to pull over every vehicle that they observe that is committing a traffic infraction. And, as a practical matter, the shift summaries and trial testimony demonstrate that MCSO officers did not issue citations to every vehicle they stopped. For example, during the January 9--10, 2009 saturation patrol in the Southwest Valley, officers stopped 473 and 246 cars, respectively, and arrested or cited only 320 and 167 people, suggesting that at least 232 vehicle stops over the two days resulted in neither a citation nor an arrest. (Ex. 111.) Further, as David Vasquez testified, he was pulled over for a

cracked windshield during the first large-scale Mesa saturation patrol, but was neither cited nor arrested. (Tr. at 201:1--5.)

The testimony of other command personnel and deputies participating [*120] in saturation patrols varied considerably as to what the zero tolerance policy was. Sheriff Arpaio, Chief Sands and Deputies Armendariz, Beeks, and DiPietro described the policy as did Lt. Sousa--it did not specify which vehicles deputies should stop and deputies retained discretion on that matter.

Sheriff Arpaio, for example, in an MCSO news release, described a "zero tolerance law enforcement operation" as requiring deputies to arrest any person found to have committed a criminal offense. "All violators of any law . . . will be booked into his jails with no one getting a 'get out of jail free card.'" (Ex. 342.) Chief Sands testified that the policy did not require officers to stop every vehicle they observed violating the traffic laws, but that officers were required to arrest any person whom they had probable cause to believe committed a criminal offense. (Tr. at 830:18--831:8.) Unlike Lt. Sousa, he testified that deputies were not required to issue a citation to every vehicle they stopped for violating the traffic law. (*Id.*) He further testified that the MCSO did not analyze officer activity to determine whether officers in fact followed this definition of the "zero tolerance" policy. [*121] (*Id.* at 831:1--4.) Lt. Sousa expressly conceded that one of the reasons he included language prohibiting racial profiling in operations plans and directives was so that he could testify to it in any subsequent litigation. (*Id.* at 1025:12--1026:7.) Chief Sands confirmed that the phrase "zero tolerance" policy is "rhetoric used by Lt. Sousa." (*Id.* at 831:1.)

Although Deputy Armendariz could not remember what he was instructed as to the particulars of the "zero tolerance" policy, (*id.* at 1581:2--21), he testified that he understood that he still had discretion as to whether or not to stop a particular vehicle, (*id.* at 1579:24--1580:2). Nevertheless, it was his understanding that the policy required him to take a person into custody instead of issuing a citation when "an arrest is likely." (*Id.* at 1581:17--21.) Deputy Beeks agreed that the zero tolerance policy did not take away a deputy's discretion when it came to deciding which traffic offender to stop. He understood that under the "zero tolerance" policy, "[w]e were told to be proactive, and if we saw violations, to address them," but that "[w]e were given discretion" to make stops. (*Id.* at 1475:2--6.) Deputy DiPietro testified that while [*122] on saturation patrols, he was not given any instruction about which vehicle to pull over and answered affirmatively when asked whether the decision to stop a vehicle on a saturation patrol was "completely within your discretion." (*Id.* at 303:24--25.)

On the other hand, both HSU sergeants and Deputies Rangel and Kikes offered definitions of a zero tolerance policy that dictated to deputies on patrol who must be pulled over in the first place. Sgt. Palmer testified that the "zero tolerance" policy required officers to stop any car which they observed to be in violation of any traffic law, and to issue a citation for that violation. (*Id.* at 694:2--6.) Sgt. Madrid also stated that the "zero tolerance" policy took away the "ordinary officer discretion to let things slide" and required officers to pull over any vehicle on the road that had committed any traffic infraction. (*Id.* at 1155:21--1156:6.) Sgts. Madrid and Palmer did not often participate in arrests during large-scale saturation patrols, however, as they were both engaged in supervisory functions with Sgt. Madrid mostly stationed at the command post and Sgt. Palmer doing field supervision. (*Id.* at 1160:5--8, 759:4--10.)

Deputies Rangel [*123] and Kikes also described the policy as removing discretion from the deputies as to which vehicles to stop. Deputy Rangel testified that, under the policy, he would stop every person he saw committing a traffic violation, ask every person in the car for identification, and investigate those passengers who did not provide identification. (*Id.* at 944:4--947:11.) Deputy Kikes testified that under the policy officers were to stop "anybody and everybody who had a violation," and issue citations. (*Id.* at 612:10--19.)

Both officers who testified that the "zero tolerance" policy required them to stop every car that committed any traffic infraction, and other MCSO officers who testified, acknowledged, however, that such a policy would be impossible to enforce because it would involve stopping nearly every car on the road. For example, Deputy Kikes testified that so many people on the road commit minor traffic or equipment infractions that stopping every person who commits a violation, and therefore following the policy as he understood it, is "impossible." (*Id.* at 613:3--6.) Sgt. Palmer acknowledged that "if you follow any vehicle on the roads of this country for even a short amount of time, you [*124] will be able to pull that person over for some kind of violation." (*Id.* at 696:17--21.) Chief Sands testified that it is not feasible to require officers to stop every driver whom they observe committing a traffic violation. (*Id.* at 830:10--14.)

Deputy Kikes' own arrest record while participating on saturation patrols suggests that in practice he followed no such policy. Deputy Kikes participated in at least three large-scale saturation patrols over the course of at least four days. [54] There is no record of any civil citations he issued during the patrol, because the MCSO kept no such records, but, according to the operations plans, he was under an obligation to arrest anyone for any criminal violation he observed during any part of his patrols including traffic stops. In the three saturation patrols in

which Deputy Kikes participated, comprising at least four patrol days, he arrested a total of five people. All of the persons he arrested had Hispanic surnames and all arrested were classified as 287(g) and thus in the country without authorization. (Exs. 82, 87, 111.) To accept Deputy Kikes's testimony in its entirety would mean that Deputy Kikes spent at least four days on traffic patrol [*125] in an environment where so many people commit traffic or equipment infractions it would be impossible to stop them all. He nevertheless followed the zero tolerance policy and stopped "anybody and everybody" he could. (Tr. at 612:12--13.) Once he made a stop, he arrested every person with an outstanding warrant or who was otherwise committing a criminal violation. (*Id.* at 14--23.) And all of that resulted in five arrests over four days, all of which just happened to be of Hispanic persons who were in the country without authorization. The Court rejects such a factual proposition. In the face of such facts, the Court concludes that Deputy Kikes, in fact, was not following the zero tolerance policy that he described during trial.

> 54   Deputy Kikes testified that he does not recall if he worked both days of all patrols, but knows that he worked a full day on every day that he did work. (Tr. at 608:23--609:3.) The arrest records demonstrate that he made arrests on four separate days during such patrols.

The same is true, although less starkly so, for Deputy Rangel. Deputy Rangel participated in at least seven large-scale saturation patrols, some of which took place over multiple days. By the Court's [*126] calculations, 54 of the 60 arrests made by Deputy Rangel during the large-scale saturation patrols, or 90% of the total arrests he made, were of persons with Hispanic names. [55] If the human-trafficking loads intercepted by Deputy Rangel during the August 2008 Sun City and the November 2009 countywide patrols are excluded, then 11 of 16 arrests or 68.7% had Hispanic names. To accept Deputy Rangel's testimony in its entirety would mean that Deputy Rangel spent at least nine to ten days on traffic patrol in an environment where so many people commit traffic or equipment infractions it would be "possible to develop probable cause to stop just about any vehicle after following it for two minutes." (Doc. 530 at ∂ 86.) In accordance with the zero tolerance policy, Deputy Rangel stopped all such vehicles, and investigated the identity of every passenger in every vehicle he stopped. He subsequently arrested every person with an outstanding warrant or who were otherwise committing a criminal violation. Nevertheless, during the nine to ten days, he made only 16 arrests (excluding the four van loads from two patrols that resulted in 44 arrests). Of the 16 arrests 11 just happened to be of Hispanic [*127] persons who were in the country without authorization, and four of

them were arrested on immigration charges. In the face of such facts, the Court concludes that Deputy Rangel, in fact, was not following the zero tolerance policy that he described during trial.

> 55   During the large-scale saturation patrol at Cave Creek and Bell he arrested a total of two people, one of whom had a Hispanic surname. (Ex. 82.) During the large-scale patrol at Guadalupe he arrested five people, four of whom had Hispanic surnames. (Ex. 87.) During the first large-scale Mesa patrol he arrested six people, three of whom had Hispanic names. (Ex. 90.) During the second large-scale Mesa patrol he arrested two people both of whom had Hispanic surnames. (Ex. 97.) During the first Sun City patrol in August 2008 he arrested 33 people, 32 of whom had Hispanic names.[55] (Ex. 102.) Although the probable cause listed on the arrest report for stopping this vehicle was "lane change," no one was arrested for the state law charge of human smuggling, but all were arrested and processed through ICE on federal immigration charges. (Id.) During the second Sun City patrol of October 16, 2009 he arrested one person who had a Hispanic [*128] surname. (Ex. 174.) During the November 16, 2009 countywide patrol he arrested eleven people, all of whom had Hispanic surnames. (Ex. 180.) These eleven persons were all turned over to ICE based on the MCSO's LEAR policy.

A look at the arrest reports in general also demonstrates that officers exercised individual discretion regarding stops. More often than not, the disparities of arrest rates between officers participating in saturation patrols cannot be easily explained. For example, 47 officers signed in for the July 14, 2008 saturation patrol in Mesa. (Ex. 97.) Of these 47, 13 arrested at least one person, and 41 total people were arrested.[56] (Id.) Deputy Armendariz arrested 18 of the 41 people arrested, including the drivers and passengers of 11 different cars. (Id.) 11 of the persons arrested by Deputy Armendariz, and five of the six of the passengers he arrested, were processed for not being legally present in the country. (Id.) Ten of the arrestees had Hispanic surnames.[57] (Id.) The next-highest arrest total for any officer was for Deputies Silva and Roughan, who both arrested four people. (Id.) Six of the eight people whom Deputies Silva and Roughan arrested had Hispanic surnames, [*129] and seven were processed for not being legally present in the country.[58] (Id.) These statistics again do not suggest that officers were following a zero tolerance policy in which they pulled over every vehicle for an infraction no matter how small and arrested every person they encountered who had committed a criminal violation.

> 56   Another officer made an arrest, but did not sign in. (Ex. 97.)
>
> 57   The name of the eleventh person arrested as being unauthorized, Minerva Vujando, also strongly suggests that this person was of Hispanic ancestry. Nevertheless, the name did not appear as in Exhibit 320. Hence the Court did not count it as an Hispanic name.
>
> 58   Again the name of the seventh person arrested as being unauthorized, Jario Olampo, also strongly suggests that this person was also Hispanic. Nevertheless, the name did not appear as Hispanic in Exhibit 320, and hence was not counted as such.

Further, the activity of at least some officers suggests a definite focus on vehicles with Hispanic occupants. For example, during the April 23, 2009 operation in Avondale, Deputy Armendariz arrested 12 people, 11 of whom had Hispanic surnames and 10 of whom were processed through the 287(g) program. [*130] (Ex. 111.) These arrests came from a total of seven vehicle stops, and included the arrests of five passengers, all of whom were Hispanic and all of whom were processed through the 287(g) program. (Id.) The deputies arresting the next-highest number of people during this saturation patrol arrested only two. (Id.)

Few of the "stat sheets" documenting the activity of individual officers remain. Those stat sheets that do remain, however, also suggest that the number of stops made by individual officers varied widely during the same saturation patrol. For example, individual stat sheets for the November 16, 2009 saturation patrol, which were preserved, show that officers working the same patrol during the same twelve-hour shift made the following number of traffic stops: 5, 15, 0, 9, 5, 6, 0, 4, 12, 2, 3, 12, 4, 2, 6, 24, 10, and 10. (Doc. 235, Ex. 10.) If an officer could stop virtually any vehicle for a traffic infraction after following it for a minute or two, these statistics demonstrate that no zero tolerance policy was uniformly followed that would provide neutral criteria about which cars should be stopped by participating deputies. The reports, therefore, establish that MCSO personnel [*131] were not following the zero tolerance policy as described by Sgts. Palmer and Madrid.

Based upon the contradictory testimony regarding the effect and definition of the zero tolerance policy, that the MCSO shredded individual officers stat sheets while under a discovery obligation to preserve them, that most witnesses testified that it would be impossible to follow a policy that required them to stop every vehicle they observed committing a traffic or equipment violation, that the MCSO conducted no analysis to determine whether officers were in fact following any "zero tolerance" policy, and that those records which were preserved suggest

that officers did not follow a "zero tolerance" policy based on any of the definitions suggested, the Court concludes that to the extent any "zero tolerance" was in effect, it was merely the sentence of instruction contained in the operation plans that required MCSO deputies to book all criminal offenders, and contained no race-neutral criteria for deputies to follow in saturation patrols.

**9. The MCSO used race as one factor among others in making law enforcement decisions during saturation patrols.**

**A. The MCSO used race as a factor in choosing vehicles [\*132] to pull over during day labor and high-ratio small-scale operations.**

As has been previously set forth in the discussion relating to the selection of locations for saturation patrols, during the day labor and small-scale saturation patrols with high arrest ratios, participating MCSO officers determined which vehicles they would pull over for traffic enforcement based, at least in part, on their observations of the Latino ancestry of the persons that entered the vehicles. After the vehicles were pulled over, the immigration status of the Latino passengers was investigated as a matter of course.

The arrest statistics from the day labor operations demonstrate that race was used as such a factor in a way that does not merely rely on the total number or total percentage of Hispanics arrested during such operations. All 35 arrests of unauthorized persons resulted from 11 traffic stops. A total of 14 traffic stops were made during all day labor operations. It is extraordinary that with only 9% of the Maricopa County population being unauthorized, the MCSO could make arrests of unauthorized aliens on 11 of the 14 traffic stops it made, with virtually all such stops resulting in multiple arrests. [\*133] This extremely high ratio of stops resulting in immigration arrests to the total stops made during the operations shows that the MCSO used targeting factors including both race and work status to achieve this ratio.

The same is true for the small-scale saturation patrols with high arrest ratios, in which 115 out of 124 arrests were of persons unauthorized. *See* Section I.D.2.a, *supra*. While an exact number of total stops resulting in these arrests of unauthorized persons is not specifically ascertainable based on the reports, the reports do reveal that a great majority of all stops during such operations resulted in the arrest of unauthorized aliens and frequently multiple unauthorized aliens per stop. *Id.* The day labor and small-scale saturation patrols with high arrest ratios, due to the nature of the operations, considered race and work status as factors of a vehicle's occupants in determining which ones would be stopped.

**B. The MCSO used race as a factor in determining whom to investigate and arrest during the small-scale patrols without high arrest ratios.**

The arrest reports for these eight operations did not, for the most part, permit the Court to determine the number of stops that [\*134] resulted in immigration arrests. To the extent that such determinations could be estimated by the reports kept, with one exception, they did not demonstrate the high ratio between stops and arrests that the previous operations had demonstrated. [59] Thus the evidence that verified that the MCSO used race in the day labor and small-scale saturation patrols with high arrest ratios was not present in these eight operations.

> 59   During six hours on the first day of the Fountain Hills operation, the HSU (assisted by the Enforcement Support ("ES") Unit) made a total of seven traffic stops, four of which resulted in seven arrests of unauthorized aliens. (Ex. 108.) Such statistics, including the low number of total stops, seem to bear out that the first day of the operation may have been a day labor operation. Nevertheless on the next day Sgt. Palmer estimates in the arrest report that of twenty stops, only four resulted in immigration arrests. The total operation, therefore, did not have a high arrest ratio as did previous operations.

Nevertheless, the arrest reports provide strong evidence that the purpose of most such operations was arresting unauthorized aliens. 85 out of 107 persons arrested [\*135] were unauthorized aliens. *See* Section II.D.2.b, *supra*. To the extent it was disclosed by the reports, the remaining 22 authorized residents arrested during such operations were arrested for driving on a suspended license, or having outstanding misdemeanor or felony warrants. *Id.* There is little to no evidence in the record that would indicate how many of these authorized residents arrested were Latino.

Still, three of the eight arrest reports from these operations provide information from which the number of passengers actually arrested from an estimated number of stops can be derived. Two of those three reports further list the names of all persons arrested. [60] They demonstrate that during these three operations MCSO deputies stopped a total of approximately 95 to 100 vehicles. During these stops a total of 55 persons were arrested. 51 of the 55 persons were unauthorized aliens, and 36 of these were passengers. [61] During the two operations for which the names of persons arrested were kept, all passengers and drivers arrested for immigration offenses had Hispanic names.

60    The arrest reports for the Aguila (Ex. 76), Fountain Hills (Ex. 108), and September 4, 2008 Cave Creek (Ex. 112), [*136] operations provide information concerning the estimated total number of stops made during each operation and specific information concerning the stops that resulted in immigration arrests. The Fountain Hills and Cave Creek arrest reports also provide the names of persons arrested.

61    The Aguila arrest report designates that the driver was cited for each of the five stops that resulted in the arrest of unauthorized aliens. (Ex. 76.) It also lists the number of aliens detained. (*Id.*) The Court assumed that one of the persons detained for each of the vehicles was the driver. If this is not true it does not serve to change the number of total persons arrested, it merely increases the percentage of those who were passengers. The Fountain Hills report explicitly distinguishes between drivers and passengers arrested in the narrative. It also discusses the arrest of two more unauthorized residents during the welfare check of a residence. Because these arrests did not result from a motor vehicle stop they were not counted in the Court's totals. (Ex. 108.) The third page of the Cave Creek report, designates whether a person arrested was a passenger. (Ex. 112.) However, two persons were arrested [*137] for failing to provide identification during a single stop, and neither was designated as a passenger. (*Id.*) Since a vehicle can have but a single driver, the Court has also counted one of those two persons as a passenger and the other as a driver in arriving at the above estimated totals. (*Id.*)

Thus the Court can conclude from the three saturation patrols with sufficient records that 51 of the 55 arrests were of unauthorized persons, most if not all of whom had Hispanic surnames. 52 of these persons have names that indicate Latino descent. There is no evidence from these arrest reports from which it can be determined that the MCSO investigated or arrested any passenger during these operations who was not of Latino descent. Of the three persons arrested without Hispanic names, two had to be drivers because they were arrested for driving without a license. The reports provide no information about the other person, including whether she was in a motor vehicle at all, or, if so, whether she was a driver or a passenger, other than that she was arrested on an outstanding felony warrant. [62] While these numbers do come from a limited sample, and are not definitively indicative of racial bias, [*138] they do strongly suggest that in at least these three operations the MCSO was both: (1) principally looking to arrest unauthorized aliens whom they believed to be Hispanic persons; and (2) they

were more likely to investigate the identities of Hispanic passengers than non-Hispanic passengers.

62    The narrative arrest report of the Aguila operation only discusses the arrest of 26 persons--all unauthorized. (Ex. 76.) The narrative arrest report of the September 4 Cave Creek operation only discusses the arrest of 11 persons--all unauthorized. (Ex. 112.) It is possible, however, to read the summary total sheets of these operations to conclude that three additional people were taken into custody during the Aguila operation and four were taken into custody during the Cave Creek operation. Nevertheless, the narrative report of the Cave Creek operation plainly states that only 11 total arrests were made during the operation-- all of unauthorized aliens, and the sheet listing the names of all persons arrested contains only 11 names. If the Aguila summary total sheet, or the Cave Creek summary total sheet, means to suggest that additional persons were arrested other than those listed in the narrative [*139] report, they provided no information about such persons or their arrest. If additional arrests were made, but not otherwise discussed in either narrative report or the total summary sheet, it only confirms that the deputies participating were principally focused on the arrest of unauthorized aliens, as they omitted non-immigration arrests from their reports or summaries.

