UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **SYED FARHAJ HASSAN; THE COUNCIL OF IMAMS IN NEW JERSEY; MUSLIM STUDENTS ASSOCIATION OF THE U.S. AND CANADA, INC.; ALL BODY SHOP INSIDE & OUTSIDE; UNITY BEEF SAUSAGE COMPANY; MUSLIM FOUNDATION, INC.; MOIZ MOHAMMED; JANE DOE; SOOFIA TAHIR; ZAIMAH ABDUR-RAHIM; and ABDUL-HAKIM ABDULLAH,**<br><br>    Plaintiffs,<br><br>           v.<br><br>**THE CITY OF NEW YORK,**<br><br>    Defendant. | Civ. No. 2:12-3401 (WJM)<br><br>OPINION |

**WILLIAM J. MARTINI, U.S.D.J.:**

This case involves the New York City Police Department's surveillance of the Muslim community in New Jersey following the attacks of September 11, 2001. Plaintiffs are six Muslim individuals, two organizations that operate mosques, two Muslim-owned businesses, and the Muslim Students Association at Rutgers University. Plaintiffs allege that the New York City Police Department's surveillance program targeted Muslims solely on the basis of religion, thereby violating their First and Fourteenth Amendment rights. Defendant City of New York ("the City") filed a motion to dismiss for lack of standing under Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). Plaintiffs opposed. There was no oral argument. L.Civ.R. 78(b). For the reasons set forth below, Defendant's motion to dismiss is **GRANTED**.

## I. BACKGROUND

In early 2002, the New York City Police Department ("NYPD" or "the Department") began a secret spying program ("the Program") to infiltrate and monitor Muslim life in and around New York City. (Amended Complaint (hereinafter "Complaint") at ¶ 2) According to Plaintiffs, the Program involved the "painstaking" documentation of the details of Muslim life in New Jersey. (Complaint at ¶ 47d)

The Complaint alleges that the NYPD used a variety of surveillance techniques to infiltrate Muslim businesses and organizations. For example, Plaintiffs allege the NYPD conducted continuous video surveillance of mosques via cameras posted on light polls. (Complaint at ¶ 46) The NYPD photographed and videotaped mosque congregants and collected their license plate numbers. (Complaint at ¶ 4)

Undercover officers infiltrated Muslim organizations and monitored sermons, meetings, conversations, and religious practices. (Complaint at ¶ 46-47, 50-51) The undercover officers created many reports on their observations. These reports named specific individuals without any evidence of wrongdoing. (Complaint at ¶ 51)

In their reports, the NYPD allegedly labeled many organizations as "Locations of Concern." (Complaint at ¶ 58) The Complaint alleges that this label designated the subject organizations as demonstrating "a significant pattern of illegal activity." (*Id.*) The Complaint alleges that this label was false and stigmatizing because the reports contain no evidence of illegal activity. (*see id.*)

The NYPD did not publicize the existence of the Program. The Program became public knowledge in August 2011 when the Associated Press broke a story about it. (*See* Complaint at ¶ 61; Declaration of Peter G. Farrell ("Farrell Decl.") at ¶ 3) The Associated Press covertly obtained confidential NYPD documents and published unredacted versions of these documents, as well as articles interpreting the documents. (Farrell Decl. at ¶ 3; Moving Brief at 2-3, 4, 17-18) Upon the Associated Press's publication of the documents, City officials publicly commented that the surveillance Program was focused on "threats" and documenting the "likely whereabouts of terrorists."[1] (Complaint at ¶ 61)

---

[1] Following the Associated Press publication about the secret Program, the Attorney General of New Jersey conducted an investigation and concluded that that NYPD had not violated any New Jersey civil or criminal laws. (Farrell Decl. at ¶ 4)

2

Collectively, Plaintiffs allege that the surveillance Program caused a series of spiritual, stigmatic, and pecuniary losses. Plaintiffs report diminished religious expression, employment prospects, property values, and revenue following the Associated Press's publication of its story about the Program.