## C. The MCSO used race as a factor in law enforcement decisions during large-scale saturation patrols.

As discussed, beginning in April 2008, the large-scale saturation patrols were subject to different and more specific instructions than were small-scale or day labor saturation patrols. The operational plans were revised in at least three important particulars, and a comparison of those revisions with the patrol results shows that the MCSO relied on race as a factor in making law enforcement decisions.

### 1. During large-scale patrols, participating MCSO deputies were instructed to not racially profile and were obliged to book all criminal offenders. Yet arrest records show a disproportionate number of arrests of persons with Hispanic surnames.

Because the purpose of the saturation patrols was to arrest unauthorized aliens, [*140] and because the great majority of unauthorized aliens in Maricopa County are persons of Hispanic descent, it would not be in and of itself indicative of a racial bias in an operation for a disproportionate number of Hispanic persons to be arrested. Nevertheless, when the plans prohibit racial profiling,

and further require that all persons committing crimes be arrested regardless of race, and yet a highly disproportionate percentage of the persons arrested during the operation are nevertheless persons with Hispanic names, the disconnect between the operational plans and instructions and the observable results of the large-scale patrols demonstrates that the deputies are not following their instructions, or that a racial bias is permitted, or even systematically implemented, in such operations. [63]

> 63   Even if MCSO deputies were particularly looking for undocumented immigrants without regard to race in these large-scale saturation patrols, the percent of undocumented immigrants in Maricopa County is, at most, 8.9%. *See* note 4, *supra*.

The overall arrest rates of persons with Hispanic names arising from the large-scale saturation patrols are very disproportionate to the population as a whole. [*141] Beginning with the large scale patrol held near Pruitt's on March 21--22, 2008, 42 out of the 43 arrests (97%) were of persons with Hispanic names. (Ex. 79.) For the Cave Creek operation on March 27--28, 2008, 36 of the 54 arrestees (67%) of the arrestees had Hispanic names. (Ex. 82.) (These two operations, however, were conducted prior to the issuance of the new instructions). At the Guadalupe patrol of April 3--4, 2008, the operation during which the new instructions were first implemented, 33 of the 47 persons (70%) had Hispanic names. (Ex. 87.) At the first large-scale Mesa patrol, the deputies arrested 63 people, 35 (57%) of whom had Hispanic names (Ex. 90); during the second Mesa patrol, 26 out of 41 persons arrested (63%) had Hispanic names (Ex. 97). During the first Sun City patrol, 88 of the 105 arrests (84%) were of persons with Hispanic names. [64] (Ex. 102.) In the first Southwest Valley operation on January 9--10, 2009, 34 of 53 arrests (64%) had Hispanic names. (Ex. 111.) In the West Valley operation on April 23-24, 2009, 30 of 41 arrests (73%) were of persons with Hispanic names. (*Id.*) During the Southeast Valley operation of July 23--9, 2009, 30 of the 41 arrestees (59%) [*142] had Hispanic surnames. (Exs. 128, 168.) Then, in the operation at Durango and 35th Ave. on September 5--6, 2009, 37 of the 51 persons arrested (72%) had Hispanic surnames. (Ex. 170.)

> 64   During this patrol the MCSO interdicted five vans that were transporting undocumented individuals.

Two more large-scale patrols occurred following revocation of the MCSO's 287(g) authority. In the October 2009 Sun City operation, 45 out of 66 persons arrested (68%) had Hispanic surnames. (Ex. 174.) During the final county-wide operation for which arrest reports were filed, 37 out of the 51 persons (73%) arrested had Hispanic surnames. (Exs. 176, 178--82.) In total 700 offenders were arrested during these operations. [65] 496 out of 700 arrests or 71% of all persons arrested, had Hispanic surnames. This 71% arrest rate occurred in a county where between 30 and 32% of the population is Hispanic, and where, as the MCSO's expert report acknowledges, the rates of Hispanic stops by the MCSO are normally slightly less than the percentage of the population that they comprise. (Ex. 402 at 3.) This arrest rate further occurred in operations in which deputies were instructed to arrest all persons committing any kind [*143] of criminal offense, and were instructed that they should not racially profile.

> 65   As discussed above, the Court has excluded the first large-scale saturation patrol at Pruitts (January 2008), where 27 arrests were made (six for 287(g)), because no surname data was included. (Ex. 77.)

While a disproportionate number of persons with Hispanic names were generally arrested during such operations, that gulf widens when the arrest rate of Latino passengers is considered. According to the large-scale saturation patrol arrest reports, 184 passengers in vehicles were arrested on some charge other than the traffic pre-text given for stopping the vehicle. 175 of these passengers, or 95%, had Hispanic surnames. Even removing all of passengers who were arrested on immigration charges from the equation (141 total, 140 Hispanic), [66] 35 of the 43, or 81% of the passengers arrested on non-immigration charges had Hispanic surnames. Only nine passengers who did not have a Hispanic surname were ever arrested on any charge. The Court recognizes that there were several human smuggling loads that the MCSO intercepted: some on the August 2008 Sun City patrol (70 passengers), the October 2009 Sun City patrol [*144] (20), and the November 2009 countywide patrol (25). (Exs. 102, 174, 178--82.) Exclude the passenger tallies from those vanloads (115, 114 of which were Hispanic), and 61 of the 69 passengers (88%) were Hispanic. Clearly a disproportionate number of passengers with Hispanic surnames were arrested during the large-scale saturation patrols. This indicates that the MCSO was more likely to investigate and arrest passengers if they were Hispanic.

> 66   One passenger in a vanload interdicted by Officer Rangel did not have a name listed in Ex. 320 (Gerseldiade Rugio) and was not counted as Hispanic.

In sum, a remarkably high percentage of arrests during the large scale patrols were of people with Hispanic surnames. These results occurred while the MCSO

claimed to be operating under a policy that forbade racial profiling and required deputies to arrest all criminal offenders. In light of the arrest numbers, the Court finds that either the MCSO was in fact not operating under those policies during the large-scale saturation patrols or MCSO's policy forbidding racial profiling nevertheless permitted the consideration of race as a factor in executing the operations.

**2. MCSO officers were instructed that  [\*145] during large-scale saturation patrols they could use race, as one factor among others, in initiating investigations into the immigration status of a person contacted.**

And, in fact, the MCSO deputies operated under the idea that they were allowed to consider race in making immigration-related law enforcement decisions. The large-scale saturation plans contained a paragraph prohibiting racial profiling and specifically prohibiting deputies from making a decision to stop a vehicle based on the race of its occupants. Nevertheless, as previously discussed, the MCSO determined that it did not constitute racial profiling to base decisions in part on race, so long as race was not the sole basis for that decision. The operations plans for the large-scale saturation patrols explicitly instructed the MCSO officers who were 287(g) certified that they could use the indicators taught them in their 287(g) training in deciding whether to initiate investigations into a contact's immigration status. And all MCSO officers testified that ICE taught them that one such indicator, among others, was a person's race. The operations plans also instructed non-287(g)-certified officers that they should not summon  [\*146] a 287(g) officer to initiate such an investigation based on race alone. But, as at least Sgts. Palmer and Madrid testified, this instruction meant that officers could consider race as one amongst a number of factors in making such a determination.

Further, all of the MCSO command staff including Sheriff Arpaio, Chief Sands, Lt. Sousa, and Sgts. Madrid and Palmer, acknowledged that the MCSO uses race as one factor in assessing whether an immigration investigation should be conducted after a stop has been made. At trial, Sheriff Arpaio was referred to media interviews in which he commented that a factor the MCSO considered in evaluating whether a person is in the country legally is whether "they look like they came from another country," (Ex. 410b), or "look like they just came from Mexico," (Ex. 410c). He explained that when he made these comments he meant that such appearance could be a factor for an MCSO officer to consider in determining whether further investigation of immigration status was appropriate once a vehicle had already been stopped. (Tr. at 498:22--503:6.) Chief Sands, Sgt. Madrid, and Sgt. Palmer also acknowledged that the MCSO did use and

continues to use Hispanic ancestry  [\*147] in this manner in deciding which occupants of a vehicle should be investigated for immigration compliance. Chief Sands confirmed that the MCSO does not prohibit officers from relying on the race of a vehicle's occupant as one factor when initiating an immigration investigation once the vehicle has been stopped, so long as race was not a factor in the stop itself. (Id. at 782:5--16.) Lt. Sousa testified at trial that it was his understanding that ICE officers taught MCSO deputies in their 287(g) training that while race could not be used even as one factor when making an initial stop, it could be used as one of a number of indicators to extend a stop and investigate a person's alienage. (Id. at 1016:3--6.)

The Court thus determines that as a matter of both policy and practice, the MCSO allowed its deputies participating in saturation patrols to consider race as one factor among others in determining whom it should investigate during large-scale saturation patrols.

**3. MCSO officers were instructed that they could use race as one factor among others in making a decision to stop vehicles during large-scale saturation patrols, and did so.**

As indicated above, the large-scale saturation plans  [\*148] contained a paragraph specifically prohibiting deputies from making a decision to stop a vehicle based on the race of its occupants. Nevertheless, as has been previously discussed, the MCSO determined that it did not constitute racial profiling to base decisions to stop a vehicle in part on the race of its occupants, so long as race was not the sole basis for that decision. When the MCSO described its own policy as it pertained to stops during such operations, it stated that MCSO officers in making stops during saturation patrols, could not use race as the sole factor on which to pull a vehicle over so as to avoid "racial profiling." (Ex. 342 ("at no time will any vehicle be stopped solely because of the race of the occupants inside that vehicle").) It pointedly did not prohibit officers from using race as a consideration in deciding to make such a stop.

Sgt. Palmer testified that if there was a legitimate basis to pull a vehicle over, for a traffic infraction or otherwise, then, by definition, a deputy would not be racially profiling. (Tr. at 724:22--725:1.) And Sgt. Madrid testified that so long as there was a legitimate basis to pull over a vehicle, it would never occur to him that  [\*149] a deputy could be racially profiling by doing so. [67] (Id. at 1172:20--24.)

> [67]  At any rate, all of the MCSO command personnel acknowledged that they never examined their arrest statistics or otherwise made any effort to determine whether their deputies were engag-

ing in racial profiling in the stops and arrests they made during saturation patrols.

With such understandings, once an MCSO deputy had identified a particular vehicle with Hispanic occupants, he or she could develop a legitimate basis under the Arizona traffic code to pull over that vehicle with very little difficulty without "racially profiling." Once they observed a traffic infraction, MCSO deputies had a factor in addition to race on which to pull the vehicle over. Their decision would never be reviewed nor racial bias suspected by their supervising sergeants because the stop was not made solely on the basis of race.

At trial, Sheriff Arpaio and much of the rest of the MCSO command staff testified that the MCSO could use race as a factor in deciding to interrogate vehicle passengers once a vehicle had been pulled over, but could not use race as a factor in deciding whether to pull the vehicle over. That distinction, however, [*150] is a very fine one. There is no evidence, in the operations plans or otherwise, that once MCSO deputies had been instructed that it was acceptable to consider race as one factor among others in an immigration context, they were further instructed that they nevertheless could not consider race as any factor in determining whether to stop a vehicle. Further, Sheriff Arpaio's testimony in this respect seems contradictory to his quote from the MCSO news release, in which he indicates it would constitute racial profiling if the *only* reason a vehicle was pulled over was because of the race of the occupants. (Ex. 342.)

Despite Lt. Sousa's understanding to the contrary, at least one of his sergeants testified that ICE specifically trained MCSO deputies that they could use race or Mexican ancestry as one consideration among others in deciding whether or not to stop a vehicle, and that MCSO deputies in fact did so. (Tr. at 715:3--19, 1164:4--12.) And Sgt. Madrid acknowledged that he could not know whether one of his deputies used race as a factor in making a stop unless he was actually present at the stop. (*Id.* at 1171:10--14.) He also testified that he would not typically be present at a stop during [*151] saturation patrols, since he was usually assigned to the command post during such operations. (*Id.* at 1160:1--25.)

Nevertheless, Deputy Rangel, and to some extent Sgt. Madrid, testified that due to tinted windows and headrests an officer could not always perceive the race of the occupants of vehicles before making a stop. (*Id.* at 927:9--21, 1192:4--15.) Thus, the MCSO argues, it was impossible for its officers to be racially profiling. While the Court accepts the testimony of Deputy Rangel and Sgt. Madrid, it rejects the assertion that such obstructions always or even regularly prevented deputies from making an assessment of the race of the occupants of a vehicle in which they are interested. The large-scale patrols

were conducted in an environment in which MCSO deputies knew that the operations were designed to enforce immigration laws. (*Id.* at 1136:15--20; *see also id.* at 786:14--18, 787:5--14, 901:4--902:17.) The deputies were required to keep track of the number of unauthorized aliens they arrested during such patrols and report that figure to their supervisors. (*See, e.g.,* Exs. 102 at MCSO 001978--001986, 111 at MCSO 056988--056998; *see also* Tr. at 690:23--691:1, 1153:13--18.) They correctly [*152] believed that the vast majority of unauthorized residents of Maricopa County are of Hispanic origin. They were trained to use race as one factor among others when investigating immigration status. While some MCSO pronouncements indicated that it constituted racial profiling to stop vehicles based on the race of its occupants, others stated that it constituted racial profiling only when race was the sole consideration in making the decision to stop a vehicle. Further, their supervising sergeants did not believe that racial profiling could exist in a stop so long as there was a legitimate basis to stop the vehicle. And every time Lt. Sousa instructed participants in large scale saturation patrols not to racially profile, he assured them that he knew they were not doing so. (*Id.* at 1025:6--8.) There was no policy or race-neutral criteria that governed which vehicles to stop on saturation patrols. Due to the pervasive nature of traffic or equipment infractions that exist on the road, an MCSO deputy could stop virtually any vehicle he or she wished to stop on a legitimate basis. Based upon these policies, practices, and, to a lesser extent, the arrest records from the operations, the Court [*153] finds that MCSO officers emphasized the enforcement of traffic and vehicle infractions against vehicles that had Hispanic occupants, and in so doing, considered and incorporated the use of race as a factor in deciding which vehicle to pull over during large-scale saturation patrols.

This determination is fortified by the testimony of Dr. Ralph Taylor. Dr. Taylor conducted a study of the MCSO's CAD records related to MCSO large-scale saturation patrols to determine whether stops during large scale saturation patrols focused on vehicles with Hispanic occupants. The MCSO's CAD database provides detail of those incidents during which MCSO officers contact their dispatch. (*Id.* at 69:4--9.) When an MCSO deputy asks dispatch to run a name through the MCSO database, the name is captured in the CAD database. The CAD database also records categories for individual stops, and type "T" is the category for a traffic stop or a traffic violation. (*Id.* at 69:8--9.) A stop that begins as a traffic stop but during which an officer makes an arrest on another charge, such as a drug arrest, will have a different final call than type T. (*Id.* at 130:22.) Thus, presumably, stops during which any arrests, including [*154] immigration arrests, were made, were not counted in the totals arrived at by Dr. Taylor. This means that Dr. Taylor's statistics

reflecting an increase in inquiries in Hispanic names during large-scale saturation patrols did not include those stops in which Hispanic names were checked and immigration arrests resulted.

Dr. Taylor only had complete information on 11 of the 13 large-scale saturation patrols on which testimony was offered at trial. (*Id.* at 76:24--77:3.) He had no information concerning the individual officers signed in to the first two large-scale saturation patrols at Pruitt's on which to run an analysis. [68] In addition to the CAD database, Dr. Taylor relied on independent U.S. Census data correlating the likelihood that a person with any given name self-identified as Hispanic. He did a differential analysis that focused particularly on names whose owners identified as Hispanic more than 90% of the time, more than 80% of the time, and more than 70% of the time. (*Id.* at 193:2--7.) He also included names whose owners self-identified as Hispanic at a 60% threshold as "a type of robustness analysis." [69] (*Id.* at 193:6--7.)

> [68]  Nevertheless, records produced at trial demonstrate that  [*155] during the first Pruitt's large-scale patrol there were six of 27 arrests that were of unauthorized persons. (Ex. 77.) During the second Pruitt's large-scale operation 42 of 43 people arrested were unauthorized persons. (Exs. 79, 82.)
>
> [69]  Dr. Taylor's statistics in this respect were, apparently, more sophisticated than those provided in the 1980 census list of Spanish surnames. (Ex. 320.)

Dr. Taylor compared the names that MCSO officers called in to central dispatch during saturation patrols to the names called in by MCSO officers during non-saturation patrol days. (*Id.* at 99:22--100:3.) [70] He also compared the names called in by MCSO officers who worked on saturation patrols, regardless of whether they were working a saturation patrol, to the names called in by MCSO officers who did not work on saturation patrols. (*Id.* at 100:25--101:6.) Further, he compared the names called in on days when saturation patrols took place, regardless of whether the name was called in as part of a saturation patrol, to names called in on all other days. (*Id.* at 155:1--4.) Finally, Dr. Taylor studied the relative lengths of stops involving at least one likely-Hispanic surname.

> [70]  As previously stated, in all patrol  [*156] operations for the relevant period, the percentage of vehicles that the MCSO pulled over with Hispanic occupants is slightly lower than the percentage of the population of Maricopa County that is Hispanic. (Ex. 402 at 3.)

He concluded that, depending on which threshold of Hispanic surname was used, names checked by an officer participating in a saturation patrol during a saturation patrol were between 46% and 54% more likely to be Hispanic than those checked by other officers operating on the same day. (*Id.* at 96:12--20.) He also found that, depending on the name threshold, names checked by all MCSO officers on saturation patrol days were between 26% to 39% more likely to be Hispanic than names checked on non-saturation patrol days. (*Id.* at 91:22--25.) Compared to names checked one week before and one week after a saturation patrol, names checked on a saturation patrol day were between 28.8% and 34.8% more likely to be Hispanic, (*id.* at 93:20--25), and names checked by saturation patrol officers operating on saturation patrol days were between 34% and 40% more likely to be Hispanic than names checked by officers who were never involved in a saturation patrol, (*id.* at 97:22--98:5). Finally,  [*157] Dr. Taylor found that stops in which an officer checked at least one Hispanic name lasted between two and three minutes longer than comparable stops in which no Hispanic names were run. (*Id.* at 109:14--16.)

Defendants called Dr. Steven Camarota to rebut Dr. Taylor's conclusions. Although, for the most part, Dr. Camarota did not take issue with Dr. Taylor's tabulations from the CAD records maintained by the MCSO, he did question several of the assumptions underlying Dr. Taylor's analysis and the adequacy of the information on which it was based. He further offered alternative explanations for the results of Dr. Taylor's analysis.

While Dr. Camarota did not independently verify Dr. Taylor's findings, he agreed that officers checked Hispanic names at a higher rate during saturation patrols. (*Id.* at 1310:6--9.) He further agreed that the Hispanic surname tables Dr. Taylor used are reliable. (*Id.* at 1305:22--1306:2.) In his own analysis, Dr. Camarota found that on days in which a saturation patrol was underway, the share of names checked that was Hispanic was 4.8% higher than on other days of the year. (*Id.* at 1309:22--1310:1.) Dr. Camarota speculated that different poverty rates could result  [*158] in disparate stop rates between Hispanics and non-Hispanics, because "people with low incomes are going to have more difficulty. . . meeting the equipment standards." (*Id.* at 1260:16--21.) Dr. Camarota presented no analysis of the stop rates corrected for poverty rates to support his speculation.