The organizational Plaintiffs allege that the Program impaired them from engaging members in open political and religious discussion and from fulfilling the spiritual needs of their members. (*See* Complaint at ¶ 15, 17, 23) The Plaintiffs that operate mosques report a drop in attendance. (Complaint at ¶ 14) They also report altering religious services and events to avoid being perceived as controversial. (Complaint at ¶ 23) Four of the individually-named Plaintiffs complain that they have avoided discussing religious and political topics, praying in public, or attending mosque service in order to avoid law enforcement scrutiny. (Complaint at ¶ 13, 26-30)

Plaintiffs Syed Hassan, Soofia Tahir, and Zaimah Abdur-Rahim fear that being the subjects of surveillance will interfere with their careers. Hassan is a U.S. Soldier and Tahir is expecting to begin a career in international social work. Both plaintiffs allege that career advancement will require background checks and security clearances. Both allege that their affiliations with organizations falsely labeled as "threats" will hinder their career advancement. (Complaint at ¶ 13, 29) Hassan also alleges that his career prospects will be harmed because his fellow soldiers and superiors will have diminished trust in him and treat him differently upon learning he was a regular congregant at a mosque that was the subject of surveillance. (Complaint at ¶ 13)

Abdur-Rahim is a teacher who has worked at two different Muslim girls' schools in Newark, one of which was run out of her own residence. (Complaint at ¶ 31-32) The NYPD conducted surveillance on both these schools. Abdur-Rahim alleges that as a result of working at two monitored schools, her future career prospects will be diminished. (Complaint at ¶ 32)

Abdur-Rahim and her husband, Plaintiff Abdul-Hakim Abdullah, are co-owners of the home in which one of the monitored schools was located. (Complaint at ¶ 32, 34) A police surveillance photograph of this school appears on the internet in connection with the NYPD's surveillance Program. (Complaint at ¶ 32) Abdur-Rahim and Abdullah both allege that the value of their home has been diminished because of its connection to the Program. (Complaint at ¶ 32, 34)

Plaintiffs All Body Shop Inside & Outside and Unity Beef Sausage Company are Muslim-owned businesses in Newark that were both subjects of the surveillance Program. (Complaint at ¶ 18-21) Both these Plaintiffs allege that business declined when it became publically known that the NYPD was monitoring them. (Complaint at ¶ 18, 20) Customers told the owner of Unity Beef Sausage Company that they felt uncomfortable going to the store knowing that the NYPD was monitoring them. (Complaint at ¶ 21) The Plaintiffs that operate mosques also complain of pecuniary losses in the form of decreasing financial support. (Complaint at ¶ 15)

The Complaint does not allege that the surveillance itself was illegal or unconstitutional. Rather, the Complaint alleges that the motivation for the surveillance was solely animus against Muslims, which, if true, could mean the City violated Plaintiffs' First and Fourteenth Amendment rights to be free from religious discrimination.

Plaintiffs seek expungement of the surveillance records, an injunction to end the targeting of Plaintiffs on the basis of religion, as well as compensatory, economic, and nominal damages. (Complaint at ¶ 73)

## II.   RULE 12(b)(1) MOTION TO DISMISS FOR LACK OF STANDING

The City argues that Plaintiffs' Complaint should be dismissed for lack of standing. A case should be dismissed under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction if the Plaintiff has no standing. *Ballentine v. United States*, 486 F.3d 806, 810 (3d Cir. 2007). Plaintiff bears the burden of demonstrating standing "with the manner and degree of evidence required at the successive stages of the litigation." *New Jersey Physicians, Inc. v. President of U.S.*, 653 F.3d 234, 239 (3d Cir. 2011) (*citing Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)). "Even at the motion to dismiss stage . . . '[i]t is a long-settled principle that standing cannot be inferred argumentatively from averments in the pleadings but rather must affirmatively appear in the record.'" *Id.* at 239 (*quoting FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990)).

Article III standing is "fundamental to the judiciary's proper role in our system of government." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006). "If a dispute is not a proper case or controversy, the courts have no business deciding it, or expounding the law in the course of doing so." *Id.* at 341.

The starting point for the analysis of Plaintiffs' standing is *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992). In order to establish the "constitutional minimum

4

of standing," a party must establish three elements. First, the plaintiff must have suffered an "injury in fact" – an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" Second, there must be a causal connection between the injury and the conduct complained of – the injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . the result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision." *Lujan*, 504 U.S. at 560-61 (internal citations omitted). Plaintiffs have not satisfied the first two prongs of the test.

### A. Injury in fact

Plaintiffs do not allege an injury in fact. In *Laird v. Tatum*, 408 U.S. 1 (1972), the Supreme Court considered allegations similar to those in this case and rejected them as a basis for Article III standing. In *Laird*, plaintiffs sought injunctive relief against the Army's surveillance of civilian political activity. The Army's information gathering system in *Laird* involved the attendance by Army intelligence agents at meetings that were open to the public, the preparation of field reports describing the meetings (containing the name of the sponsoring organization, the identity of the speakers, the number or persons present, and an indication of whether any disorder occurred), and the collecting of information from the news media. *Id.* at 6. This information was reported to Army Intelligence headquarters, disseminated from headquarters to major Army posts around the country, and stored in a computer data bank. *Id.* at 6-7.