As between Dr. Taylor and Dr. Camarota in this respect, the Court credits the opinion of Dr. Taylor. Dr. Camarota testified that his opinions were based in part on Lt. Sousa's description to him of the zero tolerance policy that was followed on saturation patrols. Dr. Camarota testified that Lt. Sousa told him that on such patrols officers "attempt when practicable, and when it's viable, to

pull over during saturation patrol anybody they see in violation making equipment violations or violating the rules of the road." (*Id.* at 1334:22--1335:5.) As the Court has already determined, however, the MCSO followed no such policy during large-scale saturation patrols, and the description of the zero tolerance policy Dr. Camarota testified that he received from Lt. Sousa is different than Lt. Sousa's description given during trial. Thus, Dr. Camarota's conclusions that relied on the existence of the zero [*159] tolerance policy as he understood it are impaired. Dr. Camarota himself acknowledged in his testimony that if his understanding of the zero tolerance policy was inaccurate and if "that's not what happens during a saturation patrol, then that can matter" with respect to his analysis that socioeconomic factors could account for different stop rates. (*Id.* at 1336:4--15.) The Court, therefore, gives more weight to the opinion of Dr. Taylor. [71]

> 71    Defendants' police practices expert, Bennie Click, similarly opined in his report that there was no impermissible racial profiling occurring during saturation patrols due to a zero tolerance policy that limited the discretion of MCSO deputies in whom they could pull over. (Ex. 1070 at 46.) He arrived at this conclusion based on a description of the zero tolerance policy provided him by Sgt. Madrid. (*Id.*) The Court similarly rejects Mr. Click's conclusion based on his misassumption regarding a zero tolerance policy that was never effectively implemented at the MCSO.

Regarding the length of stops, Dr. Camarota suggested that the need to translate information for the person stopped may contribute to stops of Hispanics taking more time. (*Id.* [*160] at 1297:11--15.) Dr. Taylor agreed that if officers translate information during a stop, the stop could take longer than a stop where no translation is required. (*Id.* at 175:9--17.) Dr. Camarota testified that Hispanics are more likely to have hyphenated last names, which would require officers to check both alternate last names and could also increase the length of a stop. (*Id.* at 1298:9--23.) While the Court agrees that both of these alternative explanations carry weight, as multiple MCSO officers admitted, once they stopped a vehicle with Latino passengers, they used the race of the occupants of the vehicle as one factor among others to prolong the stop and investigate the immigration status of the vehicle's passengers. The Court believes that the MCSO's pursuit of this practice, even if it did not ultimately result in an arrest, is a more likely explanation for the increased stop time resulting from stops with Hispanic names.

> Further, Dr. Camarota testified that missing data could affect the reliability of Dr. Taylor's conclusions. In conducting his analysis, Dr. Taylor recorded only those

stops in which the CAD Database recorded the fact that an officer had checked at least one name. [*161] (*Id.* at 75:17--19.) In approximately 30% of the recorded stops in the CAD Database, the officer did not check any names at all. (*Id.* at 1236:9--10.) In conducting his analysis, Dr. Taylor included only those stops in which the CAD Database recorded that the stop was categorized as final call type T. (*Id.* at 75:14--15.) Slightly over 80% of the stops for each year were categorized as final call type T. (*Id.* at 78:15.) Dr. Taylor's data set therefore did not include data for a number of stops conducted by the MCSO, apparently including those that would have resulted in immigration arrests. Further, the MCSO does not review the CAD data for quality control, and makes no attempt to verify the accuracy of the CAD data. (*Id.* at 1265:20--25, 1252:19--24.)

While the Court does weigh the incompleteness of the available information, there is no question that all of the information used was provided to the Plaintiffs by the MCSO, and was all the information that it kept on the topic. [72] Since the data that was excluded did not include any name that could be evaluated, the Court concludes that drawing conclusions from limited data sets is still probative when complete data are not available. Further, [*162] the non-T stops that were excluded from Dr. Taylor's analysis involved a collection of stops which, in the aggregate, involved a lower degree of officer discretion than stops designated as a traffic stop or a traffic violation. The Court thus credits Dr. Taylor's analysis and finds it credible and probative as to whether MCSO deputies used race as a factor among others in stopping vehicles with Latino occupants on saturation patrols.

> 72    The MCSO's police practices expert acknowledged that the MCSO fell below the standard in not keeping more complete records of its officer's encounters during this period. (Tr. at 1752:6--24, 1753:17--1754:1.)

Despite the voluminous evidence to the contrary, the MCSO argues that a number of specific deputies testified at trial that they never used race in the law enforcement decisions they made, even in an immigration context. For example, Deputy Armendariz testified that he never used race or ethnicity to make a decision to stop a vehicle, detain a driver or occupant, or to initiate questioning of anyone. (*Id.* at 1507:11--20.) Similarly, Detective Beeks testified that race and ethnicity are not criteria for a traffic stop. (*Id.* at 1436:8--10.) Deputy Kikes [*163] also testified that he never tries to determine anything about the race, ethnicity, or demographics of vehicle occupants in deciding who to pull over. (*Id.* at 625:10--14.) Deputy Rangel joined Deputy Armendariz in testifying that, as a matter of course, they and other deputies investigate the identity of every occupant of every vehicle they stop,

regardless of race. (*Id. at* 1518:14--19, 1543:4--12 (Deputy Armendariz testifies that its typical for all law enforcement officers to ask all passengers to volunteer their identification after pulling over a car, and he always does this whether it's a routine traffic stop or a saturation patrol), 931:2--13, 944:9--16 (Deputy Rangel testifies that he asks everybody in a vehicle for identification as a matter of habit, and not only while conducting saturation patrols).)

While the Court does not doubt the work ethic of these deputies, nor their desire to follow the various directives pertaining to their operations, it is difficult to reconcile their testimony in this respect with their actual performance during large-scale saturation patrols. That analysis demonstrates that it is unlikely that Deputy Armendariz, Deputy Rangel, Deputy Beeks, or Deputy [*164] Kikes engaged in the race-neutral policing that they claimed.

Deputy Armendariz participated in at least nine of the large-scale saturation patrols, some of which took place over multiple days. 75 of the 97 arrests made by Deputy Armendariz during the large-scale saturation patrols, or 77.3% of his total arrests, were of persons with Hispanic names. [73] Further, at least 35 of these arrests were made of passengers. 33 of them were determined to be unauthorized aliens, although only 32 of them had names that are listed as Hispanic in Exhibit 320. [74] Deputy Armendariz did arrest two passengers with non-Hispanic names.

> [73]   During the large-scale saturation patrol at Cave Creek and Bell he arrested a total of four people, all of whom had Hispanic surnames. (Ex. 82.) During the first large-scale Mesa patrol he arrested five people, all of whom had Hispanic names. (Ex. 87.) During the second large-scale Mesa patrol he arrested 18 people, ten of whom had Hispanic names (Actually, eleven persons were designated in the arrest report as being unauthorized aliens, however, the name of the eleventh, Minerva Vujando, was not included in Ex. 320 as an Hispanic name, so the Court does not count it here). [*165] (Ex. 97.) During the first Sun City patrol he arrested 17 persons on one arrest, all of whom had Hispanic names. (Ex. 102.) Although the probable cause listed on the arrest report for stopping this vehicle was a violation of Arizona's Human Smuggling Act, all persons in this arrest processed with ICE on federal immigration charges. While the arrest was not made on the state charge, the Court is willing to assume that, due to the large number being transported, there was sufficient probable cause to pull the persons over for a violation of state law, even if

Deputy Armendariz had not considered race as a factor. During the first Southwest Valley saturation patrol, he arrested nine people over the course of two days, five of whom had Hispanic surnames. (Ex. 111.) On the April 23--24 West Valley patrol, he arrested 16 people, 14 of whom had Hispanic surnames. (*Id.*) On the July 23--24 Chandler Southeast Valley patrol, he arrested 17 people, 11 of whom had Hispanic surnames. (Exs. 128, 168.) On the September 5, 2009 patrol at Durango and 35th Ave, he arrested eight people, six of whom had Hispanic surnames. (Ex. 170.) During the November 16, 2009 countywide patrol he arrested three people, [*166] all of whom had Hispanic surnames. (Exs. 176, 178--82.)

> 74   During the August 2008 Sun City large-scale patrol, Deputy Armendariz pulled over a vehicle with 17 occupants. The passengers were arrested for federal immigration violations. However, even if those arrests are removed from the equation as having sufficient probable cause to investigate and arrest absent Deputy Armendariz's use of race as a factor in making the stop, then 58 of 80 his arrests, or 72.5%, had Hispanic names, and 16 of 19 passengers arrested had Hispanic names.

Such statistics as exist regarding Deputy Armendariz's performance in small-scale patrols are even more indicative of racial disproportionality, albeit in a smaller sample. [75] Looking at the records for those operations that identify arresting officers, Officer Armendariz participated in at least the first day of the Fountain Hills operation, and in the September 2008 Cave Creek operation. The Fountain Hills operation lasted six hours. (Ex. 108.) During those six hours, seven stops were made, four of which resulted in immigration arrests. (*Id.*) Of the four stops that resulted in immigration arrests, three were made by Deputy Armendariz, the other was made by [*167] Deputy Cosme. (*Id.*) All of the recorded stops made by Deputy Armendariz resulted in the arrest of unauthorized aliens. [76] (*Id.*)

> 75   Although technically speaking the operation plans prohibiting racial profiling and requiring all possible arrests applied only to large-scale saturation patrols, Deputy Armendariz testified that he never considered race in any aspect of his law enforcement. Thus, if true, his arrests should reflect that reality.
>
> 76   On the second day of the Fountain Hills operation no record was kept of the officers who made the stops, so it is not possible to know if Deputy Armendariz participated, or how many of the stops he made.

The records for the September 2008 Cave Creek operation also reveal which officers made the stops that resulted in immigration arrests. Four of the 33 stops made on that day resulted in immigration arrests. (Ex. 112.) Deputy Armendariz made two of those four stops. (*Id.*) The ratio of stops to immigration arrests made does not serve to demonstrate whether Deputy Armendariz may have been using race as a criteria on which to stop traffic violators. Nevertheless, during these two days of operations, Deputy Armendariz made five traffic stops that resulted [*168] in ten arrests of unauthorized residents. (*Id.*) All of the persons arrested by Deputy Armendariz had Hispanic surnames and each of them was arrested on federal immigration charges. (*Id.*) At least six, but possibly as many as eight of these persons were passengers in vehicles. (*Id.*) During these two days, it is clear that Deputy Armendariz made no effort to pull over every vehicle he observed committing a traffic violation because during the entire first day of the Fountain Hills operation, both units of the MCSO pulled only over seven vehicles. During the September 2008 Cave Creek operation, although more vehicles were stopped, and more vehicles may have been stopped by Deputy Armendariz, he never arrested anyone on either day, other than Hispanic drivers or passengers. (*Id.*)

When asked to explain his disparate arrest rate of Hispanic persons, Deputy Armendariz testified that the majority of Maricopa County's population is Hispanic. (Tr. at 1504:10--1505:2.) That assertion is simply wrong. Approximately 30% of the population of Maricopa County is Hispanic. *See* United States Census, State & County QuickFacts, Maricopa County, Arizona, http://quickfacts.census.gov/qfd/states/04/ 04013.html [*169] (last visited May 21, 2013). Approximately 77% of the arrests made by Deputy Armendariz during large-scale saturation patrols had Hispanic surnames. 100% of the persons he arrested during the limited sampling of small-scale patrols had Hispanic surnames. The Court concludes that Deputy Armendariz considered race as one factor among others in making law enforcement decisions during both large- and small-scale saturation patrols.

Deputy Beeks participated in at least four of the large-scale saturation patrols. (*Id.*) From the Court's calculations 14 of the 15 arrests made by Deputy Beeks during the large-scale saturation patrols, or 93.3% of the total arrests he made were of persons with Hispanic names. [77] Further, during these large scale saturation patrols, Deputy Beeks arrested 11 passengers. (Exs. 82, 90, 174.) Nine of them were determined to be unauthorized aliens, and all of them had names that are listed as Hispanic in Exhibit 320. It is likely that the ten arrests Deputy Beeks made during the second Sun City patrol stemmed from a human smuggling load. All ten came

from the same vehicle. [78] (Ex. 174.) Excluding those numbers, Deputy Beeks made five other arrests, four of whom had [*170] Hispanic last names and were in the country without authorization. The Court concludes that Deputy Beeks considered race as one factor among others in deciding whom he would stop.

[77] During the large-scale saturation patrol at Cave Creek and Bell he arrested one person, and that person had a Hispanic surname. (Ex. 82.) During the first large-scale Mesa patrol he arrested three people, all of whom had Hispanic surnames. (Ex. 90.) During the April 2009 West Valley patrol he made one arrest of a person who did not have a Hispanic surname. (Ex. 111.) During the second Sun City patrol of October 17, 2009, he arrested ten people. (Ex. 174.) All of them had Hispanic surnames.

[78] Three of the ten were arrested on state charges and seven of the ten were turned over to ICE under MCSO's LEAR policy, presumably meaning there was no basis to arrest on state charges.

The large-scale patrol arrest statistics for both Deputy Rangel and Deputy Kikes have been previously discussed. *See* Section II.8, *supra*. As noted, Deputy Kikes participated in three large-scale saturation patrols over four days and made a total of five arrests on all such patrols. All five had Hispanic names. Thus 100% of all persons he [*171] arrested during a minimum of three days of saturation patrols were Hispanic. Similarly, Deputy Rangel participated in seven large-scale saturation patrols in which 54 out of the 60 people he arrested had Hispanic surnames. [79] The Court concludes that Deputies Kikes and Rangel considered race as one factor among others in making law enforcement decisions in an immigration context.

[79] If the human-trafficking load(s) arrested by Deputy Rangel during the August 2008 Sun City patrol are removed from the equation, then 11 of 16 arrests or 68.7% of his total arrests are of persons with Hispanic names. During the nine days, he made 60 (or 16) arrests. Of the 60 (or 16) arrests, 54 (or 11) just happened to be of Hispanic persons who were in the country without authorization, and 47 (or 4) of them were on immigration charges. The Court rejects the proposition that Deputy Rangel was not considering race in the vehicles he stopped or the passengers he investigated and arrested.

To the extent that the MCSO invites the Court to find that the MCSO saturation patrols did not incorporate racial bias in design or execution based on the testimony of these officers that they did not so engage, the Court

[*172] declines to do so. The great weight of the evidence is that all types of saturation patrols at issue in this case incorporated race as a consideration into their operations, both in design and execution, the vehicles the deputies decided to stop, and in the decisions made as to whom to investigate for immigration violations.

The day labor operations and similar small-scale patrols with high arrest ratios specifically required the investigation of passengers that were Latino day laborers, which meant a disproportionate number of Latino passengers had their identities investigated, regardless of whether that investigation resulted in arrest. The number and types of resulting arrests for each of these operations demonstrates that their principal purpose was the investigation and arrest of persons likely to be unauthorized residents. As shown above, members of the MCSO believe that virtually all unauthorized residents in Maricopa County are Hispanic. Because (1) the MCSO was involved in an operation whose principal purpose was to investigate and arrest unauthorized residents, (2) it was trained by ICE that it could take into account Hispanic background as one factor among others leading [*173] to the reasonable suspicion that a person is not here legally, and (3) individual deputies were required during such operations to keep track specifically of the number of people they arrested who were not authorized, the Court concludes that those deputies emphasized stopping and investigating the identities of Hispanic persons during such operations.

In the large-scale patrols, MCSO policy instructed officers to rely on their 287(g) certification training in making similar decisions and consequently allowed the officers to consider the passenger's race in making the decision to investigate the passenger's identity. That direction would have resulted in the disproportionate investigation of passengers of Latino background, regardless of whether probable cause or reasonable suspicion otherwise existed to justify such a search. Dr. Taylor's analysis confirms that Hispanic names were more likely to be checked. During the T-Stops that included names called into dispatch during the 11 operations that were the subject of Dr. Taylor's analysis, 308 people were arrested for being present in the country without authorization. (Tr. at 1311:20-1313:3). Further, according to Dr. Taylor, depending [*174] on the threshold of name used, between an additional 1,312 and 1,988 Hispanic names were checked during the CAD stops that he monitored. (Id. at 90:12--16.)

Further, as demonstrated below, in its ongoing enforcement of state laws related to immigration and the LEAR policy, the MCSO continues to consider race as one indicator, among others, that a person is in the country without authorization. Therefore, MCSO officers

continue to stop and check the identities of a disproportionate number of Hispanic persons.

**10. The MCSO stops a vehicle for the length of time it takes to investigate its occupants, not the amount of time necessary to dispose of the traffic infraction that resulted in the stop.**

MCSO traffic stops at issue lasted as long as it took to check the identity of the Hispanic occupants of a vehicle. Some of these stops lasted much longer than it would have taken to handle the traffic infraction that justified pulling the vehicle over in the first place. This is demonstrated by comparing two similar stops during which the MCSO took the same enforcement action.

At trial, David Vasquez testified that he was pulled over by Deputy Ratcliffe of the MCSO during the first large-scale saturation [*175] patrol in Mesa. (Tr. at 199:20--22, 201:24--202:2.) Mr. Vasquez acknowledged that the stated purpose for the stop was a very small if not imperceptible chip in his windshield. (Ex. 54.) Mr. Vasquez is Hispanic and his wife is not Hispanic. (Tr. at 198:15--17, 1992--3.) Deputy Ratcliffe asked Mr. Vasquez for his identification but did not make the same inquiry of his wife. (Id. at 200:21--201:6.) After Deputy Ratcliffe checked Mr. Vasquez's identification, he was released without being issued a citation for the chipped windshield or any other reason. (Id. at 201:1--6.) Although Mr. Vasquez estimated in his testimony that the stop took ten or 15 minutes, he was confronted on cross-examination with the CAD record of the stop that demonstrated that it took just over four minutes. (Id.) Upon cross-examination Mr. Vasquez acknowledged that the stop could have taken as little as four minutes. (Id. at 206:13--14, 208:2--7.) The Court credits the CAD record.

By contrast, although the stop that resulted in the arrest of Jose de Jesus Ortega-Melendres also resulted in only an oral warning to the driver, it lasted approximately 40 minutes. Considerable trial testimony concerned that stop. On that day, [*176] Deputy Louis DiPietro, a member of the canine unit, was recruited by the HSU and assigned to follow cars the HSU officers targeted until he could develop probable cause to stop the car for a traffic violation. (Id. at 242:10--20.) Members of the undercover team observed Mr. Ortega-Melendres and other Hispanic individuals get into a vehicle, and radioed to Deputy DiPietro that he should follow the car and develop probable cause to stop it. (Id. at 244:18--24.) Deputy DiPietro followed the car for between one and three miles, then pulled it over for speeding. (Id. at 245:8--24.)

The evidence established that Sgt. Madrid and Deputy Rangel, both HSU officers, came to the scene after they heard that Deputy DiPietro had stopped the

car. Deputy DiPietro testified that he did not believe that he had probable cause to detain the passengers for any state crime, [80] but he held all of the occupants of the vehicle pending the arrival of Sgt. Madrid and Deputy Rangel and their completion of an investigation into the immigration status of the passengers. (Id. at 256:9--18.) It took up to ten minutes for Deputy Rangel and Sgt. Madrid to arrive. [81] The Court so concludes because Deputy Rangel testified [*177] that the driver would have been at the scene a total of between 30 and 40 minutes, and that the driver would have been at the scene for approximately 30 minutes after Deputy Rangel arrived. (Id. at 952:4--6.) It then took Deputy Rangel and Sgt. Madrid, operating in tandem, approximately 30 minutes to conduct their investigation into the immigration status of the three passengers that were in the car before placing the passengers under arrest. (Id. at 952:9--11.) Deputy DiPietro then released the driver. (Id. at 246:6--8.)

> 80   DiPietro did testify that he believed the majority of day laborers to be unauthorized immigrants. However, when questioned further, he admitted that he did not form this belief until he participated in the day labor operation that resulted in the Ortega-Melendres stop. (Tr. at 299:14-300:17.)

> 81   To the extent that Deputy DiPietro testified he made any independent analysis as to whether the passengers were unlawfully present or breaking any laws, the Court concludes that pursuant to the operation, HSU officers would have arrived regardless of Deputy DiPietro's conclusions. (Ex. 129; see also Ex. 126.)