The Supreme Court identified the issue before it as "whether the jurisdiction of a federal court may be invoked by a complainant who alleges that the exercise of his First Amendment rights is being chilled by the mere existence, without more, of a governmental investigative and data gathering activity that is alleged to be broader in scope than is reasonably necessary for the accomplishment of a valid governmental purpose." *Id*. at 10. Accordingly, the Court found that the plaintiffs lacked standing because "[a]llegations of a subjective chill are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm [.]" *Id*. at 13-14. The plaintiffs were not able to demonstrate that they were chilled by "any specific action of the Army against them." *Id*. at 3. Thus, the Court refused to grant the plaintiffs what they really sought through the litigation: "a broad-scale investigation, conducted by themselves as private parties armed with the

subpoena power of a federal district court and the power of cross examination, to probe into the Army's intelligence-gathering activities." *Id*. at l4.

The allegations in this Complaint mirror those in *Laird*. For this reason, the court finds that there was no injury-in-fact.

### B. Causation

Even if Plaintiffs had an injury in fact, they have not demonstrated the required causation element of standing. A party does not have standing when the injury-in-fact alleged is "manifestly the product of the independent action of a third party." *Duquesne Light Co. v. U.S. E.P.A.*, 166 F.3d 609, 613 (3d Cir. 1999). Defendant argues that the Associated Press and not the City is the manifest cause of Plaintiffs' alleged injuries. (Moving Brief at 17.) Plaintiffs argue that no existing case law holds the action of a newspaper reporting on a government program as an "independent action of a third party." (Plaintiffs' Brief at 36.) Defendant's argument is more persuasive.

None of the Plaintiffs' injuries arose until after the Associated Press released unredacted, confidential NYPD documents and articles expressing its own interpretation of those documents. Nowhere in the Complaint do Plaintiffs allege that they suffered harm prior to the unauthorized release of the documents by the Associated Press. This confirms that Plaintiffs' alleged injuries flow from the Associated Press's unauthorized disclosure of the documents. The harms are not "fairly traceable" to any act of surveillance. *See Lujan*, 504 U.S. at 560-61.

The court is also persuaded by a distinction between this case and *Philadelphia Yearly Meeting of Religious Soc. of Friends v. Tate*, 519 F.2d 1335, (3d Cir. 1975). Like this case, *Philadelphia Yearly* involved media coverage of a police surveillance program. The media coverage publicly disclosed the names of certain groups and individuals on whom the Philadelphia Police Department was keeping surveillance records. *Id.* at 1337. In *Philadelphia Yearly*, the court reiterated the Supreme Court's holding in *Laird* that the surveillance itself was legal and that the surveillance's mere existence did not cause a concrete injury to the Plaintiffs. *Id.* at 1337-38.

However, the government in *Philadelphia Yearly* openly cooperated with the press in the publicizing of the story. The Third Circuit found this cooperation with the media improper. *Id.* at 1338. The court stated:

6

> It is not apparent how making information concerning the lawful activities of plaintiffs available to non-police groups or individuals could be considered within the proper ambit of law enforcement activity, particularly since it is alleged that plaintiffs are subject to surveillance only because their political views deviate from those of the "establishment."

*Id.* at 1338 (3d Cir. 1975).

Thus, the *Philadelphia Yearly* court found the claim justiciable on the grounds that the police department had an "absence of a lawful purpose" in disclosing on nationwide television that "certain named persons or organizations are subjects of police intelligence files." By contrast, the City of New York did not make any information about the NYPD's Program available to non-police groups. The Associated Press covertly obtained the materials and published them without authorization. Thus the injury, if any existed, is not fairly traceable to the City.

Although the *Philadelphia Yearly* court did find that the plaintiffs had a justiciable claim, had *Philadelphia Yearly* been decided today, the court would have had to dismiss it for lack of standing. The court in *Philadelphia Yearly* recognized that the plaintiffs' alleged injuries were "not concrete." *Id.* at 1339. *Philadelphia Yearly* was decided well before *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992). In *Lujan*, the Supreme Court held that standing required a "concrete and particularized injury." *Lujan*, 504 U.S. at 560. Therefore, had *Philadelphia Yearly* reached the Third Circuit after *Lujan*, it would have been highly improbable that the plaintiffs would have had standing.

For these reasons, Plaintiffs have demonstrated neither the injury in fact element nor the causation elements of standing required to survive a Rule 12(b)(1) motion.

### III.  RULE 12(b)(6) MOTION TO DISMISS FOR FAILURE TO STATE A CALIM

Even if Plaintiffs did have standing to sue, Plaintiffs still have not plead facts sufficient to state a claim for discrimination in violation of the First or Fourteenth Amendments.