Upon arrival, Deputy Rangel, who had no reason to believe that the passengers [*178] had violated any state law accordingly to his own testimony, [82] asked the passengers in the vehicle for their identification. [82] (Id. at 910:3--20.) Deputy Rangel and Sgt. Madrid began questioning the passengers. Sometime thereafter they received from Mr. Ortega-Melendres his B-1/B-2 visa. They may have also received from him his valid I-94 form. [83] (Id. at 910:19--25.) At some point, after examining the documentation provided by Ortega-Melendres and the information provided by his fellow passengers, Deputy Rangel determined to arrest the Hispanic passengers. He handcuffed them and arranged for their transportation to ICE. (Id. at 915:5--7.)

> 82   Deputy Rangel, who is and was at all times relevant to this lawsuit a member of the MCSO's Human Smuggling Unit, has not been trained in the human smuggling statute, although he has read it. (Tr. at 953:19--25.) He has never been trained that day laborers are committing criminal

violations by seeking or accepting labor. (Id. at 935:12--17.) Deputy Rangel did not believe that the vehicle that Deputy DiPietro stopped was involved in human smuggling. (Id. at 938:19--22.) Deputy Rangel does not believe that transporting a day laborer implicates the human smuggling [*179] statute, even if the person transporting the day laborer knows or has reason to believe that the day laborer is not authorized to be in the country. (Id. at 953:5--954:2.)

> 83   Deputy Rangel disputes that Ortega Melendres ever produced an I-94 form. According to ICE documentation, however, when he was presented at the ICE detention facility, "Ortega-Melendres did have his I-94 in his wallet." (Ex. 1093.) After being held for several more hours at ICE pending investigation Ortega-Melendres was released without further action being taken against him.

Neither Deputy Rangel nor Deputy Madrid ever spoke to the driver. Deputy DiPietro alone had contact with him. (Id. at 952:14--15, 246:20--25, 247:23--24.) Deputy Rangel testified that he never spoke with the driver because it was not HSU's job to clear the driver. (Id. at 910:11--18.) Although Deputy DiPietro vacillated several times in his testimony, and was confronted with contrary testimony from his deposition, the Court ultimately credits Deputy DiPietro's testimony that he held the driver until HSU had completed its investigation. Therefore, 40 minutes after the initial stop, after the investigation of the vehicle's passengers was complete and [*180] the HSU had determined to detain the passengers, Deputy DiPietro gave the driver a verbal warning and let him go. (Id. at 246:11--16.) Yet, as the stop of Mr. Vasquez demonstrates, it would only have taken approximately four minutes to issue a warning to the driver. That Deputy DiPietro retained the driver until the investigation of the passengers was complete does not establish that it would have reasonably taken forty minutes to give the driver an oral warning for speeding.

A brief review of the arrest reports shows that a great number of the arrests during the saturation patrols involved the arrest of multiple passengers during a stop when drivers received only a traffic warning or citation. In many such cases, merely investigating the identities of the passengers would have dwarfed the amount of time necessary to issue a traffic citation. For example, during the first day labor operation at Cave Creek, Deputy DiPietro issued only warnings to both drivers he stopped. As with the driver of the Ortega-Melendres vehicle, Deputy DiPietro also issued only a traffic warning to the second driver he stopped on that day. There were, however, six passengers who were investigated and arrested [*181] during that stop. (Ex. 126.) The Court finds that it

would have taken longer than 40 minutes, and certainly longer than four, for the MCSO officers to investigate the identities of those six passengers.

Similarly, during the balance of the day labor operations, and apparently the small-scale saturation patrols, many of the immigration arrests arose from traffic stops during which multiple passengers were arrested. (Exs. 76, 80, 81, 108, 112, 114, 117, 119, 120, 123, 125, 129, 131, 175, 286.) Based on the Ortega-Melendres stop, it would take three deputies approximately 40 minutes to issue a citation or a warning to the driver and investigate the identity of three passengers who did not have ready identification in their possession. Thus, the Court finds that many of the traffic stops conducted during those operations would have taken around 40 minutes.

There was, however, additional evidence about how much time it takes to investigate the identity of a passenger. Deputies Rangel and Armendariz both testified about the process. As discussed above, they testified that MCSO deputies ask all passengers for identification during every traffic stop. If an occupant provides them with identification [*182] they run the identification through the standard database accessible from their patrol vehicles. If a passenger provides no identification, they next ask the passenger to provide his or her name and date of birth. They then run the provided name and date of birth in the standard database.

Deputy Rangel testified that if the standard MVD database contained no information concerning a person with that name and date of birth, he returns and asks the vehicle's occupant(s) for another form of identification and/or asks questions concerning their identity and status. (Tr. at 946:5--9.) If he received no further identification, and Deputy Rangel was on a saturation patrol, he would then arrest the person for an immigration violation. (*Id.* at 947:2--20.) Since the termination of MCSO's 287(g) authority, when he encounters an individual who he suspects is undocumented but he has no basis to take into custody for violation of a state crime, he takes that person into MCSO custody, pending their transfer to ICE. (*Id.* at 958:23--959:7.)

Deputy Armendariz testified that if the database accessible from his patrol vehicle provided no information on a person with the name and date of birth supplied, he [*183] then takes the person into custody until their identity could be ascertained. (*Id.* at 1544:7--9, 1585:7--1586:12.) In such a circumstance, he accesses other databases that may or may not be available through the MVD database such as the JWI, NCIC, and ACIC. (*Id.* at 1520:25--1524:4.) If these databases are not accessible to him from his patrol vehicle, or if, for other reasons it would be beneficial to have dispatch run the searches, he contacts dispatch and has dispatch run the supplied iden-

tity through other databases, including PACE--a system maintained by the City of Phoenix. (*Id.* at 1526:21--24.) He acknowledged that such a process takes time, and it would be impossible to calculate an average. Nevertheless, he testified that such an inquiry takes

> a while because the dispatchers--the dispatcher that we have that we run on that particular channel runs information for the entire county. . . You have to base it on the fact that when--we're on the satellite or we're on a mobile system and the computers run real slow. There are a lot of cases where DPS, the DPS system itself is down and the queue is down.
>
> There is when we go to our info channel and we run them on our information channel where [*184] the dispatcher is backlogged because, as I said, she runs -- it's one dispatcher for the entire county, whoever transfers over to that channel that needs information.
>
> And also I request a PACE check, which is through the City of Phoenix. So she has to call--the dispatcher that is to contact the City of Phoenix for more information.

(*Id.* at 1525:21--23, 1526:12--24.)

Deputy Armendariz acknowledged that while he is waiting for a response, he returns to the vehicle and asks further questions to the passenger, or requests other forms of identification including the passenger's social security number. (*Id.* at 1525:4--14, 1585:23--1586:12.) He further noted, consistent with other testimony, that such inquiries can prolong the stop because Hispanic surnames are often hyphenated, requiring a check of each permutation of the same name. (*Id.* at 1508:4--1509:3, 1527:13--18.)

Deputy Armendariz does not believe that it has ever taken him more than a half hour to run such a database check, but acknowledged that an identification check would run approximately fifteen minutes. (*Id.* at 1590:5--12.) Deputy Armendariz then twice confirmed that it is still his practice to go through this process of investigating passengers [*185] during all of his stops. (*Id.* at 1526:1--3, 1546:3--17.) After the lunch break in his testimony, however, he seemed to contradict himself in part when he testified that now that he does not have 287(g) authority, if he is unable to figure out a passenger's identity he just lets them go. (*Id.* at 1589:12--18.) The Court finds that such testimony is not credible especially in

light of the LEAR policy, discussed below, which would require Deputy Armendariz to detain such persons if he develops reasonable suspicion that they are not in the country legally.

As the investigation of Deputy Rangel and Sgt. Madrid into the identity of Mr. Ortega-Melendres and his fellow passengers demonstrates, investigating the identity of multiple persons per stop extends the duration of the time that it takes to conduct such stops, even when multiple officers are conducting the inquiries.

While writing a citation would take somewhat longer than issuing a warning, it would not take considerably longer. Many cases suggest that such stops last around ten minutes. *See, e.g., Illinois v. Caballes, 543 U.S. 405, 406, 125 S. Ct. 834, 160 L. Ed. 2d 842 (2005)* (noting that the issuance of a warning ticket, arrival of another officer, tour around the car [*186] with a narcotics-detection dog, search of the trunk and resulting arrest took "less than 10 minutes" in total). Yet, Deputy DiPietro estimated that it typically could take up to twenty minutes to issue a citation. (Tr. at 297:16--22.) Even accepting this higher estimate, many of the arrests during saturation patrols resulted in the arrest of multiple passengers, and thus their investigation would have taken significantly more time than it would have taken to issue a ticket to the driver. Although most arrest reports of the operations show that a traffic stop resulted in at most a citation to the driver, during a few the driver was arrested on criminal charges. Even so, the majority of the evidence indicates that investigating the identities of passengers occurred frequently during MCSO operations and that such investigations took significantly longer than it would take to warn or cite the driver. Thus, the Court finds that for most stops conducted by the MCSO, the length of the stop lasted the time it took to investigate the passengers rather than to deal with the traffic citation.

**11. Some MCSO deputies claim to conduct identity checks on all vehicle occupants. Due to MCSO policy that [*187] allows officers to consider race in determining whether to initiate an immigration inquiry, vehicle occupants who are Latino are more likely to have their identity checked as a matter of operational procedure and policy.**

The MCSO acknowledges that there is no legal requirement in this state that passengers in vehicles carry identification. Nevertheless, Sheriff Arpaio stated in a national press interview that when persons were passengers in a vehicle with a driver stopped on criminal suspicion, MCSO deputies were entitled to investigate the passengers in the vehicle as a matter of course. (Ex. 410a (stating that if unauthorized aliens were passengers in a vehicle with a driver stopped for an immigration violation or other crime, "we have the right to talk to those

people").) Some MCSO witnesses at trial, including Deputy Armendariz, testified that, as a matter of continuing practice, MCSO officers investigate the identity of all passengers in every vehicle they stop regardless of whether the stop was made during a saturation patrol. (Tr. at 1518:14--19, 1543:4--12 (Deputy Armendariz testifies that its typical for all law enforcement officers to ask all passengers to volunteer their [*188] identification after pulling over a car, and he always does this whether it's a routine traffic stop or a saturation patrol), 923:12--14, 931, 944:9--16 (Deputy Rangel testifies that he asks everybody in a vehicle for identification as a matter of habit, and not only while conducting saturation patrols).) Further, Chief Click stated in his report that it was his understanding that "all passengers in vehicles that had been stopped would be contacted" because of the zero tolerance policy. (Ex. 1070 at 46.) At least some deputies understood the purpose of saturation patrols to be making contact with as many people as possible during the course of each traffic stop. (Tr. at 302:16--22.) Thus, many stat sheets requested the number of contacts made during patrol stops. To the extent that the deputies understood this to be the purpose of saturation patrols, they would have likely asked for the identity of every person stopped as a matter of course, as Deputy Armendariz suggested.

Regardless of whether individual officers routinely investigated the identity of every person in every car they stopped, Sgt. Madrid testified that officers participating in day labor operations were instructed that [*189] when they responded to a vehicle that had been stopped, they were to investigate all passengers for immigration violations. (*Id.* at 1144:1--14.) As set forth above, investigating passengers' identities was a basic element of a day labor operation. None of the reports made any attempt to set forth reasonable suspicion to investigate the passengers once a stop was made. [84] Rather, they confirm that the investigation of the passengers' identities followed the traffic stop as a matter of course. (Exs. 123, 129, 131.) Three of the four reports state:

> traffic stops [were] made from UC [undercover] vehicles relaying that day laborers were picked up from the area. Once the pick up vehicle was located by MCSO marked patrol units, detectives would establish probable cause for a traffic stop. Once the vehicle was stopped HSU detectives would interview the subjects in the vehicles in reference to their legal status to be in the US.

(Exs. 123, 129, 131; Tr. at 1144:1--8; 1151:4--11.)

84    At trial, Deputy DiPietro testified that the HSU officers were en route to the scene once they heard he stopped the vehicle. (Tr. at 256:9--18.) Thus, as an operational matter, the deputies were not looking to establish [*190] independent reasonable suspicion to investigate the passengers once the vehicle was stopped, even if they could have established it.

As with the reports of the day labor operations, the great majority of the small-scale saturation patrol reports, especially those with high arrest ratios, set forth for every traffic stop that resulted in the arrest of an unauthorized alien: (1) the basis for the traffic stop, (2) whether and for what the driver was cited and/or arrested, (3) the number of unauthorized aliens arrested during the stop, and (4) the number of persons, including unauthorized aliens, that were arrested on state charges as opposed to federal immigration charges. It is clear from these arrest reports that officers investigated passengers because many of the stops resulted in multiple arrests per stop. In any small-scale patrol where the deputy developed reasonable suspicion during the traffic stop that another state crime was being or had been committed, the MCSO arrested the vehicle's occupant on that basis. The reports, however, do not state any observations made after the vehicle was pulled over that would provide reasonable suspicion that the passengers were in the country [*191] without authorization.

The arrest reports for large-scale saturation patrols confirm that separate probable cause or reasonable suspicion as to passengers was not considered a necessity prior to investigating their identities. Those reports contain a column listing the probable cause that lead to each arrest. Again, in almost all cases involving passengers who were arrested, the only probable cause listed is that the person was a passenger in a vehicle stopped for a traffic violation. (Exs. 79, 82 (particularly the arrests of Deputies Ruiz, Almanza, Smith, Calderon, Armendariz, Romney, Sloup and Seclacek), 90, 97 (particularly the arrests of Deputies Armendariz, Schmizer, Doyle, Beeks, Brockman, Trombi, Komoroski, Cosme, Templeton, Silva, Summers, Roughan and Rangel); 102, 111, 174, 178, 180.) Thus, as with the small-scale patrols, these arrest reports do not delineate any individualized reasonable suspicion or probable cause on which an MCSO deputy could detain a passenger or prolong a stop to investigate a passenger's authorization for being in the United States.

Based on the weight of the evidence and testimony, the Court concludes that officers in the MCSO operations frequently detained [*192] passengers to investigate their immigration status as a matter of course, whether based in part on the race of the occupants or otherwise. In some of those stops, some officers may

have had an objectively reasonable suspicion with respect to individual passengers sufficient to prolong detention for a reasonable amount of time to conduct a brief investigation. Nevertheless, MCSO practice and some of its operational procedures do not require its deputies to have such suspicion beyond the initial traffic stop or to document their bases to routinely investigate the identities of a vehicle's occupants.

**12. The MCSO never made an evaluation to determine whether its saturation patrols were being implemented with racial bias.**

MCSO command personnel uniformly testified that they did not conduct any sort of investigation or monitoring to determine whether the saturation patrols were being implemented in a racially-biased fashion. For example, Chief Sands testified that the MCSO does not collect data on those people it stops or detains to determine whether officers are engaging in racial profiling. [85] (Id. at 833:6--8.) Sgt. Palmer testified that if he saw that a deputy had reported that he had reasonable [*193] suspicion to justify a stop, he knew that the deputy did not engage in "racial profiling." (Id. at 724:22--725:1.) He further testified that he socializes with other officers in the MCSO off-duty, and based on knowing them socially and knowing them as well as he does, he knows that they do not engage in "racial profiling." (Id. at 778:25--779:2.) He also testified that he believes there is no need to investigate whether MCSO officers improperly use race in the course of their law enforcement duties because "quite frankly, sir, I know my brothers, and we abide by the law." [86] (Id. at 779:17--18.) Because he is certain that the other members of the HSU would never engage in racial profiling, Sgt. Palmer never took any action to determine whether HSU deputies engaged in racial profiling and never put any system in place to monitor for racial profiling. (Id. at 780:15--22.)

85    Chief Click, the MCSO's standard of care expert at trial, testified that any supervisor who wanted to minimize racial profiling would have to take active steps to combat it by reviewing records, investigating unusual findings, and retraining officers as needed. (Tr. at 1746:24--1747:5, 1750:20--1751:9, 1754:4--13.) He testified [*194] that "anything that would raise the specter of racial profiling needs to be investigated and looked at further." (Id. at 1765:12--14.) Chief Click testified that to determine whether or not officers are improperly using race during a saturation patrol, a department would not merely look to see if there was probable cause for a particular stop, but "look at the bigger picture, how many people did either the individual deputy stop or how many were stopped, how many total people

were stopped during the patrol?" (*Id.* at 1764:23--1765:1.)

86   The deputies that Sgt. Palmer supervised in the HSU are, apparently the same ones with whom he exchanged e-mails demeaning Mexicans. (Exs. 18, 29.) Sgt. Palmer, considering the e-mails a "joke," forwarded them to the deputies he supervised in the HSU. (Tr. at 735:11--13.) Although Sgt. Palmer believes he was disciplined for sending the emails, he remained a supervising sergeant in the Human Smuggling Unit. (*Id.* at 737:17--18.) A year later, Sgt. Palmer circulated to the HSU a fictional article from the Los Angeles Times purporting to be about immigration which contained baseless statistics regarding the unauthorized population in California. (Ex. 2.) Sgt. [*195] Palmer did not investigate whether the statistics in the e-mail were true before sending it to his subordinates. (Tr. at 729:21--23.) Sgt. Palmer forwarded the e-mail to his deputies in the Human Smuggling Unit as factual information for training purposes. (*Id.* at 732:2--6.) Sgt. Palmer later learned that the statistics in the e-mail were not from the Los Angeles Times and were not factual, but does not recall ever sending an e-mail to his deputies mentioning that the earlier e-mail was a hoax. (*Id.* at 732:13.)

Sgt. Madrid has never reviewed his deputies' incident reports for the purpose of checking whether they are engaged in racial profiling. (*Id.* at 1172:12--15.) If Sgt. Madrid determined that an officer had probable cause to make a stop, he "wouldn't even suspect" that the officer had engaged in racial profiling. (*Id.* at 1172:20--24.) Lt. Sousa did not review citations, stat sheets, or any other documents to determine whether racial profiling was occurring in the Human Smuggling Unit because he believed that racial profiling was a "nonissue." (*Id.* at 1022:12--16.) Lt. Sousa is not aware of the MCSO ever disciplining an officer for racial profiling. (*Id.* at 1023:23--25.)

**13. After the revocation [*196] of its 287(g) status, the MCSO erroneously trained all of its 900 deputies that they could enforce federal immigration law. The MCSO further erroneously trained its deputies that unauthorized presence in the country, without more, was a criminal as opposed to an administrative violation of federal immigration law. The MCSO operated under that misunderstanding during most of the period relevant to this lawsuit.**

Until December 2011, the MCSO continued to operate under the erroneous premise that being an unauthorized alien in this country in and of itself established a criminal violation of federal immigration law which the

MCSO was entitled to enforce without 287(g) authorization. (Tr. at 699:3--702:17.) At the time of revocation, the MCSO had approximately 100 field deputies who were 287(g) certified. (Exs. 356, 359, 360.) Shortly after the revocation of his 287(g) authority, Sheriff Arpaio decided to have all of his deputies trained on immigration law. Being so trained, the MCSO asserted, all MCSO deputies could make immigration arrests. (Exs. 359 (MCSO news release dated March 18, 2010 stating that because ICE revoked the ability of 100 287(g)-trained officers to enforce immigration [*197] law, the MCSO would now use all 900 of its deputies to enforce immigration laws in Maricopa County), 356, 358 (MCSO news release dated March 1, 2010 stating that "[t]hese arrests are a result of Sheriff Joe Arpaio's recent promise to ensure that all 900 of his sworn deputies receive training on the enforcement of illegal immigration laws"), 360, 362.)