7

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a complaint, in whole or in part, if the plaintiff fails to state a claim upon which relief can be granted. The moving party bears the burden of showing that no claim has been stated. *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005). In deciding a motion to dismiss under Rule 12(b)(6), a court must take all allegations in the complaint as true and view them in the light most favorable to the plaintiff. *See Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts Inc.*, 140 F.3d 478, 483 (3d Cir. 1998) (*citing Warth v. Seldin*, 422 U.S. 490, 501 (1975)).

Although a complaint need not contain detailed factual allegations, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Thus, the factual allegations must be sufficient to raise a plaintiff's right to relief above a speculative level, such that it is "plausible on its face." *See id.* at 570; *see also Umland v. PLANCO Fin. Serv., Inc.*, 542 F.3d 59, 64 (3d Cir. 2008). A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*citing Twombly*, 550 U.S. at 556). While "[t]he plausibility standard is not akin to a 'probability requirement' . . . it asks for more than a sheer possibility." *Id.* at 678. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* at 662 (*quoting Twombly*, 550 U.S. at 557).

Where the claim is invidious discrimination based on religion, Plaintiffs must plead (and ultimately prove) that the Defendant acted with discriminatory purpose. *Ashcroft v. Iqbal*, 556 U.S. at 676 (*citing Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 540-41 (1993)); *Abdul-Akbar v. McKelvie*, 239 F.3d 307, 317 (3d Cir. 2001). "Purposeful discrimination requires more than 'intent as volition or intent as awareness of consequences. It involves a decisionmaker's undertaking a course of action 'because of, not merely in spite of, [the action's] adverse effects upon an identifiable group.'" *Iqbal*, 556 U.S. at 676-77 (*quoting Personnel Administrator of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)). It follows that, to state a claim based on a violation of a constitutional right, Plaintiffs must plead sufficient factual matter to show that the City adopted and implemented the surveillance program not for a neutral, investigative reason but for the purpose of discriminating on account of religion. *Iqbal*, 556 U.S. at 677, 682.

"[D]etermining whether a complaint states a plausible claim is context-specific, requiring the reviewing court to draw on its experience and common sense." *Iqbal*, 556 U.S. at 663-64 (*citing Twombly*, 550 U.S. at 556). *Ashcroft v. Iqbal* is particularly instructive here because of the similar context. Both *Iqbal* and this case grow out of the same tensions between security and the treatment of Muslims that is particular to the post-September 11 time period.

In *Iqbal*, the plaintiff alleged that he was detained as a "high interest" suspect and subjected to particularly harsh conditions of detention based upon his race, religion, or national origin. Although his allegations were consistent with a discriminatory purpose, there was a "more likely explanation" for his treatment as a "high interest" suspect. *Id.* at 681. As the U.S. Supreme Court stated in *Iqbal*:

> The September 11 attacks were perpetrated by 19 Arab Muslim hijackers who counted themselves members in good standing of al Qaeda, an Islamic fundamentalist group. Al Qaeda was headed by another Arab Muslim—Osama bin Laden—and composed in large part of his Arab Muslim disciples. It should come as no surprise that a legitimate policy directing law enforcement to arrest and detain individuals because of their suspected link to the attacks would produce a disparate, incidental impact on Arab Muslims, even though the purpose of the policy was to target neither Arabs nor Muslims. On the facts [alleged] the arrests . . . were likely lawful and justified by [a] nondiscriminatory intent to detain aliens who were illegally present in the United States and who had potential connections to those who committed terrorist acts. As between that "obvious alternative explanation" for the arrests, *Twombly,* 550 U.S. at 567, and the purposeful, invidious discrimination respondent asks us to infer, discrimination is not a plausible conclusion.

*Iqbal*, 556 U.S. at 682.

For similar reasons, the Plaintiffs in this case have not alleged facts from which it can be plausibly inferred that they were targeted solely because of their religion. The more likely explanation for the surveillance was a desire to locate budding terrorist conspiracies. The most obvious reason for so concluding is that surveillance of the Muslim community began just after the attacks of September 11, 2001. The police could not have monitored New Jersey for Muslim terrorist activities without monitoring the Muslim community itself. While this surveillance

9

Program may have had adverse effects upon the Muslim community after the Associated Press published its articles; the motive for the Program was not solely to discriminate against Muslims, but rather to find Muslim terrorists hiding among ordinary, law-abiding Muslims.

## IV. CONCLUSION

For the reasons stated above, Defendant's motion to dismiss is **GRANTED**. An appropriate order follows.

/s/ William J. Martini

_____
**WILLIAM J. MARTINI, U.S.D.J.**

**Date: February 20, 2014**