This training erroneously instructed MCSO deputies that a person within the country without authorization was necessarily committing a federal crime, and the MCSO thus maintained the authority to detain them for criminal violations. (Tr. at 699:3--702:17.) Further, Sheriff Arpaio gave interviews to the national and local press in which he asserted that if a person is in the country without authorization, that person has necessarily committed a criminal offense. (*Id.* at 362:17--21 ("[T]hey did commit a crime. They are here illegally.").) Sgt. Palmer continued to provide such instruction and training until December 2011, when this Court enjoined the MCSO from detaining persons on the belief, without more, that those persons were in this country without legal authorization. *Ortega-Melendres, 836 F. Supp. 2d at 994.*

Moreover, the Sheriff continued [*198] to run numerous saturation patrols focused on arresting unauthorized immigrants generally. (Exs. 350 ("[D]eputies turned over a total of 19 of the 30 suspected illegal aliens who were not charged for any state violations to Immigration and Custom Enforcement officials without incident."); 358--62 (emphasizing the number of illegal immigrants arrested in these operations).) In such operations, he continued to arrest and turn over to ICE the unauthorized aliens that his deputies arrested during these patrols. (Ex. 360 (MCSO news release noting that 47 of 64 people arrested in a post-revocation saturation patrol were illegal aliens. 27 of those 47 were arrested on state charges with the remainder being turned over to ICE).)

**14. When enforcing state laws related to immigration the MCSO continues to use race as an indicator, among others, of unauthorized presence, as it did in its previous operations.**

At trial, Sheriff Arpaio testified that the loss of 287(g) authority did not affect how the MCSO conducted

its immigration related operations, including the saturation patrols. (Tr. at 469:23--470:5.) He has continued to enforce "the immigration laws, human smuggling, employer sanction" as he [*199] did previously. (Id. at 473:23--474:1.) The Sheriff maintains the right and intention to conduct such operations in the future. (Id. at 469:20--470:2, 473:5--474:7, 474:20--24.) Sheriff Arpaio testified that the last saturation patrol the MCSO conducted prior to trial occurred during October 2011 in southwest Phoenix. (Id. at 474:8--13.) He testified that although the MCSO had not conducted a saturation patrol in the eight months prior to trial, he has not re-evaluated the propriety of the patrols based on the current litigation or other litigation. (Id. at 474:14--475:1.) Further, the MCSO continues to make immigration arrests. As the Sheriff testified, they arrested about 40 unauthorized persons in Maricopa County in the two weeks prior to trial. They charged those they could with state law violations and they successfully turned the rest over to ICE. (Id. at 503:3--11.) The Sheriff reaffirmed that the MCSO "will continue to do all that we can to reduce the number of illegal aliens making their way into the United States and Maricopa County." (Id. at 336:23--337:8.)

Several officers and deputies likewise affirmed that, essentially, nothing has changed. Chief Sands testified that he does not [*200] believe that the revocation of 287(g) authority had any impact on MCSO's ability to conduct saturation patrols or Human Smuggling operations. (Id. at 845:14--22, 837:6--7.) Chief Sands testified that, the MCSO will "continue enforcement of immigration issues." (Id. at 837:6--7.)

Sgt. Madrid also testified that ICE's termination of the MCSO's 287(g) authority does not affect the MCSO's ability to conduct immigration enforcement operations because a person's immigration status is relevant to determining whether there has been a violation of the Arizona state crime of human smuggling, or possibly other state laws related to immigration. (Id. at 1157:17--1158:6.) As discussed above, Sgt. Madrid testified that, in enforcing the state human smuggling statute, MCSO officers continue to consider race as one factor among many "in deciding whether someone is suspected of being an undocumented immigrant in a smuggling load." (Id. at 1164:4--12.) In reviewing a report prepared by an MCSO deputy under his supervision in which the deputy stated that he was suspicious that passengers in a vehicle were unauthorized immigrants based on, among other factors, "[t]he Hispanic decent [sic] of his passengers [*201] the pungent body odor and the lack of luggage for traveling," (Ex. 157 at MCSO 024667), Sgt. Madrid stated that he would not conduct any corrective follow up on the officer who submitted it based on the use of race as a factor in forming his original suspicion, (Tr. at 1170:22--1171:3.)

Sgt. Palmer similarly testified that MCSO policy allows officers to "decide to initiate an investigation during a stop based on race or ethnicity, among other factors." (Id. at 717:2--4.) He specifically testified a passenger's race could be used to determine whether the vehicle was a human smuggling load. (Id. at 721:18.) He stood by his sworn deposition testimony that he believed a subject's race was one relevant factor among others that officers could use to develop reasonable suspicion that the subject was unlawfully present in the United States. (Id. at 726:1--15.) Further, when presented with the same report that Sgt. Madrid had reviewed in which a deputy described the suspect's Mexican descent as a basis, among others, for his belief that the suspect was in the country illegally, Sgt. Palmer stated that "[a]mong the other indicators listed there I don't see a problem with that, no." (Id. at 721:1--2.)

Finally, [*202] Deputy Rangel testified that he currently uses the 287(g) factors to determine whether he has reasonable suspicion that someone is unlawfully present. (Id. at 956:25--957:5.)

**15. MCSO deputies continue to follow the LEAR policy, which directs them to detain persons whom they cannot arrest on state charges, but whom they believe to be in the country without authorization, pending direction from, or delivery to, ICE.**

The MCSO continues to arrest those it believes to be unauthorized aliens, charges those it can on state charges, and turns the rest over to ICE. At trial, Sheriff Arpaio testified that "in the last two weeks we've made over 40 arrests of illegal aliens coming into our county, and a few we did not have the state charge, including some young children, and ICE did accept those people." (Id. at 503:3--6.) He specified that the state charge to which he referred was the Arizona Human Smuggling Act and then noted that when the MCSO arrested unauthorized aliens that could not be charged under the Act, "we haven't had any problem yet turning those that we cannot charge in state court over to ICE." (Id. at 503:10--11.) Although the LEAR policy as written does not require ICE to accept [*203] such persons, according to Sheriff Arpaio, there is no problem with ICE doing so. Nevertheless, the Sheriff has apparently stated in press interviews that if he encounters a problem with ICE agreeing to accept the unauthorized aliens he arrests, the Sheriff will have the MCSO transport such persons back to Mexico. (Ex. 348.)

Similarly, according to Chief Sands under MCSO's current practice "[i]t's the ones that you possibly can't determine there's enough evidence to charge them with the state law, and then you would turn them over to ICE." (Id. at 845:15--17.)

Deputy Rangel similarly testified that MCSO initially "take[s] into custody" and then turns over to ICE "an individual that you suspect is an illegal immigrant but for which you do not have probable cause of a state crime." (*Id.* at 958:23--959:14.) He repeated that the individual would be "detained by the MCSO until the MCSO . . . receives a response from ICE as to whether ICE wants the individual or wants them to be released." (*Id.*)

Likewise, Lt. Sousa testified at trial that after the Department lost its 287(g) authority, its officers continued to detain people whom they believed to be unlawfully present in the country and "make [*204] that phone call to ICE if they didn't have the state charge." (*Id.* at 1007:9--11.)

Sgt. Madrid also testified that after the MCSO lost its 287(g) authority, MCSO deputies would continue to arrest persons that they believed were present without authorization and turn such people over to ICE. (*Id.* at 1161:14--19 (testifying that his practice was to detain a suspected illegal immigrant and "make a call to ICE and let them make that determination"), 1226:8--23 (testifying that, after the loss of 287(g) authority, HSU continued to operate in the same way except that they would have to call ICE after detaining a suspected illegal immigrant rather than arresting that person with their own 287(g) authority).)

Sgt. Palmer testified that MCSO officers who encounter people they believe are unlawfully present in the country "ha[ve] to wait for contact with an ICE agent." (*Id.* at 698:8--11.) MCSO has drafted, placed in effect, and trained all of its deputies on this policy. (*Id.* at 1055:14--24, 1056:9--13, 1070:1--10, 1076:11--18.) Deputy DiPietro testified that he received "some online training" on the effect of the loss of 287(g) authority, and that "we were to call ICE, because we didn't have our 287(g) [*205] any longer." (*Id.* at 291:22--23.) Deputy Armendariz stated that it is his current practice to conduct "investigative detentions" of vehicle passengers to determine whether they are in the country legally. (*Id.* at 1519:13--15; 1544:7--9, 1585:8--1586:9.) He also testified that if the database accessible from his patrol vehicle provided no information on a person with the name and date of birth supplied, he then takes the person into custody until their identity could be ascertained. (*Id.*)

The Court thus concludes that it is current MCSO policy to detain people on the reasonable suspicion, without more, that they are not legally present in the country while MCSO deputies attempt to or do contact MCSO field officers and/or ICE personnel to investigate the detainee's alienage. (*Id.* at 1590:1--12, 959:3--14, 503:3--11, 845:7--22, 1161:7--19, 1162:6--22, 1205:10--1206:9, 1226:5--14, 958:23--959:2, 1055:14--24, 1056:9--13, 1070:1--10, 1076:11--18.)

**16. In following its LEAR policy, the MCSO continues to use race as an indicator of unauthorized presence.**

Pursuant to its LEAR policy, MCSO deputies continue to apply the indicators of unlawful presence that were identified in the 287(g) training their officers received [*206] from ICE to determine whether there is reasonable suspicion that someone is in the country without authorization. Lt. Sousa stated that in implementing the LEAR policy, the formerly certified 287(g) officers "still had that training, so they would definitely know the indicators." (*Id.* at 1007:9--10.) Sgt. Madrid testified that agents continue to look for indications of unauthorized presence during stops and that they are trained to use race as one of those indicators. (*Id.* at 1162:6-1164:12.) Deputy Rangel testified that he currently uses the 287(g) factors to determine whether he has reasonable suspicion that someone is unlawfully present. (*Id.* at 957:1--5.) The MCSO therefore continues to pursue the same policies and practices it did before it lost 287(g) authority.

**17. The MCSO arrests and/or detains all persons it believes to be unauthorized, and it remains the regular practice of some of MCSO deputies to investigate all the occupants of every vehicle they stop.**

The MCSO continues to investigate the identity and immigration status of persons it detains during vehicle stops. (*Id.* at 503:9--12 (Arpaio), 845:14--22 (Sands), 1007:9--11 (Sousa), 1226:8--23 (Madrid), 698:8--11 (Palmer), 958:23--959:7 [*207] (Rangel) 1526:1--3, 1546:3--17 (Armendariz), 291:22--23 (DiPietro).) Deputy Armendariz twice confirmed that it is still his practice to go through this process of investigating passengers during all of his stops. (*Id.* at 1526:1--3, 1546:3--17.)

Sgt. Madrid testified that agents continue to look for indications of unauthorized presence during stops and that they are trained to use race as one of those indicators. (*Id.*)

Further, once a vehicle has been stopped, MCSO policies allow MCSO deputies to consider the Latino ancestry of a vehicle's occupants, as one factor among others, in deciding whether to inquire into the immigration compliance of persons stopped.

**CONCLUSIONS OF LAW**

**I. PROPRIETY OF INJUNCTIVE RELIEF**

In this action, Plaintiffs seek injunctive relief only. To obtain such relief, Plaintiffs have the burden of establishing that, not only have they been wronged, but there is "a sufficient likelihood that [they] will again be

wronged in a similar way." *City of Los Angeles v. Lyons, 461 U.S. 95, 111, 103 S. Ct. 1660, 75 L. Ed. 2d 675 (1983)*. To the extent the MCSO has ongoing policies or practices that violate the constitutional protections of the Plaintiff class, such policies or practices constitute a sufficient possibility [*208] of ongoing harm to support an injunction. *See LaDuke v. Nelson, 762 F.2d 1318, 1326 (9th Cir. 1985)*; *Thomas v. Cnty. of L.A., 978 F.2d 504, 508 (9th Cir. 1992)*; *Walters v. Reno, 145 F.3d 1032, 1048 (9th Cir. 1998)*.

When it had 287(g) enforcement authority, the MCSO implemented operations, policies and practices to take full advantage of its expanded authority to enforce federal administrative immigration regulations and enhance the efficiency of its enforcement operations against unauthorized aliens. Because the federal government has terminated the MCSO's 287(g) authority, and because Plaintiffs seek injunctive relief only, the MCSO's policies, operations, and practices adopted to implement its 287(g) authority would not otherwise be relevant except that, as was made clear by the testimony of the Sheriff and other members of the MCSO command staff at trial, nothing has changed: the MCSO both uses these same policies, operations and practices, and claims the right to continue to use them in its enforcement of both immigration-related state law and its LEAR policy.

Plaintiffs challenge a number of aspects of the policies, operations and practices that the MCSO has used and continues to [*209] use. The MCSO stipulated that Sheriff Arpaio is its ultimate policy maker. A policy, endorsed by an officer who claims he has final decisionmaking authority, combined with statements by officers who are responsible for implementing the policy, provides evidence that the MCSO made "a deliberate choice to follow a course of action made from among various alternatives by the official or officials responsible for establishing *final policy* with respect to the subject matter in question." *Meehan v. Cnty. of Los Angeles, 856 F.2d 102, 107 (9th Cir. 1988)* (quoting *Pembaur v. City of Cincinnati, 475 U.S. 469, 483, 106 S. Ct. 1292, 89 L. Ed. 2d 452 (1986)* (emphasis in original).

Thus, to the extent such practices violate the constitutional rights of the Plaintiff class, Plaintiffs are entitled to injunctive relief. *See LaDuke, 762 F.2d at 1326* (holding that plaintiffs "do not have to induce a police encounter before the possibility of injury can occur" because stops are the result of an "unconstitutional pattern of conduct"); *Thomas, 978 F.2d at 508* (stating that injunctive relief is appropriate when plaintiffs show that police misconduct "is purposefully aimed at minorities and that such misconduct was condoned and tacitly authorized [*210] by department policy makers").

To the extent the MCSO asserts that, despite any potential future harm to the certified class resulting from its policies, Plaintiffs cannot prevail because none of the class representatives demonstrated at trial that they suffered personal harm, its argument is not well-founded. It is true that to gain class certification, named plaintiffs must "allege and show that they personally have been injured." *Warth v. Seldin, 422 U.S. 490, 502, 95 S. Ct. 2197, 45 L. Ed. 2d 343 (1975)*. However, when the claims of named plaintiffs are not proven at trial, unnamed class members may be awarded relief so long as a "controversy" still exists between the unnamed class members and the defendants. *Sosna v. Iowa, 419 U.S. 393, 402, 95 S. Ct. 553, 42 L. Ed. 2d 532 (1975)*. ("The controversy may exist, however, between a named defendant and a member of the class represented by the named plaintiff, even though the claim of the named plaintiff has become moot."); *see also Franks v. Bowman Transp. Co., Inc., 424 U.S. 747, 753, 96 S. Ct. 1251, 47 L. Ed. 2d 444 (1976)* (granting relief to class members in multiple subclasses even though the named class representative's claim failed, because "[t]he unnamed members of the class . . . have such a personal stake in the outcome of [*211] the controversy . . . as to assure that concrete adverseness") (internal quotations and citation omitted). The evidence demonstrates that such a controversy exists between Defendants and unnamed class members here.

At any rate, as discussed in greater detail below, Mr. Ortega-Melendres's *Fourth* and *Fourteenth Amendment* claims succeed, so he "personally [has] been injured" and is an appropriate class representative. *Warth, 422 U.S. at 502*.

## II. SPECIFIC CONCLUSIONS

### A. The MCSO is enjoined from enforcing its LEAR policy.

Mere unauthorized presence in this country, without more, is not a criminal offense. It is true that use of unauthorized methods of entry into this country generally constitutes at least misdemeanor or petty criminal violations of federal immigration law. *See, e.g., 8 U.S.C. β 1325 (2005)* (making it a federal misdemeanor to enter or attempt to enter the United States at "any time or place other than as designated by immigration officers."). However, aliens may enter the country legally, but become subject to removal either by staying longer than authorized or otherwise acting in excess of their authorization. Although a number of such aliens are here without or in excess [*212] of authorization, they have only committed a civil, as opposed to a criminal, violation of federal law. As the Supreme Court recently explained "[a]s a general rule, it is not a crime for a removable al-

ien to remain present in the United States. If the police stop someone based on nothing more than possible removability, the usual predicate for an arrest is absent." *Arizona v. United States,* U.S. , , 132 S. Ct. 2492, 2505, 183 L. Ed. 2d 351 (2012) (citing *INS v. Lopez-Mendoza,* 468 U.S. 1032, 1038, 104 S. Ct. 3479, 82 L. Ed. 2d 778 (1984)).

This Court preliminarily enjoined the MCSO on December 23, 2011 from detaining persons based only on a suspicion that they were in this country without authorization in the absence of additional facts. The MCSO appealed the preliminary injunction to the Ninth Circuit. In affirming the preliminary injunction, the Ninth Circuit reiterated these principles:

> We have long made clear that, unlike illegal entry, mere unauthorized presence in the United States is not a crime. *See Martinez-Medina v. Holder,* 673 F.3d 1029, 1036 (9th Cir. 2011) ("Nor is there any other federal criminal statute making unlawful presence in the United States, alone, a federal crime, although an alien's willful failure to [*213] register his presence in the United States when required to do so is a crime, and other criminal statutes may be applicable in a particular circumstance.") (citation omitted); *Gonzales v. City of Peoria,* 722 F.2d 468, 476--77 (9th Cir. 1983) (explaining that illegal presence is "only a civil violation"), *overruled on other grounds by Hodgers-Durgin,* 199 F.3d 1037. The Supreme Court recently affirmed that, "[a]s a general rule, it is not a crime for a removable alien to remain present in the United States." *Arizona v. United States,* 132 S.Ct. at 2502.

*Ortega-Melendres v. Arpaio (Ortega-Melendres II),* 695 F.3d 990, 1000 (9th Cir. 2012).

As demonstrated by the testimony of every MCSO officer at trial, the MCSO's LEAR policy directs its deputies to detain persons believed to be unauthorized aliens but whom they cannot arrest on state charges. The focus of the LEAR policy on detaining *any* removable alien as opposed to aliens who have committed criminal offenses necessarily means that the MCSO is detaining persons based only on its suspicion that they have committed a civil infraction of federal immigration law. As a local law enforcement agency without 287(g) authority, the MCSO has no statutory, [*214] inherent, or constitutional authority to detain people for civil violations of federal immigration law. *See Martinez-Medina, 673 F.3d at 1036* ("[U]nlike illegal entry, which is a criminal violation, an alien's illegal presence in the United States is only a civil violation.") (citing *Gonzales, 722 F.2d at 476*).

As the Supreme Court explained in *Arizona,* removable aliens are subject to administrative removal proceedings that are civil in nature. *132 S. Ct. at 2499.* Thus, "Congress has put in place a system in which state officers may not make warrantless arrests of aliens based on possible removability except in specific, limited circumstances." [87] *Id. at 2507.* After the termination of its 287(g) authority, the MCSO offers no legal authority that would place it, or its LEAR policy, in one of those circumstances. When the MCSO merely suspects a person of being in the country without authorization, it does not, in the absence of additional facts that would make the person guilty of an immigration-related crime, have a basis to arrest or even engage in a brief investigatory detention of such persons.

> [87]   As an example, the Court cited the Attorney General's authority to enter into a 287(g) [*215] agreement. *Arizona, 132 S. Ct. at 2506.* Other examples include an "imminent mass influx of aliens off the coast of the United States." *8 U.S.C. β 1103(a)(10).*

In affirming this Court's preliminary injunction, not only did the Ninth Circuit establish that the MCSO has no power to arrest such persons under such circumstances, it made clear that the MCSO has no power to detain them to investigate their immigration status. It is the existence of a suspected *crime* that gives a police officer the right to detain a person for the minimum time necessary to determine whether a *crime* is in progress. "[P]ossible criminality is key to any *Terry* investigatory stop or prolonged detention. . . . Absent suspicion that a 'suspect is engaged in, or is about to engage in, criminal activity,' law enforcement may not stop or detain an individual." *Ortega-Melendres II, 695 F.3d at 1000* (quoting *United States v. Sandoval,* 390 F.3d 1077, 1080 (9th Cir. 2004). [88]

> [88]   In *United States v. Brignoni-Ponce,* 422 U.S. 873, 881--82, 95 S. Ct. 2574, 45 L. Ed. 2d 607 (1975) the Supreme Court extended the authority to conduct *Terry*-like stops to civil immigration contexts for those who had authority to investigate such violations. But, after revocation of [*216] its 287(g) authority, the MCSO cannot claim such authority or benefit from this extension.

In the absence, then, of any reasonable suspicion of a possible crime, there is no basis on which the MCSO

can make an investigative detention--let alone an arrest--based only on the belief that someone is in the country without authorization. *See also Arizona v. Johnson, 555 U.S. 323, 326, 129 S. Ct. 781, 172 L. Ed. 2d 694 (2009)* (holding that an investigatory stop is justified at its inception only when an officer "reasonably suspects that the person apprehended is committing or has committed a criminal offense").

The MCSO's LEAR policy is not saved by that part of the Supreme Court's decision in *Arizona* that upheld, as against a preemption challenge, a provision in SB 1070 which provides that, "[f]or any lawful stop, detention or arrest made by a law enforcement official . . . a reasonable attempt shall be made, when practicable, to determine the immigration status of the person." *A.R.S. ß 11-1051(B)*; *see Arizona, 132 S. Ct. at 2515-16*. The threshold requirement is a "lawful" stop or detention. As explained above, any stop or detention based only on a reasonable suspicion that a person is in the country without authorization, without [*217] more facts, is not lawful. Thus, the LEAR policy does not fall under the ambit of *A.R.S. ß 11-1051(B)*.

Further, while *8 U.S.C. ß 1357(g)(10)* does not require a 287(g) agreement for a local law enforcement agency to report "that a particular alien is not lawfully present in the United States," or to "cooperate in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States," such statutory language does not negate constitutional guarantees or authorize local law enforcement agencies to unilaterally arrest such individuals. As the Supreme Court said in discussing this statutory authorization, "[d]etaining individuals solely to verify their immigration status would raise constitutional concerns." *Arizona, 132 S.Ct. at 2509*. Thus, in describing the cooperation anticipated by the statute, the Supreme Court observed:

> There may be some ambiguity as to what constitutes cooperation under the federal law; but no coherent understanding of the term would incorporate the unilateral decision of state officers to arrest an alien for being removable absent any request, approval, or other instruction from the Federal Government. The Department of Homeland [*218] Security gives examples of what would constitute cooperation under federal law. These include situations where States participate in a joint task force with federal officers, provide operations support in executing a warrant, or allow federal immigration officials to gain access to detainees held in state facilities. . . . State officials can also

assist the Federal Government by responding to requests for information about when an alien will be released from their custody. . . . But, . . . unilateral state action to detain . . . goes far beyond these measures, defeating any need for real cooperation.

*Id. at 2507*.

The LEAR policy requires the arrest of the subject encountered by the MCSO. As Sheriff Arpaio testified, the MCSO continues to arrest all persons that it comes across that it believes to be unauthorized aliens. When the MCSO finds some aliens that it cannot charge with a violation of state law, it turns them over to ICE (and has done so consistently without problem). Of course, his testimony highlights the fact that once such persons come into the custody of the MCSO, they are not free to leave and are hence under arrest. His testimony in this respect is supported by the similar [*219] testimony of a number of other MCSO witnesses. Chief Sands, Deputy Rangel, and others testified that such persons are taken into custody first, and only those that cannot be charged on state charges are then turned over to ICE. Such persons are investigated and apprehended upon the prerogative of the MCSO and not at the direction of ICE. And such apprehensions occur despite the lack of any authority on the part of the MCSO to investigate or arrest for civil immigration violations.

Even if this Court accepted the MCSO's argument that the application of the LEAR policy involves only a detention of the subject pending contact with ICE, it would not make the detention constitutional. In the absence of a reasonable suspicion that a crime has been committed, the MCSO lacks authority to engage in a detention of someone pending such contact. As stated above, a law enforcement officer must suspect that an individual is "engaged in, or is about to engage in, criminal activity," before he or she can stop or detain that individual. *Ortega-Melendres II, 695 F.3d at 1000*. To the extent the MCSO actually follows the written requirements of the LEAR policy, it requires the MCSO deputy to summon an [*220] MCSO supervisor to the scene and requires the supervisor to obtain certain information, contact ICE, pass along the information to ICE, await an ICE response, and/or deliver the arrestees to ICE. This inevitably takes time in which the subject is not free to leave regardless of whether the detention is officially termed an arrest. If the cooperation clause in *8 U.S.C. ß 1357(g)(10)* were to be read broadly enough to countenance such arrests as cooperation, there would be no need for the 287(g) authorization and training which the same statute authorizes. *Cf. Christensen v. C.I.R., 523*

*F.3d 957, 961 (9th Cir. 2008)* (stating that courts should avoid interpretations "that would render . . . subsections redundant").

In the MCSO's operations, there appears to be no practical difference between how it presently implements the LEAR policy and how it performed when it had full 287(g) authority. Even after the revocation of its 287(g) authority, the MCSO continues to look for indications of unauthorized presence using its 287(g) training, which taught officers that race could be used as an indicator. The MCSO further continues to take credit in the press for unauthorized aliens that it arrested  [*221] but could not charge and thus turned over to ICE pursuant to its LEAR policy.

The MCSO's LEAR policy is not authorized by *Arizona v. United States, 8 U.S.C. β 1357(g)(10)*, or any other case or statute. The policy is further in excess of the MCSO's constitutional authority because the policy's focus on removable aliens as opposed to aliens who have committed criminal offenses violates the strictures against unreasonable seizures set forth in the *Fourth Amendment*. [89] The Court therefore concludes as a matter of law that when MCSO detains a vehicle's occupant(s) because a deputy believes that the occupants are not legally present in the country, but has no probable cause to detain them for any other reason, the deputy violates the *Fourth Amendment* rights of the occupants. *See Arizona, 132 S. Ct. at 2509* ("Detaining individuals solely to verify their immigration status would raise constitutional concerns.") (citation omitted). The Court further concludes, as a matter of law, that the MCSO has violated the explicit terms of this Court's preliminary injunction set forth in its December 23, 2011 order because the MCSO continues to follow the LEAR policy and the LEAR policy violates the injunction.  [*222] *See Ortega-Melendres v. Arpaio (Ortega-Melendres I), 836 F. Supp. 2d 959, 994 (D. Ariz. 2011)*. The MCSO is thus permanently enjoined from enforcing its LEAR policy with respect to Latino occupants of motor vehicles in Maricopa County.

89   The *Fourth Amendment's* application to unauthorized aliens is unclear and may vary based on the alien's ties to the country. *See U.S. v. Verdugo--Urquidez, 494 U.S. 259, 265, 110 S. Ct. 1056, 108 L. Ed. 2d 222 (1990)*. However, it is clear that law enforcement actions may not "diminish the *Fourth Amendment* rights of citizens who may be mistaken for aliens." *Brignoni--Ponce, 422 U.S. at 884*.

**B. The MCSO is enjoined from using Hispanic ancestry or race as any factor in making law enforcement decisions.**

The day labor, small-scale, and large-scale saturation patrols either incorporate racial considerations into their operational structure, as is the case with day labor operations, or the MCSO explicitly allows its deputies to consider the race of subjects as one factor among others in forming reasonable suspicion that the subjects are unauthorized aliens. The MCSO presently claims the right to enforce state law with the same operations guided by the same policies that it used to enforce federal  [*223] immigration law. Sheriff Arpaio and others specifically claim that the Arizona Human Smuggling Act and the Employer Sanctions laws afford the MCSO the right to pursue unauthorized aliens. Because they follow the same policies and procedures as they did previously, the MCSO and its officers continue to consider race as an indicator of illegal presence in enforcing state laws related to immigration, and in enforcing the MCSO's LEAR policy.

There are, however, at least two problems with the methods in which the MCSO pursues these enforcement prerogatives that render those methods unconstitutional.

**1. The MCSO's use of Hispanic ancestry or race as a factor in forming reasonable suspicion that persons have violated state laws relating to immigration status violates the *Fourth Amendment*.**

"The *Fourth Amendment* prohibits 'unreasonable searches and seizures' by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu, 534 U.S. 266, 273, 122 S. Ct. 744, 151 L. Ed. 2d 740 (2002)* (citing *Terry v. Ohio, 392 U.S. 1, 9, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968))*. However, the *Fourth Amendment* is satisfied if an officer's action is supported by "reasonable suspicion supported  [*224] by articulable facts that criminal activity may be afoot." *United States v. Sokolow, 490 U.S. 1, 7, 109 S. Ct. 1581, 104 L. Ed. 2d 1 (1989)* (citing *Terry, 392 U.S. at 30*).

During a so-called "*Terry* stop," an officer's reasonable suspicion that a person may be involved in criminal activity permits the officer to stop the person for a brief time and take additional steps to investigate further. *Terry, 392 U.S. at 24*. Under Ninth Circuit law, the race of an individual cannot be considered when determining whether an officer has or had reasonable suspicion in connection with a *Terry* stop, including for immigration investigation. *See, e.g., Montero-Camargo, 208 F.3d 1122 (9th Cir. 2000)*; (Doc. 530 at 23 ∂ c). Nevertheless, analysis under the *Fourth Amendment*, including that relating to reasonable suspicion, is wholly objective, and "[s]ubjective intentions play no role in ordinary, probable-cause *Fourth Amendment* analysis." *See Wren v. United States, 517 U.S. 806, 813, 116 S. Ct. 1769, 135 L. Ed. 2d 89 (1996)*.

All parties to this action stipulated as a matter of law that "[r]ace cannot be considered as a factor for reasonable suspicion." (Doc. 530 at 23 ∂ c.) The parties' stipulation comes from the following legal background. In *Brignoni-Ponce, 422 U.S. at 881--82*, [*225] the Supreme Court held that the Border Patrol had to have reasonable suspicion that a person was in the country without authorization prior to stopping a vehicle to question its occupants about their immigration status. Even then, absent consent or the development of probable cause, it could only make a brief *Terry*-like stop to conduct a quick and limited inquiry. In that case, the Court further held that the Hispanic race of the occupants of a vehicle being driven in close proximity to the border did not, without more, provide reasonable suspicion to stop a car at all.

> Even if [the officers] saw enough to think that the occupants were of Mexican descent, this factor alone would justify neither a reasonable belief that they were aliens, nor a reasonable belief that the car concealed other aliens who were illegally in the country. Large numbers of native-born and naturalized citizens have the physical characteristics identified with Mexican ancestry, and even in the border area a relatively small proportion of them are aliens. The likelihood that any given person of Mexican ancestry is an alien is high enough to make Mexican appearance a relevant factor, but standing alone it does not [*226] justify stopping all Mexican-Americans to ask if they are aliens.

*Id. at 886--87. Brignoni-Ponce* thus generally stands for the proposition that a person's Mexican ancestry, even when that person is in proximity to the border, does not provide sufficient reasonable suspicion, on its own, to justify even a brief investigative detention. However, the opinion's observation in dicta that "[t]he likelihood that any given person of Mexican ancestry is an alien is high enough to make Mexican appearance a relevant factor" has been interpreted by ICE to mean that a person's Hispanic appearance can be used as one amongst a number of factors in establishing the requisite quantum of reasonable suspicion to justify a brief investigative detention. The 287(g) training manual for January 2008 that was used by ICE in training the MCSO cites to *Brignoni-Ponce* for the proposition that "apparent Mexican ancestry was a relevant factor" that could be used in forming a reasonable suspicion that a person is in the country without authorization but standing alone was insufficient to stop the individuals. (Ex. 68 at 7.)

ICE failed to take into account that its interpretation of the *Brignoni-Ponce* dicta in this [*227] respect was rejected by the en banc Ninth Circuit 13 years ago in *United States v. Montero-Camargo, 208 F.3d 1122 (9th Cir. 2000)* (en banc). In *Montero-Camargo*, the Ninth Circuit held, at a minimum, that in locations where a significant portion of the legal resident population is of Hispanic ancestry, Hispanic descent was not a permissible factor to consider, either alone or in conjunction with other factors, in forming reasonable suspicion justifying the detention of a suspect based on his or her suspected unauthorized presence. *Id. at 1131--33*.

In that case, the Border Patrol had stopped the drivers of two vehicles who reversed course and headed back in the direction of Mexico after passing a sign indicating that an upcoming border patrol facility, previously closed, was now open again. *Id. at 1126--27*. The location where the drivers reversed their direction was 50 miles north of the border, not visible from the border patrol facility, and had been frequently used to exchange illegal immigrants or drugs. *Id.* Border Patrol agents began following the vehicles after they observed them change their direction. *Id.* To the agents trailing the vehicles from behind, the occupants of the vehicles [*228] appeared to be Hispanic. *Id.* They thus pulled the vehicles over and asked the occupants about their citizenship. *Id.* A subsequent search of the cars revealed quantities of marijuana, and the drivers were arrested and convicted for, among other things, possession with intent to distribute marijuana. *Id.* Both the district court and the Ninth Circuit panel allowed reliance upon the Hispanic appearance of the vehicle's occupants as one factor among others giving rise to reasonable suspicion to justify the stop. *Id. at 1131*. While the en banc Ninth Circuit also affirmed the convictions, it emphasized that the defendants' Hispanic appearance was not a proper factor to consider in determining whether the Border Patrol agents had reasonable suspicion to stop the vehicles. *Id.* In so holding, the Ninth Circuit noted that for reasonable suspicion to exist, the totality of the circumstances "must arouse a reasonable suspicion that *the particular person being stopped* has committed or is about to commit a crime." [90] *Id. at 1129* (citing *United States v. Cortez, 449 U.S. 411, 418, 101 S. Ct. 690, 66 L. Ed. 2d 621 (1981)* (emphasis in original). The court went on to note that:

> [t]he likelihood that in an area in which the majority--or [*229] even a substantial part--of the population is Hispanic, any given person of Hispanic ancestry is in fact an alien, let alone an illegal alien, is not high enough to make Hispanic appearance a relevant factor in the reasonable suspicion calculus. As we have previously held, factors that have such a low

probable value that no reasonable officer would have relied on them to make an investigative stop must be disregarded as a matter of law.

*Id. at 1132; see also Gonzalez-Rivera, 22 F.3d at 1446.* The court concluded its opinion by noting "at this point in our nation's history, and given the continuing changes in our ethnic and racial composition, Hispanic appearance is, in general, of such little probative value that it may not be considered as a relevant factor where particularized or individualized suspicion is required." *Id. at 1135.*

90    The court observed that it was permissible for police in making an arrest in a specific crime to consider a description of the particular suspect including race for purposes of forming probable cause in making an arrest. *Montero-Camargo, 208 F.3d at 1134 n.21* ("Nor do we preclude the use of racial or ethnic appearance as *one* factor relevant to reasonable [*230] suspicion or probable cause when a particular suspect has been identified as have a specific racial or ethnic appearance, be it Caucasian, African-America, Hispanic or other.") (emphasis in original). It held, however, as had previous courts before it, that it is not appropriate for law enforcement to consider race as being an indicator that a person is more likely to be a perpetrator of a generic class of crime. *See id. at 1122 n.10* (citing *United States v. Rodriguez-Sanchez, 23 F.3d 1488, 1492 (9th Cir. 1994)* (holding that reasonable suspicion cannot be based "on broad profiles which case suspicion on entire categories of people without any individualized suspicion of the particular person to be stopped")).

The MCSO stipulated that Ninth Circuit law prohibits its officers from using race or Hispanic appearance in determining "whether an officer has or had reasonable suspicion in connection with a *Terry* stop, including for immigration investigation." (Doc. 530 at 23 ∂ c.) To the extent the Court finds that the MCSO nevertheless uses and has used race or Hispanic appearance as a factor in forming reasonable suspicion, the MCSO urges the Court to "determine whether the actions taken [*231] were justified based upon other factors constituting the totality of the circumstances." (Doc. 562 at 30 n.29.) It suggests that "[t]o do otherwise, would be contrary to the holding in *Montero-Camargo*" in which the Ninth Circuit, while rejecting the use of race as any criteria in arriving at reasonable suspicion, nevertheless recognized that there were sufficient facts independent of race to provide reasonable suspicion justifying the stop. (*Id.*)

To the extent that there was a legitimate, pretextual traffic basis for the original stop that does not involve race, it does not matter to *Fourth Amendment* analysis that the officer's underlying decision to make the stop may have subjectively been based on considerations of race. *See Whren, 517 U.S. at 813.* Further, to the extent that other factors in combination, and excluding race as a consideration, were sufficient to justify reasonable suspicion for the stops, there is no *Fourth Amendment* violation. *See United States v. Manzo-Jurado, 457 F.3d 928, 934--36 (9th Cir. 2006).* As discussed below, however, such motivations do make a difference to the equal protection analysis.

As to the investigation and arrests of vehicle occupants for unauthorized [*232] presence, with few exceptions, the arrest reports contain insufficient facts on which this Court could determine that, even absent their consideration of race, MCSO deputies could have formed reasonable suspicion that an occupant of the vehicle was in the country without authorization. That is true for most of the MCSO's operations at issue in this trial. [91] *See, e.g., Manzo-Jurado, 457 F.3d at 932* (holding that an "individual['s] appearance as a member of a Hispanic work crew, [his] inability to speak English, [his] proximity to the border, and unsuspicious behavior," cannot together provide law enforcement with reasonable suspicion to investigate his immigration status).

91    In a few cases, however, there are such facts. In the few examples noted in the footnotes, for instance, the Court has presumed, based on the sheer number of persons arrested from a single vehicle that there was at least reasonable suspicion to believe that the state crime of human smuggling was occurring. Further, a few arrest reports do demonstrate that MCSO officers made a stop that resulted in the driver being taken into custody. In such cases, it would be within the scope of the arrest, even if not within the [*233] basis for the original stop, for the MCSO deputies to investigate the identity of a passenger to see if he or she could drive the vehicle away from the scene. If ICE had placed a detainer on the passenger, the resulting arrest would have originated from the investigation into his or her identity that would have been within the scope of the original arrest. *United States v. Diaz-Castaneda, 494 F.3d. 1146 (9th Cir. 2007).*

The problem with the MCSO's policies and procedures is that they institutionalize the systematic consideration of race as one factor among others in forming reasonable suspicion or probable cause in making law enforcement decisions. To the extent that officers do consider the race of a person in making law enforcement

decisions that result in his or her seizure, they necessarily consider race as a factor in forming the reasonable suspicion or probable cause that led to their arrest. It is true that in any given factual setting there may be other facts independent of race sufficient to justify reasonable suspicion that a state statute related to immigration has been violated. But, that possibility does not justify the MCSO's systematic policy in using race as a factor [*234] in forming reasonable suspicion. Further, it is apparent that allowing the MCSO to consider race as one factor among others in forming reasonable suspicion will produce irreparable injury to the Plaintiff class. The MCSO is thus enjoined from promulgating, implementing, continuing, or following any such policy or practice.

**2. The MCSO's use of Hispanic ancestry or race as a factor in forming reasonable suspicion that persons have violated state laws relating to immigration status violates the *Equal Protection Clause of the Fourteenth Amendment*.**

The MCSO's consideration of race or ethnicity as a factor in developing probable cause or reasonable suspicion also gives rise to equal protection issues. The *Equal Protection Clause* provides that no state shall "deny any person within its jurisdiction the equal protection of the law." *U.S. Const. Amend. XIV, β 1*. The Clause is "a direction that all persons similarly situated should be treated alike." [92] *City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439, 105 S. Ct. 3249, 87 L. Ed. 2d 313 (1985).*

> 92    The text of the *Fourteenth Amendment* makes explicit distinctions between citizens and persons in the rights it protects. The right to the equal protection of the laws applies [*235] to persons and not just citizens of the United States. *U.S. Const. amend. XIV; Plyer v. Doe, 457 U.S. 202, 211, 102 S. Ct. 2382, 72 L. Ed. 2d 786.*

The *Equal Protection Clause* is violated by governmental action undertaken with intent to discriminate against a particular individual or class of individuals. See *Personnel Adm'r of Mass. v. Feeney, 442 U.S. 256, 271--72, 99 S. Ct. 2282, 60 L. Ed. 2d 870 (1979).* Discriminatory intent may be demonstrated by statutory language, or by governmental action that creates a disparate impact on the individual or class and there is direct or circumstantial evidence of a discriminatory purpose. *Id. at 272--74; Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 266, 97 S. Ct. 555, 50 L. Ed. 2d 450 (1977).*

The MCSO's policies and practices, some of which it apparently received from ICE, expressly permitted officers to make racial classifications. Such racial classifications are subject to strict scrutiny, and the policies here fail to withstand that scrutiny, for the reasons de-

scribed below. *See Parents Involved in Community Schools v. Seattle School Dist. No. 1, 551 U.S. 701, 127 S. Ct. 2738, 168 L. Ed. 2d 508 (2007).* Nevertheless, the MCSO, consistent with its argument that the Plaintiff class has been unable to demonstrate that the representatives of the class suffered [*236] any harm, argues that there is no evidence that Deputies DiPietro or Rangel had any racial motivation for stopping the vehicle in which Mr. Ortega-Melendres was a passenger. That argument, however, fails to address the most relevant facts. Those facts reveal an institutionalized consideration of race in MCSO operations.

According to the news release issued by the MCSO after the first Cave Creek operation at which Mr. Ortega-Melendres was arrested, the genesis for that operation was "tips received on [Sheriff Arpaio's] newly implemented illegal immigration hotline" about a local church providing assistance to day laborers." (Ex. 307.) As has been discussed above, the MCSO had solicited such complaints from citizens because it sought to enforce federal immigration laws against Hispanic day laborers. Other courts have found an equal protection violation when "plaintiffs' status as day laborers was inextricably intertwined with race in the minds of . . . law enforcement officials." *Doe v. Vill. of Mamaroneck, 462 F. Supp. 2d 520, 552 (S.D.N.Y. 2006).*

On September 19 and 22, 2007, several days previous to the September 27 operation, Latino HSU officers went undercover to the church, signed [*237] up for work, and verified the presence of day laborers inside the church parking lot. They then held their operation there, in part, based on the racial makeup of the day laborers who were present. Thus, the location for the operation was selected, at least in part, based on racial makeup of the day laborers that were present there. When locations are selected, in whole or in part, because they will enhance enforcement of the law against a specific racial component of the community, that selection involves racial classification and must meet the requirements of strict scrutiny. As an MCSO witness acknowledged, it would be "racial profiling for deputies to aggressively enforce traffic laws in predominantly Latino neighborhoods because of an assumption that illegal immigrants live or work there." (Tr. at 1152:20--24.)

As is also explained above in some detail, Deputy DiPietro received his instruction to stop the vehicle from the undercover officers based in part on their observation that Mr. Ortega-Melendres and those who entered the truck with him were Latino. Therefore, regardless of whether Deputy DiPietro or even Deputy Rangel were able to observe the racial makeup of the occupants [*238] of the vehicle, the direction to develop a basis to stop the vehicle in which Mr. Ortega-Melendres was a passenger was based, in part, on his race.

Similarly, in day labor and small-scale operations, MCSO undercover officers routinely directed that vehicles that picked up Hispanic day laborers be targeted for pre-textual traffic enforcement. And, pursuant to MCSO policy and practice in other operations, MCSO deputies, in determining which vehicles they will stop for traffic enforcement purposes, emphasize those vehicles that have Hispanic occupants. As the supervising sergeants noted, according to their understanding, it would be impossible for a deputy to commit racial profiling if he has a legitimate reason to pull over a vehicle. This is clearly a limited and incorrect understanding.

Further, having pulled over a vehicle with Hispanic occupants, MCSO deputies are further authorized by policy, operation plans, and continuing practice to consider the race of the occupants in deciding which ones they will investigate for immigration-related violations of state law. The fact that Mr. Ortega-Melendres's vehicle was stopped and his identity investigated, based at least in part on racial [*239] considerations, makes Mr. Ortega-Melendres an adequate representative for persons in the class that were subjected to similar policies or practices.

Any government policy or practice that discriminates based upon race is subject to strict judicial scrutiny. In such cases, the racial distinction must be narrowly tailored to serve a compelling governmental interest. *See Parents Involved, 551 U.S. at 720* (holding that "when the government distributes burdens . . . on the basis of individual racial classifications that action is reviewed under strict scrutiny."); *Gratz v. Bollinger, 539 U.S. 244, 270, 123 S. Ct. 2411, 156 L. Ed. 2d 257 (2003)* (holding that "racial classifications are simply too pernicious to permit any but the most exact connection between justification and classification."); *Grutter v. Bollinger, 539 U.S. 306, 326, 123 S. Ct. 2325, 156 L. Ed. 2d 304 (2003)* (same). Government decisions are further subject to equal protection review when race is merely one factor that motivates action, even if it is not the predominant factor. A government policy is presumed to be racially discriminatory when it is "based *in part* on reports that referred to explicit racial characteristics." *Flores v. Pierce, 617 F.2d 1386, 1389 (9th Cir. 1980)* (emphasis added) [*240] (Kennedy, J.). In *Grutter*, the Supreme Court applied strict scrutiny to a policy which involved race as one factor among many even though plaintiff's expert conceded that "race is not the predominant factor" in the policy. *539 U.S. at 320*; *see also Arlington Heights, 429 U.S. at 263* (subjecting government action to equal protection review on "proof that a discriminatory purpose has been a motivating factor in the decision").

The enforcement of immigration-related civil or criminal offenses amounts to a compelling governmental interest. Yet Defendants have not argued that this policy

is narrowly tailored to meet that interest. Given the facts surrounding the presence of Hispanics in Maricopa County, the MCSO could not successfully do so. The great majority of Hispanic persons in the county are citizens, legal residents of the United States, or are otherwise authorized to be here. Thus the fact that a person is Hispanic and is in Maricopa County is not a narrowly-tailored basis on which one could conclude that the person is an unauthorized alien, even if a great majority of the unauthorized persons in Maricopa County are Hispanic. Further, as has been explained above, in the Ninth Circuit, [*241] race cannot be used under the *Fourth Amendment* to form probable cause or reasonable suspicion that a crime has been committed. Thus, there is no legitimate basis for considering a person's race in forming a belief that he or she is more likely to engage in a criminal violation, and the requisite "exact connection between justification and classification," *Gratz, 539 U.S. at 270*, in focusing on Hispanic persons in immigration enforcement is lacking. [93]

> [93]     Plaintiffs' Title VI claim differs from the *Equal Protection Clause* claim only in that Title VI provides that covered entities may not discriminate based on national origin in addition to race. Some officers testified about the use of "apparent Mexican ancestry" in the use of law enforcement, but no evidence was presented that any MCSO policy had a disparate impact on people of Mexican ancestry as opposed to on Hispanics generally. The Title VI claim thus succeeds only with respect to the *Equal Protection Clause* concerning racial discrimination.

Despite the presence of express racial classifications in the policies, practices, and procedures followed by the MCSO, it argues that a plaintiff challenging law enforcement policies on equal [*242] protection grounds must show "both that the . . . system had a discriminatory effect and that it was motivated by a discriminatory purpose." *Wayte v. U.S., 470 U.S. 598, 608, 105 S. Ct. 1524, 84 L. Ed. 2d 547 (1985)* (citation omitted); *see also Arlington Heights, 429 U.S. 252, 265, 97 S. Ct. 555, 50 L. Ed. 2d 450 (1977)* ("Proof of racially discriminatory intent or purpose is required to show a violation of the *Equal Protection Clause*."). [94] But the discriminatory intent requirement arises when law enforcement operations that are race-neutral nevertheless produce racially disparate results. *Feeney, 442 U.S. at 272*. In those circumstances, the Supreme Court has determined that such policies are not violations of the *Fourteenth Amendment* if there is no discriminatory intent. *Id. at 280--81*. As discussed above, however, the operations in this case are not race-neutral. They expressly incorporate racial bias. The MCSO's policies at issue here make overt racial classifications because they permit the consideration of

race as one factor among others in making law enforcement decisions. In such circumstances, according to *Wayte*, "[a] showing of discriminatory intent is not necessary." *470 U.S. at 609 n.10*.

94    Title VI similarly authorizes a private right of action  [*243] only in cases involving intentional discrimination. *Alexander v. Sandoval, 532 U.S. 275, 280, 121 S. Ct. 1511, 149 L. Ed. 2d 517 (2001)*.

In light of the facts found above, the Plaintiffs have sufficiently established a basis for injunction on equal protection grounds without the need for additional analysis. Nevertheless, even if Plaintiffs were required to show additional indicia of discriminatory intent, they have sufficiently done so. A "sensitive inquiry into such circumstantial .and direct evidence of intent as may be available," *Arlington Heights, 429 U.S. at 266*, demonstrates that the MCSO discrimination against Hispanics was intentional, even if it was done to be responsive to some elements of the electorate.

The Court finds direct evidence of discriminatory intent based on the MCSO's policies, operations plans and procedures. Although such discrimination must be intentional in a disparate impact case, it need not be based on ill-will. That is, although the MCSO permits its officers to make overt racial classifications in making law enforcement decisions, it does not necessarily follow that such policies and practices are based on overt antipathy towards Hispanics. The policies, at least originally, may have been  [*244] based on a desire to produce the most efficient immigration enforcement. [95] Yet, to the extent the MCSO intended and does discriminate based on race, through its policies, the lack of racial antipathy as a motivation makes no difference in the constitutional analysis. The Supreme Court has noted that their "cases clearly reject the argument that motives affect the strict scrutiny analysis." *Parents Involved, 551 U.S. at 741 (2007)* (collecting cases). According to the Supreme Court, "all governmental action based on race--a *group* classification long recognized as 'in most circumstances irrelevant and therefore prohibited'--should be subjected to detailed judicial inquiry to ensure that the *personal* right to equal protection of the laws has not been infringed." *Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 227, 115 S. Ct. 2097, 132 L. Ed. 2d 158 (1995)* (quoting *Hirabayashi v. United States, 320 U.S. 81, 100, 63 S. Ct. 1375, 87 L. Ed. 1774 (1943)* (emphasis in original).

95    Nevertheless, after fielding reports and critiques from some within the Hispanic community about its policies, the MCSO's response to those critiques reflects a confrontational attitude, including its response to the protests at Pruitt's.

In addition to the explicit policies and practices [*245] of the MCSO discussed above, there is circumstantial evidence of discriminatory intent. The MCSO further made changes in its policies and instructions to present the appearance of racially-neutral operations without actually implementing such operations. One such measure was the so-called "zero tolerance policy." No officer could provide a consistent definition of that policy as instituted by the MCSO for large-scale saturation patrols. At best, it did not limit in any way a deputy's discretion as to whom to pull over for traffic violations during an operation. By Lt. Sousa's own admission, the zero tolerance policy was specifically designed to "avoid the perception of racial profiling." (Tr. at 998:5--17.). Lt. Sousa expressly conceded that one of the reasons he included language prohibiting racial profiling in operations plans and directives was so that he could testify to it in any subsequent litigation. Chief Sands himself referred to this policy as "rhetoric." (*Id.* at 830:23--831:1.)

Further, Lt. Sousa periodically instructed deputies at pre-operational briefings that they should not racially profile. At the same time, however, Lt. Sousa told them he was sure that they were not racially  [*246] profiling. Coincident with these self-assuring instructions and assurances, the MCSO continued to implement policies and operations plans regarding saturation patrols that instructed officers that while race could not be the only basis on which to base law enforcement action, it was a legitimate factor, among others, on which they could base decisions pertaining to immigration enforcement. The MCSO did so in spite of criticisms from the media and other sources that its officers were engaging in racial profiling.

In addition to its policies that permitted the consideration of race as a factor in making law enforcement decisions, the MCSO did no monitoring to determine whether operations as a whole, or individual officers participating in operations, demonstrated patterns of racial bias. Based on the Court's review of the arrest statistics and shift summaries, the Court concludes that a cursory review of the shift summaries after the HSU operations would have demonstrated high disparities of Hispanic surnames among those arrested during saturation patrols, even for non-immigration related offenses. It would further have revealed a high incidence of Hispanic surnames among passengers arrested,  [*247] even for non-immigration related offenses. Such a review would have suggested to the MCSO the possibility that such stops and arrests were being effectuated in a manner that was not race-neutral.

Chief Click, the MCSO's standard of care expert at trial, testified that any supervisor who wanted to minimize racial profiling would have to take active steps to combat it by reviewing records, investigating unusual

findings, and retraining officers as needed. He testified that "anything that would raise the specter of racial profiling needs to be investigated and looked at further." (*Id.* at 1765:12--14.) Despite the presence of arrest reports, stat sheet summaries, and other records that raised the specter of racial profiling, Sgts. Madrid and Palmer, Lt. Sousa and Chief Sands took no action to investigate racially biased policing during the saturation patrols.

Chief Click testified that to determine whether or not officers are improperly using race during a saturation patrol, a department would not merely look to see if there was probable cause for a particular stop, but "look at the bigger picture, how many people did either the individual deputy stop or how many were stopped, how many total [*248] people were stopped during the patrol?" (*Id.* at 1764:23--1765:1.) Yet both supervising sergeants testified that as long as there was probable cause to stop a particular vehicle, they would have no suspicion of racially-biased policing in an operation.

When asked about a policy to prevent racial profiling, Chief Click stated that, "I think if it was solely, 'I trust them, so I therefore don't have to monitor them,' that would fall below the standard of care." (*Id.* at 1754:11--13.) Sgt. Palmer testified that he simply trusted his deputies not to engage in racial profiling, even as he exchanged e-mails that denigrated people of Mexican ancestry and Spanish-speakers with those very deputies. Although he claimed to have been subject to unspecified discipline for such e-mails, he was not removed from his position. Sgt. Palmer's e-mails to his deputies would have led those deputies to believe that racial insensitivity towards Hispanics was practiced and endorsed within the HSU. *See DeWalt v. Carter, 224 F.3d 607, 612 n.3 (7th Cir. 2000)* (holding that the use of racially offensive language does not constitute a per se constitutional violation, but it "is strong evidence of racial animus").

Further, [*249] the MCSO did not have its deputies make a record of all their stops during saturation patrols, even though, as testified to by Chief Click, it is a standard reasonable practice for a law enforcement officer to document any law-enforcement related stop he or she has with any person. (Tr. at 1778:4--13.) Thus, the MCSO's failure to monitor its deputies' actions for patterns of racial profiling was exacerbated by its inadequate recordkeeping, which made it more difficult to conduct such monitoring.

During the time that the MCSO was aware that ICE was contemplating terminating its 287(g) certification, it relied, in significant part, on the internet research of Sgt. Palmer to determine whether it could continue to enforce federal immigration law without 287(g) authority. The sergeant supplied to his command staff a non-existent federal law obtained from the internet, by which the MCSO erroneously concluded that it had legal authority to continue to enforce federal immigration law. After MCSO's 287(g) authority was revoked, Sheriff Arpaio, on national television, professed MCSO's erroneous position that it could continue to enforce federal immigration law absent federal authorization based [*250] on this non-existent statute as justification. In relying on Sgt. Palmer's unverified internet research, the MCSO did not make any competent effort to ensure that its legal positions were in compliance with controlling authority, and therefore made no real effort to ensure that its deputies were following the law pertaining to the rights of minorities during such operations. [96]

> [96] The MCSO did eventually base its training concerning its deputies continued authority to enforce federal immigration law on the legal theories of Kris Kobach. (*See, e.g.*, Tr. At 747:18--24.) Mr. Kobach is apparently legally trained, but it is not clear that MCSO sought his legal counsel on whether his theories were in compliance with the law in this jurisdiction.

Further, Sheriff Arpaio's public statements about the HSU operations and the saturation patrols signaled to MCSO deputies that the purpose of those operations and patrols was to arrest people who were not legally present in the United States. As the chief policymaker within the MCSO, Sheriff Arpaio's public comments may have created the impression both in and out of the MCSO that considering a person's race when evaluating whether that person was legally [*251] present in the United States was appropriate and endorsed by the MCSO.

At trial, Sheriff Arpaio testified that he did not agree with his statements on CNN or the Glenn Beck show. (*Id.* at 363:17; 365:17.) Yet later on in his testimony he inconsistently explained that when he made these comments he only meant that such appearance could be a factor for an MCSO officer to consider in determining whether further investigation of immigration status was appropriate once a vehicle had already been stopped. (*Id.* 498:22-503:6.) Whether or not he believed at the time or believes now the statements that he made during these nationally-televised interviews is not relevant to the question of whether the interviews would have led MCSO officers to believe that the sentiments were the policy of the MCSO. Defendants stipulated that Sheriff Arpaio "has final authority over all the agency's decisions," and "sets the overall direction and policy for the MCSO." (Doc. 513 at 8.) Sheriff Arpaio's statements and the attendant news releases shed light not only on "[t]he historical background of the decision," but also provide "contemporary statements by members of the decisionmaking body." *Arlington Heights, 429 U.S. at 267--68.*

Finally, [*252] after December 2011, when this Court entered its preliminary injunction prohibiting the MCSO from detaining persons based solely on a belief that the person was in the country without authorization, the MCSO continued to conduct its LEAR policy in violation of the explicit terms of that injunction. Its officers continued to race as a factor in doing so.

The MCSO asserts that it had no discriminatory purpose in promulgating its policies because they were based on training received by ICE. Even assuming this is true, the MCSO cannot suggest that it can continue system-wide policies applying racial classifications, because even though they are legally erroneous and facially discriminatory, the MCSO believed in good faith that they were permissible at the time of their adoption. Such reliance does not prevent the *Equal Protection Clause* from barring the future use of such facially discriminatory systemic classifications, even assuming they were implemented in good faith.

Defendants cite numerous cases holding that advice of counsel is a defense to an equal protection claim. They do not cite any evidence that the ICE officers conducting the training were attorneys providing legal advice to [*253] the MCSO. [97] And again, even assuming that counsel wrongfully advised the MCSO that it could promulgate system-wide policies in enforcing state laws related to immigration, the MCSO has a constitutional responsibility to refrain from wrongfully using race in law enforcement decisions independent of any advice provided by another law enforcement agency, even ICE. *U.S. Const. amend. XIV, ß 1*

> 97  Defendants also cite *U.S. v. Lopez-Moreno, 420 F.3d 420, 434 (5th Cir. 2005)*, in which the Fifth Circuit denied an equal protection claim when it found that an officer who questioned the Hispanic passengers of a vehicle whose driver was unresponsive to the officers' questions had not demonstrated the requisite intent to discriminate. This out-of-circuit case involved an individual officer and not a department policy.

Based on the factors set forth in *Arlington Heights* and discussed above, Plaintiffs have established that the MCSO had sufficient intent to discriminate against Latino occupants of motor vehicles. Further, the Court concludes that the MCSO had and continues to have a facially discriminatory policy of considering Hispanic appearance probative of whether a person is legally present in [*254] the country in violation of the *Equal Protection Clause*. The MCSO is thus permanently enjoined from using race, or allowing its deputies and other agents to use race as a criteria in making law enforcement decisions with respect to Latino occupants of vehicles in Maricopa County.

**C. The MCSO is enjoined from unconstitutionally lengthening stops unless during the legitimate course of the stop it develops reasonable suspicion, based on permissible factors, that a state crime is being committed.**

In appropriate circumstances, it is acceptable for law enforcement to engage in pre-textual traffic stops to investigate other potential criminal acts. *See Whren, 517 U.S. at 810--813*. Analysis under the *Fourth Amendment* is wholly objective, and "[s]ubjective intentions play no role in ordinary, probable-cause *Fourth Amendment* analysis." *Id. at 813*. However, "[a] seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Illinois v. Caballes, 543 U.S. 405, 407, 125 S. Ct. 834, 160 L. Ed. 2d 842 (2005); Florida v. Royer, 460 U.S. 491, 500, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983)* (holding that the scope of the stop "must be carefully [*255] tailored to its underlying justification"); *United States v. Turvin, 517 F.3d 1097, 1099, 1104 (9th Cir. 2008)* (same).

When the driver of their vehicle is stopped, passengers are legally seized for the same time it takes the officer to resolve the basis for the stop with the driver. *Brendlin v. California, 551 U.S. 249, 257--58, 127 S. Ct. 2400, 168 L. Ed. 2d 132 (2007)*. Yet, stopping a driver for a traffic violation provides no "reason to stop or detain the passengers." *Maryland v. Wilson, 519 U.S. 408, 413, 117 S. Ct. 882, 137 L. Ed. 2d 41 (1997)*. The deputy cannot prolong the stop to investigate a passenger unless the deputy through his or her observations obtains particularized reasonable suspicion that the passenger is committing a violation that the deputy is authorized to enforce. *See United States v. Cortez, 449 U.S. 411, 417--18, 101 S. Ct. 690, 66 L. Ed. 2d 621 (1981)*. In such cases, the deputy is only allowed to prolong the stop for the brief time sufficient to investigate the existence of the crime. *Arizona, 132 S. Ct. at 2528*. When the MCSO deputies were 287(g) authorized, that authority presumably extended to include administrative and hence non-criminal violations of federal immigration law. Such authority, however, no longer exists.

Even in the absence of reasonable suspicion, [*256] however, an officer may make inquiries of the driver and passengers concerning "matters unrelated to the justification for the traffic stop." But again, such inquiries may not "*measurably extend the duration of the stop.*" *Johnson, 555 U.S. at 323* (emphasis added). *See also Muehler v. Mena, 544 U.S. 93, 101, 125 S. Ct. 1465, 161 L. Ed. 2d 299 (2005)* ("Mere police questioning does not constitute a seizure" unless it prolongs the detention of the individual) Even if a simple request for passenger identifi-

2013 U.S. Dist. LEXIS 73869, *

cation is thus within the scope of a traffic stop for a minor infraction to the extent it does not extend the stop, see *United States v. Soriano-Jarquin, 492 F.3d 495, 500 (4th Cir. 2007)*, detaining passengers to investigate their immigration status once they have either provided or not provided identification runs into the *Fourth Amendment*. Detaining a passenger while running his or her identification through an MCSO database is not "reasonably related in scope" to the traffic infraction and therefore requires independent reasonable suspicion. *Caballes, 543 U.S. at 407*; *Terry, 392 U.S. at 20*. "Detaining individuals solely to verify their immigration status" raises "constitutional concerns." *Arizona, 132 S. Ct. at 2509*.

The [*257] evidence demonstrates that during many saturation patrol stops, officers investigated the identities of and arrested multiple passengers on immigration violations, while also being responsible for issuing a citation to the driver. In such circumstances, based on the amount of time it took to resolve the stop of Mr. Ortega-Melendres, together with the process testified to by Deputies Armendariz and Rangel, the Court concludes that the investigation of the passengers would have frequently taken significantly more time than it generally took to issue a traffic citation to a driver. [98]

> 98   As discussed above, the traffic stops would only have taken longer once 287(g) authority was revoked. A passenger pulled over under the MCSO's LEAR policy would have to wait for the deputy to resolve the traffic violation and contact a supervisor, for the supervisor to arrive and conduct additional investigation into the passenger's identity, and for any additional time he or she might spend in custody if an officer determined to hold him or her while waiting for a response from ICE.

As the facts summarized above indicate, at least some MCSO deputies claim that they investigate the identities of all of the [*258] passengers of the vehicles they stop as a matter of course. The arrest reports do not generally support this proposition. Nevertheless, to the extent that MCSO officers investigate the identity of all vehicle occupants as a matter of course, they do so without determining whether there is reasonable suspicion with respect to the individual occupants that would justify their extension of the stop. The same is also true to the extent that: (1) Sheriff Arpaio claimed the right for the MCSO to investigate all the passengers in a vehicle when the driver was pulled over, and (2) during day labor operations, during which participating deputies were instructed to investigate the immigration status of all of the occupants of a vehicle.

Even if some officers participating during saturation patrols extended the duration of the stop only upon ob-

taining reasonable suspicion as they saw it that some or all of the vehicle's occupants were unauthorized, they had been erroneously instructed that in doing so they could use race as one factor among others in forming that reasonable suspicion. *Montero-Camargo, 208 F.3d at 1135* (holding that Hispanic appearance, for example, is "of such little probative [*259] value that it may not be considered as a relevant factor where particularized or individualized suspicion is required"). Thus, to the extent that officers considered race as a necessary factor in forming the reasonable suspicion on which they prolonged the stop, they had insufficient basis for both the reasonable suspicion and the prolonged stop.

As a result of its enforcement of state law related to immigration and its LEAR policy, MCSO deputies continue to screen the occupants of vehicles they stop for immigration compliance despite the revocation of their 287(g) authority. In doing so, they are either prolonging a stop to investigate a civil violation of federal law which they have no authority to enforce, or, as demonstrated by their past activities, present a substantial likelihood that they will prolong the stop beyond the time reasonably necessary to resolve the traffic stop. The MCSO, in so operating and claiming a right to so operate, presents a likelihood that it will violate the *Fourth Amendment* rights of the Plaintiff class, and is thus prohibited from prolonging stops in the absence of reasonable suspicion, formed on a permissible basis, that a separate crime is or is about [*260] to be committed.

**D. The MCSO is enjoined from using reasonable suspicion of unauthorized presence, without more, as probable cause or reasonable suspicion that the Human Smuggling Act or Employer Sanctions Law has been violated sufficient to justify an investigatory detention or arrest.**

As is stated above, the MCSO has no probable cause to arrest or even hold a person that it only believes has committed a civil infraction of state or federal laws. [99] At trial, Sheriff Arpaio testified to two specific state statutes that he claims give the MCSO authority to continue to engage in ongoing enforcement operations--the Arizona Employers Sanction Law and the Arizona Human Smuggling Statute.

> 99   Of course, an MCSO officer can detain someone for purposes of issuing a civil traffic or other citation to the extent authorized to do so by state law.

The Arizona Employer Sanctions Law, *A.R.S. § 23-211* (2010) *et seq.*, explicitly authorizes the "county sheriff or any other local law enforcement agency to assist in investigating a complaint" filed pursuant to that law. *A.R.S. §§ 23-212, 23-212.01*. But the law contains only

civil, and not criminal, sanctions against employers. It imposes no criminal sanction [*261] against unauthorized aliens. The law thus provides no basis for the MCSO to criminally cite, arrest, or engage in investigatory detentions of persons whom it believes to be in the country without authorization based upon a reasonable suspicion that they have violated the Employer Sanctions Law or are conspiring with others to do so. As the Ninth Circuit has already noted, "possible criminality is key to any *Terry* investigatory stop or prolonged detention. . . . Absent suspicion that a 'suspect is engaged in, or is about to engage in, criminal activity,' law enforcement may not stop or detain an individual." *Ortega-Melendres II, 695 F.3d at 1000* (quoting *United States v. Sandoval, 390 F.3d 1077, 1080 (9th Cir. 2004)*. The Arizona Employer Sanctions Law, a non-criminal law, thus provides the MCSO with no basis to stop or detain any person that it believes to be in the country without authorization.

By contrast, the Arizona Human Smuggling Act provides criminal sanctions against those who smuggle unauthorized persons. The Act specifies that "[i]t is unlawful for a person to intentionally engage in the smuggling of human beings for profit or commercial purpose." *A.R.S. ß 13-2319*. As defined [*262] by the Act, "smuggling of human beings" means:

> [1] the transportation, procurement of transportation or use of property or real property

> [2] by a person or an entity that knows or has reason to know that the person or persons transported or to be transported are

>> [a] not United States citizens, permanent resident aliens or persons otherwise lawfully in this state or

>> [b] have attempted to enter, entered or remained in the United States in violation of law.

*A.R.S. ß 13-2319(F)(3)*.

There is nothing in the Act that criminalizes unauthorized presence. The Act criminalizes smuggling an unauthorized alien. Even to the extent that an unauthorized alien could be charged for committing the crime of conspiracy to violate the Arizona Human Smuggling Act with his or her smuggler, an MCSO officer could only

have reasonable suspicion sufficient to detain the unauthorized alien on conspiracy charges if he had reasonable suspicion under the "totality of the circumstances" that both the crime of human smuggling is being committed and the unauthorized alien *conspired* in its commission. *Montero-Camargo, 208 F.3d at 1129*.

Having reasonable suspicion that the Arizona state crime of human smuggling is being violated [*263] requires considerably more facts than merely having reasonable suspicion that a person is in the country without authorization. There must be, at the least, a reasonable suspicion under all of the circumstances of the conjunction of the elements necessary for the crime to be present. Aside from the other elements, an MCSO officer would have to have reasonable suspicion that the person who was transporting the unauthorized alien "knew or had reason to know that the [unauthorized alien was] not [a] United States Citizen[], permanent resident alien[], or person[] otherwise lawfully in this state." *A.R.S. ß 13-2319(F)(3)*.

One does not have reason to *know* that an alien is unauthorized merely because he or she is unauthorized. To offer an example from the facts of the present case, Deputy DiPietro set forth no legitimate basis on which he could have formed a reasonable suspicion that the driver of the vehicle in which Ortega-Melendres was a passenger knew or had reason to know that the persons he was transporting were not lawfully in this state. When Deputy DiPietro himself was asked how he came to the opinion that the day laborers were likely to be unauthorized, he testified that he did [*264] not form that belief until after participating in the operation during which he arrested Ortega-Melendres.

When a 287(g)-trained MCSO deputy participating in an HSU operation did not purport to have the experience to form a reasonable suspicion that day laborers in general were unauthorized aliens until *after* the operation in which he made the arrest that is subject to question, it is not clear how he could successfully attribute to the driver of the vehicle he stopped during the operation "reason to know" that day laborers were likely to be "unauthorized aliens." Even if he had this experience, the idea that day laborers are usually unauthorized aliens is unsupported by any statistics presented at trial, and, as discussed above, is typically compounded with an unconstitutional association between work status and race, at least within the MCSO. [100]

> [100]   A section of the Human Smuggling Act does state that "[n]otwithstanding any other law, in the enforcement of this section a peace officer may lawfully stop any person who is operating a motor vehicle if the officer has reasonable suspicion to believe the person is in violation of any

civil traffic law." *A.R.S. ß13-2319(E)*. This section [*265] of the statute does nothing more than to allow peace officers to stop drivers of motor vehicles who have committed traffic infractions. Nothing in the text of the statute allows a peace officer to prolong a traffic stop to investigate a potential violation of the Arizona Human Smuggling Act in the absence of reasonable suspicion that the Act is being violated. A reasonable suspicion that a person is in violation of a civil traffic law, does not, in and of itself, provide reasonable suspicion that a driver has violated the Act. Any interpretation of the statute to the contrary would create constitutional problems.

Further, the MCSO acknowledges that, at the time of his arrest, Ortega-Melendres was in possession of a visa that was validly issued and, on its face, authorized his presence on the day of his arrest. Thus, even assuming that he did not have his I-94 document in his possession and/or was otherwise "out-of-status" with the federal immigration requirements of his visa, the status violation was a violation of federal civil immigration regulations, and did not constitute a violation of the Arizona Human Smuggling Act. Pursuant to his existing and validly issued visa, Ortega-Melendres [*266] was lawfully in this state. To the extent that he was lawfully in this state, but out of compliance with federal immigration regulations, that is an issue presented by the federal immigration regulations, and not state law, and thus not within the jurisdiction of MCSO officers after the revocation of their 287(g) authority.

Additionally, the MCSO cannot use Ortega-Melendres's Hispanic origin as any basis for arguing that the driver of his vehicle had reason to know that he was in the country without authorization. If an MCSO officer cannot use Hispanic ancestry as a reason on which to base reasonable suspicion that a crime is being committed, then he or she cannot use it to establish that a human smuggler had reason to know that he was transporting an unauthorized alien. [101]

> 101 To the extent that the officers systematically only held and investigated the Hispanic persons being smuggled for conspiracy to commit human smuggling and released the alleged Caucasian smugglers, as they apparently did in the case of Ortega-Melendres and other day labor operations, that would present equal protection problems additional to those already discussed.

Thus, a reasonable suspicion that someone is in [*267] the country without authorization does not alone constitute sufficient reasonable suspicion to detain someone on the basis that the Arizona Human Smuggling Act is being violated. The preliminary injunction

entered by this Court on September 23, 2011 is made permanent. Further, suspected violations of the Arizona Employer Sanctions Law provides the MCSO with no basis to conduct investigatory detentions of persons that it believes to be in the country without authorization. The MCSO is thus enjoined from detaining persons on the belief that they are involved with a violation of, or have otherwise conspired to violate, the Arizona Employer Sanctions Law. The MCSO is further permanently enjoined from detaining persons based only on the belief that they are in the country without authorization, for the reasons set forth in this Court's order of December 23, 2011.

**CONCLUSION**

Injunctive relief in a class action must be properly tailored to the actual harm proven at trial. *See Lewis v. Casey, 518 U.S. 343, 358, 116 S. Ct. 2174, 135 L. Ed. 2d 606 (1996)* ("It is the role of courts to provide relief to claimants, in individual or class actions, who have suffered, or will immediately suffer, actual harm; it is not the role of courts, [*268] but that of the political branches, to shape the institutions of government in such fashion as to comply with the laws and Constitution."). Plaintiffs are entitled to injunctive relief necessary to remedy the *Fourth* and *Fourteenth Amendment* violations caused by MCSO's past and continuing operations. The MCSO is thus permanently enjoined from: (1) detaining, holding or arresting Latino occupants of vehicles in Maricopa County based on a reasonable belief, without more, that such persons are in the country without authorization, (2) following or enforcing its LEAR policy against any Latino occupant of a vehicle in Maricopa County; (3) using race or Latino ancestry as a factor in determining to stop any vehicle in Maricopa County with a Latino occupant; (4) using race or Latino ancestry as a factor in making law enforcement decisions with respect to whether any Latino occupant of a vehicle in Maricopa County may be in the country without authorization; (5) detaining Latino occupants of vehicles stopped for traffic violations for a period longer than reasonably necessary to resolve the traffic violation in the absence of reasonable suspicion that any of them have committed or are committing [*269] a violation of federal or state criminal law; (6) detaining, holding or arresting Latino occupants of a vehicle in Maricopa County for violations of the Arizona Human Smuggling Act without a reasonable basis for believing that, under all the circumstances, the necessary elements of the crime are present; (7) detaining, arresting or holding persons based on a reasonable suspicion that they are conspiring with their employer to violate the Arizona Employer Sanctions Act.

The permanent injunctive relief ordered above is immediately effective. But, as the Court previously dis-

cussed with the parties at the end of trial, it will confer with them before ordering any further relief that the evidence demonstrates to be necessary to effectuate this relief. In considering the necessity and extent of such additional relief, and in addition to the other matters discussed at length during this order, the Court has determined that the MCSO is aggressively responsive to the wishes of a significant portion of the Maricopa County electorate that desires vigorous law enforcement operations against unauthorized residents by state and local law enforcement authorities. The MCSO continues to engage in law  [*270] enforcement efforts against unauthorized aliens, and continues to aggressively assert its authority to do so. In doing so, the MCSO erroneously trained its patrol deputies that, despite the revocation of its 287(g) authority, the MCSO nevertheless had authority to enforce federal immigration law. It further violated and continues to violate the terms of this court's preliminary injunction entered on December 23, 2011 by enforcing its LEAR policy.

To the extent that the MCSO implemented faulty instruction from ICE through the racially-biased policies and practices governing its enforcement operations, its own implementation of those operations was also significantly flawed by its failure to observe normal standards of police conduct as defined by its own practices expert. Among other things the MCSO implemented a "zero tolerance" policy without meaningful effect to mollify those concerned about the racial disparity caused by MCSO operations, and thus failed to have a clear policy that required execution of the saturation patrols and other enforcement efforts in a race neutral manner; made no efforts to determine whether its officers were engaging in racially-biased enforcement during  [*271] its saturation patrols, and failed to comply with standard police practices concerning record-keeping maintained by other law enforcement authorities engaged in such operations.

The Court will entertain any proposals that are mutually acceptable to the parties in implementing steps to ensure compliance with its above orders, but in the absence of such proposals will proceed to enter such orders as are necessary to effectuate the above relief. In determining what authority may be necessary to provide such relief, the Court is particularly interested in the views of the parties concerning the following questions: (1) To what extent, if any, should any law enforcement operations of the MCSO that have the potential to involve members of the Plaintiff class be subject to the direct oversight and pre-approval? (2) To what extent, if any, should the MCSO be required to provide training to all of its personnel including posse members concerning the inappropriate use of race as an indicator of legal violations? (3) To what extent, if any, should the MCSO be required to provide training to all of its personnel con-

cerning the elements of the Arizona Human Smuggling Statute and the requirements  [*272] necessary to have reasonable suspicion that the statute is being violated? (4) To what extent, if any, does the MCSO still hold itself out to the general public as enforcing laws against illegal aliens or as currently engaged in immigration enforcement? (5) To what extent should the MCSO be required to keep publicly available records of all persons with whom it has law enforcement contact in vehicles so long as it is engaged in the enforcement of state laws that have immigration-related elements such as the state Human Smuggling Act? (6) To what extent should those records be required to contain the purpose of any law enforcement stops, the names of persons contacted, and the resulting length of the stop?

As further guidance for the proceeding, the Court asks the parties to consider the following stipulations of settlement in place in other jurisdictions:

1) *Daniels v. New York*, No. 99 Civ. 1695 (S.D.N.Y. Sept. 24, 2003), *available at* http://ccrjustice.org/files/Daniels_ StipulationOfSettlement_12_03_0.pdf

2) *United States v. Los Angeles*, No. 00-11769 GAF (C.D. Cal. June 15, 2001), *available at* http://www.lapdonline.org/assets/pdf/final_consent_decree.pdf

3) *United States v. State of New*  [*273] *Jersey*, Civil No. 99-5970 (D.N.J. Dec. 30, 1999), available at http://www.nj.gov/oag/jointapp.htm.

**IT IS THEREFORE ORDERED** that Plaintiffs are entitled to injunctive relief necessary to remedy the *Fourth* and *Fourteenth Amendment* violations caused by MCSO's past and continuing operations. The MCSO is thus permanently enjoined from:

1. Detaining, holding or arresting Latino occupants of vehicles in Maricopa County based on a reasonable belief, without more, that such persons are in the country without authorization.

2. Following or enforcing its LEAR policy against any Latino occupant of a vehicle in Maricopa County.

3. Using race or Latino ancestry as a factor in determining to stop any vehicle in Maricopa County with a Latino occupant.

4. Using race or Latino ancestry as a factor in making law enforcement decisions with respect to whether any Latino occupant of a vehicle in Maricopa County may be in the country without authorization.

5. Detaining Latino occupants of vehicles stopped for traffic violations for a period longer than reasonably necessary to resolve the traffic violation in the absence of

reasonable suspicion that any of them have committed or are committing a violation of federal [*274] or state criminal law.

6. Detaining, holding or arresting Latino occupants of a vehicle in Maricopa County for violations of the Arizona Human Smuggling Act without a reasonable basis for believing that, under all the circumstances, the necessary elements of the crime are present.

7. Detaining, arresting or holding persons based on a reasonable suspicion that they are conspiring with their employer to violate the Arizona Employer Sanctions Act.

**IT IS FURTHER ORDERED** setting a hearing at which the above matters will be discussed for **Friday, June 14, 2013 at 9:30 a.m.** in Courtroom 602, Sandra Day O'Connor U.S. Federal Courthouse, 401 W. Washington St., Phoenix, Arizona 85003-2151.

Dated this 24th day of May, 2013.

/s/ G. Murray Snow

G. Murray Snow

United States District Judge